1  M. Cris Armenta (SBN 177403)
   THE ARMENTA LAW FIRM APC
2  11900 W. Olympic Boulevard, Suite 730
   Los Angeles, CA 90064
3  Tel: (310) 826-2826 x 108
   Facsimile: (310) 826-5456
4  Email: cris@crisarmenta.com

5  Credence E. Sol (SBN 219784)
   La Garenne
6  86300 Chauvigny
   France
7  Telephone: 06 74 90 22 08
   Email: credence.sol@sol-law.com
8
   Attorneys for Plaintiff
9  Cindy Lee Garcia

10          **UNITED STATES DISTRICT COURT**

11      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12  | CINDY LEE GARCIA, an individual, | Case No. CV12-8315 MWF (VBKx) |
    |---|---|

13  CINDY LEE GARCIA, an
    individual,

                   Plaintiff,

14  vs.

15
    NAKOULA BASSELEY
16  NAKOULA, an individual also
    known as SAM BACILE, MARK
17  BASSELEY YOUSSEF,
    ABANOB BASSELEY
18  NAKOULA, MATTHEW
    NEKOLA, AHMED HAMDY,
19  AMAL NADA, DANIEL K.
    CARESMAN, KRITBAG
20  DIFRAT, SOBHI BUSHRA,
    ROBERT BACILY, NICOLA
21  BACILY, THOMAS J. TANAS,
    ERWIN SALAMEH, YOUSSEFF
22  M. BASSELEY, and/or MALID
    AHLAWI; GOOGLE, INC., a
23  Delaware Corporation;
    YOUTUBE, LLC, a California
24  limited liability company, and
    DOES 1 through 10, inclusive.
25
                   Defendants.
26

Case No. CV12-8315 MWF (VBKx)

**(1) *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT;**

**(2) DECLARATIONS OF CINDY LEE GARCIA, DAN SUTTER, GAYLORD FLYNN, KHALED ABOU EL FADL; ZACARAH LEVINE; DAVE HARDY, AND M. CRIS ARMENTA;**

**(3) REQUEST FOR JUDICIAL NOTICE;**

**(4) [PROPOSED] ORDER (lodged separately)**

27

28

PLEASE TAKE NOTICE that Plaintiff Cindy Lee Garcia brings this Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause Re Issuance of Preliminary Injunction, and an Order of Impoundment.  This Application is based on the papers and pleadings in this action, the matters of which this Court may take judicial notice, the declarations submitted in support.

This Application follows a conference pursuant to Local Rule 11-6 between counsel for Plaintiff and counsel for Defendants YouTube and Google.  Although Plaintiff has communicated with Defendant Nakoula's criminal defense attorney and advised of this Application and its contends, that attorney does not formally represent Defendant Nakoula in this civil matter.  Defendant Nakoula is currently detained at the Bureau of Prisons' Los Angeles Metropolitan  Detention Center and these papers are being served, along with the Summons and First Amended Complaint, through the procedures set forth by the Bureau of Prisons in conjunction with the Los Angeles County Sheriffs Department.

Dated: October 17, 2012                    THE ARMENTA LAW FIRM, A.P.C.

By: _____
M. Cris Armenta
Attorneys for Cindy Lee Garcia

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS… ................................................................ .i

TABLE OF AUTHORITIES ............................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ....................... 1

I.     STATEMENT OF THE ISSUES ............................................... 1

II.    PRELIMINARY STATEMENT ................................................ 1

III.   STATEMENT OF FACTS IN SUPPORT OF THE APPLICATION ......... 5

      A.     Plaintiff Agreed to Provide a Dramatic Performance But Did Not Agree to Relinquish her Copyright in that Performance .............. 5

      B.     Nakoula Used Plaintiff As a "Puppet" for His Racist Views, and YouTube Published a Doctored Version of Her Performance ......... 6

      C.     After Defendants Published an Arabic Translation of the Film, It Went Viral and Provoked a Wave of Global Violence And a *Fatwa* on Plaintiff's Head, to Which Defendants Are Completely Indifferent…................................................ 7

      D.     Defendant Nakoula Admitted That He Procured Plaintiff's Dramatic Performance Through Fraud and Deception…................................................................ 8

      E.     In Addition to Becoming the Target of a *Fatwa,* Ms. Garcia Has Received Numerous Death Threats, ............................... 9

      F.     Plantiff Has Begged YouTube and Google to Save Her Life and Take Down the Film, But they Prefer to Continue to Profit From The Millions of Pageviews That the Film Attracts ..................... 11

      G.     YouTube and Google Have Specific Knowledge of the Infringing Material and Are in Receipt of Direct Financial Benefits Attributed to the Rampant Infringement ............................... 12

      H.     The Only "Defense" That Defendants Have Offered So Far is Their Deliberately Incorrect Assumption That Plaintiff Garcia's Copyrighted Performance is a "Joint Work." .......................... 13

IV.   STANDARD FOR ISSUANCE OF RESTRAINING ORDER AND ORDER TO SHOWCAUSE RE PRELIMINARY INJUNCTION IN COPYRIGHT CASES .......................................................... 14

V.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ................... 14

      A.     Plaintiff Clearly Owns the Rights to Her Dramatic Performance ...... 14

      B.     Plaintiff Never Assigned Her Copyright Interests ...................... 16

i

C.  Defendant Nakoula and Plaintiff Garcia Never Agreed, in Writing Or Otherwise, to Create a "Joint Work of Authorship," as Google And YouTube Apparently Claim ........................................................ 17

D.  YouTube has Stepped Far Outside the DMCA's Safe Harbor Harbor Provision, Subjecting it To Liability for Copyright Infringement ................................................................................. 19

E.  Even if Defendant Nakoula Had a Joint Copyright Interest with Plaintiff Garcia, All of the Third Parties Who Have Copied and Re-Posted the Film on YouTube Have No Right to Copy and Re-Post the Film, and Are Infringing on Plaintiff Garcia's Copyright .... 20

VI.  PLAINTIFF GARCIA WILL SUFFER IRREPARABLE HARM IF THE TRO AND INJUNCTION ARE NOT GRANTED ........................... 21

VII.  THE BALANCE OF EQUITIES IN PLAINTIFF GARCIA'S FAVOR .. 22

VIII.  AN INJUNCTION IS DECIDEDLY IN THE PUBLIC INTEREST ........ 23

IX.  THE RELIEF REQUESTED ................................................................. 24

X.  CONCLUSION ..................................................................................... 25

ii

1

## TABLE OF AUTHORITIES

2

3 Federal Statutes

4 17 U.S.C. § 101 ………………………………………………………18

5 17 U.S.C. § 102(a)……………………………………………………14

6 17 U.S.C. § 107…………………………………………………….......19

7 17 U.S.C. § 201 (b) …………………………………………………16

8 17 U.S.C. § 204 (a)………………………………………………...16

9 17 U.S.C. § 411(a)……………………………………………………1

10 17 U.S.C. § 502(a)……………………………………………………14

11 17 U.S.C. § 512(c)(1)(a). …………………………………………14

12 18 U.S.C. § 2……………………………………………………….24

13

14

15 Cases

16 A&M Records v Napster, Inc.,
239 F3d 1004 (9th Cir, 2001); ...................................................... 19
17

18 Aalmuhammed v. Lee,
202 F.2d 1227, 1233-1234 (9th Cir. 2000) ................................ 18
19

American Geophysical Union v. Texaco, Inc.,
20 60 F.3d 913, 922 (2d Cir. 1994) ..................................................... 19

21 Beardslee v. Woodford,
395 F.3d 1064, 1067 (9th Cir. 2005) .................................... 14,23
22

Brown v. Twentieth Century Fox Film Corp.,
23 799 F. Supp. 166 (D.D.C. 1992) .................................. 16

24 Caribbean Marine Services Co.., Inc. v. Baldridge,
844 F.2d 668, 674 (9th Cir. 1988)............................................... 21
25

Childress v. Taylor,
26 945 F.2d 500 (2nd Cir. 1991) ....................................................... 19

27 Columbia Pictures, Inc. v. Bunnell,
245 F.R.D. 443 (C.D. Cal. 2007) .................................................. 23

28 Cosmetic Ideas, Inc. v. IAC/Interactive Corp., et al,
606 F.3d 612 (9th Cir. 2010) ........................................................ 1

iii

Easter Seal Society v. Playboy Enters.,
815 F. 2d 323, 329 (5th Cir. 1987) ................................................ 17

Effects Associates, Inc. v. Cohen, et al.,
908 F.2d 555 (9th Cir. 1990), ...................................................... 17

Ellison v. Robertson,
357 F.3d 1072, 1076 (9th Cir. 2004). .......................................... 19

Export Establishment etc. v. Columbia Broadcasting Service,
Inc.,
503 F. Supp. 1137, 1147 (S.D.N.Y. 1980)............................... 19

Fleet v. CBS, Inc.,
50 Cal. App. 4th 1911, 1919-1920 (1996) ................................ 14

Granny Goose Foods, Inc. v. Brotherhood of Teamsters
& Auto Truck Drivers,
415 U.S. 423, 429, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). ..... 21

Harper & Row Publishers, Inc. v. Nation Enters.,
471 U.S. 539, 564-65, 105 S.Ct. 2218, 85 L.Ed.2d
588 (1985) ............................................................................ 19,23

Harris v. Board of Supervisors,
366 F.3d 754, 766 (9th Cir. 2004) ............................................ 21

Jules Jordan Video v. 144942 Canada,
617 F.3d 1146 (9th Cir. 2010), .................................................. 15

Law v. Miller,
2011 U.S. Dist. LEXIS 102527 (E.D. Cal. 2011) ................... 23

Laws v. Sony Music Entm't, Inc.,
448 F.3d 1134, 1137 (9th Cir. 2006), ........................................ 15

Lenz v. Universal Music Corp.,
572 F. Supp. 2d 1150 (N.D. Cal. 2008). .................................. 19

Los Angeles News Service v. Tullo,
973 F. 2d 791, 798 (9th Cir. 1992) ............................................ 19

Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,
571 F.3d 873, 877 (9th Cir. 2009) ............................................ 14

Muller v. Walt Disney Productions,
871 F. Supp. 678 (S.D.N.Y. 1994) ............................................ 16

National Meat Ass'n v. Brown,
599 F.3d 1093, 1097 (9th Cir. 2010)................................... 14,23

Oddo v. Ries,
743 F. 2d 630 (9th Cir 1984) ................................................... 17

iv

Oster v. Lightbourne,
2011 U.S. Dist. LEXIS 138191 (N.D. Cal. 2011) ................... 22

Reinsdorf v. Skechers, U.S.A.,
2011 U.S. Dist. LEXIS 28293, at *9
(C.D. Cal. Mar. 9, 2011) ........................................................ 19

Rooney v. Columbia Pictures, Inc.,
538 F. Supp. 211 (S.D.N.Y. 1982) ........................................ 16

Schenck v. United States,
249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) ................ 23

Siegel v. Time Warner, Inc.,
496 F. Supp. 2d 1111, 1148 (C.D. Cal. 2007). ........................ 19

Sierra Forest Legacy v. Rey,
577 F.3d 1015, 1021 (9th Cir. 2009). ...................................... 14

TMTV Corp. v Pegasus Broad. of San Juan,
490 F Supp. 2d 228 (D.C. Puerto Rico 2007) ........................ 15

Universal City Studios, Inc. v. Corley,
273 F.2d 429, 440 (2d Cir. 2001), ............................................ 19

Viacom, et al. v. YouTube, et al,
(2nd Cir, Apr. 5, 2012), ............................................................ 20

Winter v. Natural Res. Def. Council, Inc.,
129 S.Ct. 365, 374, 376 (2008) ..................................... 14,21,23

World Church of God v. Philadelphia Church of God,
227 F.3d 1110, 1118 (9th Cir. 2000) ........................................ 19

Yue v. Conseco,
CV 11-9506 AHM, 2012 U.S. Dist. LEXIS 46565, 40-41
(C.D. Cal. Apr. 2, 2012) ............................................................ 21

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

**I.    STATEMENT OF THE ISSUES**

3

4        Plaintiff Cindy Lee Garcia gave a dramatic performance (the "Copyrighted

5   Performance") in a production Defendant Nakoula B. Nakoula misrepresented as a

6   fictional "adventure" titled *Desert Warrior*.  In post-production, Defendant Nakoula

dubbed Plaintiff's lines to give the false impression that she had agreed to play a

7   role in which she accused historical religious figure Mohammed of being a child

8   molester.  Defendant Nakoula then published the Copyrighted Performance on

9   YouTube a 13:51 minute "trailer" ("Film") titled *Innocence of Muslims*.  Plaintiff is

10  now the subject of a *fatwa* and has received gruesome, credible death threats.

11  Despite begging Defendant YouTube and its parent company, Defendant Google, to

12  remove the Film on the grounds of copyright infringement, they refuse.

13       The principal issue presented by this Application is whether Defendants'

14  actual and contributory infringement of the Copyrighted Performance,[1] which any

15  reasonable person would know would endanger her life, warrants the issuance of a

16  temporary restraining order and an order to show cause why a preliminary

17  injunction should not issue requiring the Defendants to cease and desist their

18  infringing activities and unauthorized worldwide broadcasts of the Copyrighted

19  Performance.  A related issue is whether Ms. Garcia is entitled to an impounding

20  order.

21  **II.   PRELIMINARY STATEMENT**

22       In July of 2011, Plaintiff delivered the Copyrighted Performance for a film

23  that Defendant Nakoula, the film's producer, told her was an "adventure" titled

24

---

25       [1]      Plaintiff has filed a federal copyright application, entitling her to bring
    suit.  Plaintiff Garcia filed an application to register her work with the United States
26  Copyright Office. (Garcia Decl. ¶ 18, Ex. C.)   Plaintiff thus is entitled to bring suit.
    17 U.S.C. § 411(a); see also Cosmetic Ideas, Inc. v. IAC/Interactive Corp., et al, 606
27  F.3d 612 (9th Cir. 2010) (application satisfies pre-suit registration requirement).

28

1

1  *Desert Warrior*.  Plaintiff Garcia *never* assigned the rights to the Copyrighted

2  Performance to *anyone*.  Nor did Plaintiff Garcia sign a work-for-hire agreement.

3  She was not an employee of anyone associated with *Desert Warrior*.

4      On July 2, 2012, Nakoula and/or his agents[2] posted the Film (*i.e.*, the

5  doctored, dubbed version retitled *Innocence of Muslims*) to YouTube in English.  In

6  early September, Arabic versions were released around the world and in primarily

7  Muslim countries, and went "viral" on September 11, 2012.  Rather than portraying

8  an innocuous historical adventure set in the desert – the video in which Defendant

9  Nakoula told Plaintiff Garcia she was appearing – the Film was instead a crude,

10  hateful work of propaganda.  The Film portrays the Muslim religious figure

11  Mohammed as a sexual deviant.  Specifically, Defendant Nakoula and/or his agents

12  dubbed over Plaintiff's voice, suggesting she called Mohammed a "child molester."

13      After YouTube broadcast the Arabic-language version of the Film, ferocious

14  violence broke out around the world.  The outrage has not been confined to Muslim

15  societies; even U.S. Secretary of State Hillary Rodham Clinton has condemned the

16  Film.  Many believe the Film provoked the September 11, 2012, attack on the U.S.

17  Consulate in Benghazi, Libya, in which four Americans, including Ambassador

18  Christopher Stevens, were savagely murdered.  Whether or not the Film provoked

19  the violence in Benghazi, it is now universally acknowledged that the Film has

20  provoked violence and unrest worldwide.

21      Following Defendants' global dissemination of the Film, Plaintiff became the

22  subject of a *fatwa* issued by an Egyptian cleric, which states in relevant part:

23      ***I issue a fatwa and call on the Muslim youth in America and Europe***

24      ***to do this duty, which is to kill the director, the producer and the***
    ***actors and everyone who helped and promoted the film.***

25  

---

26  [2]    Defendant Nakoula posted the Film under the name Sam Bacile, one of his

27  many aliases. At the time he posted the Film, Nakoula was restricted from using a
computer or the Internet pursuant to the terms of his federal criminal probation
following a fraud conviction, and was required to use his true name. (See RJN at ¶

28  & Ex. B.)

CV 12 8315 (VBKx)

1  (See Abou El Fadl Decl. ¶ 14.)  Even though Plaintiff Garcia immediately spoke to

2  condemn the Film's hateful message (reporters called her relentlessly and camped

3  outside her home), she continues to receive death threats.  (See Garcia Decl. Ex. B.)

4  She changed her life substantially to protect herself and her family.  What did

5  Plaintiff do to deserve this?  Nothing.  In addition to taking drastic security

6  measures, Plaintiff Garcia requested that YouTube and Google remove or disable

7  the Film pursuant to the Digital Millennium Copyright Act ("DMCA").  Plaintiff

8  has begged Defendants to assist her in her efforts to protect her safety by taking

9  down the Film.  They refuse.

10      Not once has Defendant Nakoula disputed that Plaintiff retained the rights to

11  her Copyrighted Performance.  Under the DMCA, Defendants Google and

12  YouTube's decision to arrogate to themselves the right to adjudicate Plaintiff

13  Garcia's copyright claim eviscerates their "safe harbor" protections for online

14  service providers that act "expeditiously" to "remove" or "disable" content upon

15  notice of a copyright claim, making them just as legally responsible as Defendant

16  Nakoula for violating Plaintiff Garcia's copyright interests.  The "safe harbor"

17  provisions of the DMCA provide that Defendant YouTube must notify the poster

18  that the content has been removed pursuant to a DMCA takedown notice and

19  provide the poster the opportunity to contest the takedown in writing.  If the poster

20  does so, YouTube must then notify the complaining copyright holder of that fact.  If

21  the copyright owner does not bring a lawsuit in district court within 14 days,

22  YouTube then must restore the material.

23      Rather than comply with the DMCA and protect their own economic, legal,

24  and moral interests, Defendants Google and YouTube instead refused Plaintiff's

25  takedown requests based on an incorrect assumption that Plaintiff has no copyright

26  interest.  On October 5, 2012, Google and YouTube's lawyers finally revealed their

27  legal reasoning -- according to them, Plaintiff had a meeting of the minds with

28

3

1   Defendant Nakoula, at the time she agreed to act in *Desert Warrior* that the finished

2   project would be a "joint work."  Defendants are wrong.  As early as September 12,

3   2012, and in any event no later than September 20, 2012, when they were served

4   with a lawsuit in California state court, Defendants have been aware that *Defendant*

5   *Nakoula himself has admitted that he tricked Plaintiff into appearing in his hate*

6   *film.*[3]  Thus, Plaintiff and Defendant Nakoula never shared any joint intent to create

7   *Innocence of Muslims* as a joint work; Plaintiff's Copyrighted Performance thus

8   remains her own.  The touchstone for establishment of a joint work is a mutual

9   intent that both creators share in the *completed* work or its derivatives.  Because

10  Defendant Nakoula always harbored a secret intent to treat the work as though he

11  was the sole owner, and to exploit the work in a manner contrary to any and all of

12  Plaintiff's intentions, much less any intentions that the two shared (which, it turns

13  out, were none), there exists no "joint work," and Plaintiff retains the rights to her

14  Copyrighted Performance.  Plaintiff thus is entitled to sue Defendants for copyright

15  infringement under the United States Copyright Act.

16       Moreover, irrespective of whether Defendant Nakoula has a joint copyright

17  with Plaintiff Garcia, there are hundreds of third parties who have copied and

18  reposted the Film on YouTube, *who have no color of a legal right* to copy and re-

19  post the Film, and who clearly are infringing on Plaintiff Garcia's copyright.

20  Defendant Nakoula's posting of the Film on YouTube is only one of the hundreds of

21  infringing webpages (URLs) illegally displaying the Film on YouTube (and

22

23  ───────────────

[3]   In a telling and shameful attempt to "blame the victim," YouTube and Google

24  have taken the position that the death threats and global fatwa against Plaintiff are
    *her* fault.  (Armenta Decl. ¶ 3.)  They are wrong.  It was *the media*, not Plaintiff, that

25  originally revealed Ms. Garcia's identity to the public, and the reason that Ms.
    Garcia spoke publicly was to clear her name.  Indeed, Ms. Garcia strongly believes

26  that it is her strong public stand against the Film's message of hatred that is keeping
    her alive at this point, along with the outpouring of support she has received from

27  moderates in the Muslim community who have lauded not only her efforts to
    remove the Film, but her courage as well.  (Abou El Fadl Decl. ¶ 23; Garcia Decl. ¶

28  14.)

                                        4

representing tens of millions of views) that Plaintiff Garcia has identified in her eight compliant DMCA takedown notices to Defendants YouTube and Google, which Defendants YouTube and Google have refused to remove or disable, and which continue to be viewed, recopied, and reposted widely.

## III.   STATEMENT OF FACTS IN SUPPORT OF THE APPLICATION

### A.   Plaintiff Agreed to Provide a Dramatic Performance, But Did Not Agree to Relinquish Her Copyright In That Performance.

Plaintiff is an ordained Christian minister. (Declaration of Cindy Lee Garcia ("Garcia Decl.") ¶ 3.)   She began acting to supplement her income after her husband became disabled. (Id. ¶ 3.) As a minister, Ms. Garcia preaches tolerance and respect for all religions. (Id. ¶ 4.) The depiction of Plaintiff Garcia as a person who would participate in a hateful production that blasphemes any religion is profoundly devastating to her. (Id. ¶ 4.)

In July of 2011, Plaintiff responded to a casting notice for a film with a working title of *Desert Warrior*. (Garcia Decl. ¶ 5.) Plaintiff was cast in a supporting role, in which, according to the film's producer, Defendant Nakoula, she was to play the mother of a young woman who had been promised in marriage to the movie's protagonist, "Master George." (Id.)   After Plaintiff was cast, Defendant Nakoula gave her "call sheets" that indicated the days she was to be on set, and outlined the scenes that would be filmed. (Id. ¶ 6.) Additionally, Defendant Nakoula and/or his agents provided Plaintiff with "script sheets" for those scenes in which her character was to appear. (Id.) None of those sheets contained content or language that Plaintiff perceived to be religiously offensive. (Id.) Moreover, none of the script sheets referred to a character named "Mohammed." (Id.)

Plaintiff never signed a release of any kind to her rights to her dramatic performance, nor a work-for-hire agreement. (Garcia Decl. ¶ 8.) Additionally, she was never an employee of Nakoula or any production company associated with

5

1   *Desert Warrior*, nor was she an agent of Nakoula or anyone else. (Garcia Decl. ¶ 5.)

2   Plaintiff's position in this regard is entirely consistent with the recollections of other

3   actors who appeared in the production:  none of them apparently signed releases, nor

4   did they sign work-for-hire agreements.  (Declaration of Dan Sutter ¶ 4; Declaration

5   of Gaylord Flynn ¶ 1 Declaration ¶ 4.)

6   　　　Both prior to accepting the role and while on set, Plaintiff specifically asked

7   Defendant Nakoula (who was using the alias "Sam Bacile") about the film's

8   content.  (Garcia Decl. ¶ 10.)  Defendant Nakoula consistently responded that the

9   film was titled *Desert Warrior*, and that it was an "adventure" story set in the

10   Arabian Desert 2,000 years ago. (Id.)  Significantly, *at no time during her presence*

11   *on the set did Plaintiff hear any mention of Islam.* (Id.)

12   　　　It is apparent now that Defendant Nakoula planned all along, contrary to his

13   stated intention to Plaintiff Garcia, never to create a film called *Desert Warrior*.

14   Instead, as he later admitted to Plaintiff Garcia, his true intention from the beginning

15   was to use her (copyrighted) performance to create a hate film.  (Garcia Decl. ¶ 13.)

16   **B.**　　**Nakoula Used Plaintiff As a "Puppet" For His Racist Views, and**
**YouTube Published a Doctored Version of Her Performance.**

17

18   　　　In March of 2012, Defendant Nakoula requested that Plaintiff participate in a

19   post-production session. (Garcia Decl. ¶ 11.)  Plaintiff only restated lines she had

20   stated previously. (Id. )  Sometime after July 2, 2012, Plaintiff telephoned Nakoula

21   to ask whether the film was ready to be screened. (Id. ¶ 12.)  Defendant Nakoula

22   then revealed that he had posted a trailer on YouTube.  (Id. ¶ 12.)

23   　　　When Plaintiff accessed the trailer (*i.e.,* the "Film") on YouTube she made

24   the horrifying discovery that Defendant Nakoula had dubbed bigoted dialogue over

25   her lines, and used her Copyrighted Performance in a manner that was *entirely*

26   inconsistent with the production in which Defendant Nakoula had told Ms. Garcia

27   she was participating. (Garcia Decl. ¶ 12.)  Defendant Nakoula literally turned her

28

6

1   into a walking, talking "puppet" for his opinion that Islam founder Mohammed was

2   a "child molester." (Id. )  That was also when Plaintiff learned that the Film had

3   been retitled toe *Innocence of Muslims.*  (Id.)

4       The words Plaintiff Garcia actually delivered for "Desert Warrior" were:

5         ***"Is George crazy?  Our daughter is but a child?"***

6   (Garcia Decl. ¶ 12.)  In *Innocence of Muslims*, Defendant Nakoula retained her

7   visual performance but dubbed in the words:

8         ***"Is your Mohammed a child molester?"***

9   (See Garcia Decl. ¶ 12, and Ex. B to Declaration of Dave Hardy ("Hardy Decl.")

10   (YouTube video, The Innocence of Muslims, posted by "Sam Bacile").)  Plaintiff

11   Garcia has never uttered those words *ever*, let alone on the set of *Desert Warrior*.

12   (Garcia Decl. ¶ 12.)

13      **C.**    **After Defendants Published an Arabic Version of the Film, It**
14              **Went Viral and Provoked a Wave of Global Violence and a *Fatwa***
15              **on Plaintiff's Head, to which Defendants Are Completely**
                **Indifferent.**

16       On September 11, 2012, the U.S. Consulate in Benghazi, Libya, was

17   attacked, resulting in the deaths of four Americans, including Ambassador

18   Christopher Stevens.  (Abou El Fadl Decl. ¶ 10.)  Violence has continued to erupt

19   across the world.  (Id. ¶ 11.)  Many experts in geopolitical affairs have attributed

20   this violence directly to the Film. (Id. Decl. ¶ 9-15.)   News reports indicate that

21   many people worldwide have died in the violence that the film has sparked.  (Id.

22   Ex. D.)  Whether the Film is or is not the cause of the violence, the violence in fact

23   occurred, with many at the time attributing it to the anti-Muslim sentiment in the

24   Film.  (Id. ¶ 15.)

25

26

27

28

7

On September 19, 2012, Egyptian cleric Ahmad Fouad Ashoush issued a "fatwa"[4] directed at Plaintiff and every other person involved in the production of *Desert Warrior/The Innocence of Muslims*:

> *I issue a fatwa and call on the Muslim youth in America and Europe to do this duty, which is to kill the director, the producer and the actors and everyone who helped and promoted the film.*

(Abou El Fadl ¶ 14.)

Google Chairman Eric Schmidt's response to the fatwa astounds.  He said: "We believe the answer to bad speech is more speech … It'll stay up."  (Armenta Decl. ¶ 9 & Ex. C.)  Plaintiff, however, has no desire to become a martyr for Nakoula and Schmidt's "cause" of attacking Islam while pretending that YouTube and Google are neutral defenders of free speech.  Nor has she any interest in helping Defendants to profit from the 30 million-plus "views," and associated ad revenues, from exhibiting the Film.[5]

### D.   Defendant Nakoula Admitted That He Procured Plaintiff's Dramatic Performance Through Fraud and Deception.

Immediately after seeing the news about the attacks in Libya and realizing that the grotesque manipulation of her performance was related to the violence around the world, Plaintiff Garcia asked Nakoula why he "did this?" (Garcia Decl. ¶ 13.)  He replied, "You are not responsible.  Tell the world that you are innocent.  I did this… I did it because I am tired of the radical Muslims killing innocent people." (Id. ¶ 10.)  In essence, Defendant Nakoula admitted that it was *always* his secret

---

[4]    Under Islamic law, a *fatwa* is a unbinding opinion, which may have significant importance to the followers of that particular Iman.  Of greater concern, however, are the undisclosed, secret intentions of others. (Abou El Fadl Decl. ¶ 17).

[5]    As proof that YouTube relies on "views" to generate revenue and enhance its business model, behold the words of YouTube co-founder Chad Hurley: "[W]e need views [but] I'm a little concerned with the recent Supreme Court ruling on copyrighted material …we're hosting copyrighted content," which statements he made prior to Google's $1.8 billion purchase of YouTube. (Armenta Decl. ¶ 10 & Ex. C .)

8

1   intention to manipulate the footage so that Plaintiff would appear to have

2   participated in creating a hate film.  (Id.)  In that conversation, Defendant Nakoula,

3   and by telling Plaintiff she was "innocent" and "not responsible," – he basically

4   affirmed that the work was not a joint one.  (See Garcia ¶ 13.)

### E.   In Addition to Becoming the Target of a *Fatwa*, Ms. Garcia Has Received Numerous Death Threats.

7          Immediately after the Film "went viral" on YouTube, Plaintiff began to

8   receive calls from the media, all of whom apparently were already somehow aware

9   that she had appeared in the Film.  (Garcia Decl. ¶ 14.)  Media camped outside her

10   home.  (Id. ¶ 14.)  Plaintiff Garcia learned about the *fatwa* and began to receive

11   credible and gruesome threats. (Id. ¶ 14.)  In order to clear her name, ensure that the

12   world was aware that she was duped into performing in the Film, and that she never

13   uttered the words attributed to her, she spoke out publicly that she does not condone

14   the Film, its content and its message, and that her performance was grotesquely

15   mutilated.  (Id. ¶ 14.)  Hoping that the justice system would show more concern for

16   her continued survival than had the Defendants, Plaintiff took legal action in state

17   court to attempt to have the Film removed from YouTube.  (Id. ¶¶ 14, 15.)

18          While in Los Angeles Superior Court on September 20, 2012, for a hearing on

19   her state-law claims against Defendants,[6] Plaintiff and her counsel were directed by

20   law enforcement to park in a secure location; seven armed Los Angeles County

21   Deputy Sheriffs accompanied them in the courthouse. (Id. ¶ 15; Armenta Decl. ¶ 2.)

22   Her attorney was approached by the head of security for the Los Angeles Superior

23   Court, who expressed concern for Plaintiff, Ms. Armenta, and both of their families;

24   he advised that those threatening Plaintiff "are very patient," and that everybody

25   connected with this case was in danger.  (Id.; Garcia Decl. ¶ 15.)  Both were advised

26

27   [6]   After recognizing that her federal copyright interests preempted some of her
state law claims and that, therefore, this Court holds exclusive jurisdiction, Plaintiff
28   dismissed her state law action without prejudice.

9

1    to take serious security measures entering and exiting the L.A. Superior Court at any

2    time in the future, and with their families and homes. (Garcia Decl. ¶ 15; Armenta

3    Decl. ¶ 2.)

4         While in New York during the last week of September 2012, Plaintiff and

5    counsel were accompanied by retired police officers and other security officers.

6    (Garcia Decl. ¶ 16.)  When they departed New York, the Port Authority Police

7    would not permit Plaintiff to even enter the La Guardia International Airport

8    terminal; Plaintiff was taken directly to her airplane on the tarmac in a squad car, for

9    fear that she would become an "instant target" in the terminal. (Id.)[7]  Plaintiff moved

10   her home, and also moved the location of her church.  (Id. ¶ 17.)  The numerous

11   death threats have been reported to the authorities.  (Id.)  They include, but are not

12   limited to, the following:

13        "I am ready to die for MUHAMMAD (PBUH) and I would Like to
          Kill all Those Who contributed in the Shape of Acting or Financially
14        or any other Kind of Support in Shameless Movie."

15        "And If You Wanna to save your life and we consider your innocent
          then Just Kill Sam and Terry Jones."
16
          "Dear the end is near."
17
          "It's all a big joke.  She will be Killed by someone who loves and
18        cares our Prophet Muhammad peace be upon him"

19        "She will know what she did now she is saying sorry about that"

20   (Id. ¶ 17 & Ex. B.)(Grammatical errors in original.)  She also received a gruesome

21   set of threats related to raping her daughter.  (Id.)  According to noted international

22   expert and UCLA Professor Abou El Fadl, it is the threats that are not made that are

23   the most dangerous.  (Abou El Fadl ¶ 17.)  Plaintiff's life changed forever in

24   material ways by the continued posting of the Film.  (Id. ¶ 16.)  It is only her public

25   efforts to clear her name that may be keeping her alive and her efforts to remove or

26

27   [7]    This type of heightened security is similar to that to which Salman Rushdie
     was subjected for approximately ten years following the *fatwa* that was issued
28   against him after he published *The Satanic Verses*.  (Abou El Fadl Decl. ¶ 16.)

CV 12 8315 (VBKx)

1   disable the Film will certainly help to convince others that she is not a willing

2   puppet of a global conspiracy to harm Muslims.  (Id. ¶ 21.)

3   **F.**   **Plaintiff Has Begged YouTube and Google to Save Her Life and**
        **Take Down the Film, But They Prefer to Continue to Profit From**
4       **the Millions of Pageviews That the Film Attracts.**

5          In accordance with YouTube's terms of service, Plaintiff issued the first of

6   many DMCA takedown notices on September 24, 2012, through her takedown

7   agent, DMCA Solutions.  (Declaration of David Hardy ("Hardy Decl.") ¶ 5.)

8   Plaintiff and DMCA Solutions have issued eight takedown notices.   In the

9   experience of DMCA Solutions, YouTube typically responds to an initial takedown

10  notice in a manner intended to protect itself from liability for contributory copyright

11  infringement pursuant to the "safe harbor" provisions of the DMCA.  (Id. ¶ 4.)

12  First, YouTube typically sends a notice advising that the notice has been received

13  ("Acknowledgement of Takedown Notice").  Next, YouTube typically quickly

14  removes or disables the allegedly infringing content pending the original poster's

15  provision of proof that he or she has the right to post it.  (Id.)

16         YouTube itself, through the Associate General Counsel of Google, Inc.

17  (YouTube's parent company) Zavanah Levine agrees that YouTube's DMCA

18  procedures are consistent with the observations of DMCA Solutions:

19         **Once YouTube receives a notification of alleged infringement that**
           **substantially complies with the DMCA requirements, we act**
20         **promptly to remove the identified material from our service or**
           **disable access to it.  Throughout my tenure at the company, we**
21         **have removed almost all of the videos identified in DMCA notices**
           **within 24 hours; indeed for the vast majority of DMCA notices**
22         **(about 85%), we remove the identified videos within a few**
           **minutes using automated tools.**
23
    (Declaration of Zavanah Levine ¶ 19.)
24
           This time, contrary to the policy and protocols sworn to by Ms. Levine, and
25
    the practices long observed by DMCA Solutions, YouTube did *not* remove or
26
    disable the content within 24 hours.  Instead, it sent multiple, identical form letters
27
    denying Ms. Garcia's requests. (Hardy Decl. ¶ 7 & Ex. C ("YouTube's First
28
                                        11

1   Substantive Inquiry").) In response to YouTube's First Inquiry Response, Plaintiff's

2   agent sent a detailed response explaining her copyright interests, setting forth the

3   relevant law. (Id. ¶ 8 & Ex. D ("Garcia's First Substantive Response").) Garcia's

4   First Substantive Response was sent on September 26, 2012. (Id.) By October 2,

5   2012, YouTube still had neither responded nor disabled the content. (Id. ¶ 9.)

6   YouTube has breathed life into a work of fiction that is causing violence and death

7   the world over.

8        On October 2, 2012, counsel for Plaintiff Garcia spoke directly with counsel

9   for Defendants Google and YouTube.[8] (Armenta Decl. ¶ 4.) She was told that the

10  Film was still up, that a decision was made "at the highest levels" to keep the Film

11  up, and that **YouTube was not obligated to respond to Garcia's First Substantive**

12  **Response**—even though it was YouTube that had demanded "further information …

13  [in] as much detail as possible!" (Id.)

14       Within two hours of that conversation, Plaintiff received another inquiry from

15  YouTube, requesting even more information. (Hardy Decl. ¶ 9 ("YouTube's

16  Second Inquiry").) Plaintiff's takedown agent then issued Garcia's Second

17  Substantive Response, citing additional relevant case law and provisions of the

18  United States Copyright Act. (Hardy Decl. ¶ 10 & Ex. E.) Finally on October 4,

19  2012, YouTube set forth its final position – consistent with Chairman Schmidt's

20  public remarks -- that the content will not be removed. (Hardy Decl. ¶ 11

21  ("YouTube's Final Response").)

22  **G.    YouTube and Google Have Specific Knowledge of the**
         **Infringing Material and Are in Receipt of Direct Financial**
23       **Benefits Attributed to the Rampant Infringement.**

24       YouTube is on specific notice of the URLs that contain the infringing content.

25  YouTube claims to have received more than 30 million "views" of the Film in the

26  ────────────────────

27  [8]    Counsel for Plaintiff Garcia has copied counsel for Defendants Google and
     YouTube on all transmissions between their respective takedown agents. (Armenta
28  Decl. ¶ 7,)

1   English language alone. (See generally Hardy Decl. & Exs.)  It is incontrovertible

2   that the Film is a "draw" for consumers—whose viewings provide YouTube with

3   profit from ad revenues—to visit YouTube.  YouTube and Google have the ability

4   to block access to the Film—in fact, they have already made the editorial judgment

5   to do so in Saudi Arabia, Libya, Indonesia, and Egypt, and may have done so in

6   other countries. (Armenta Decl. ¶ 9 & Ex. C.)

7   **H.    The Only "Defense" that Defendants Have Offered So Far is Their**
        **Deliberately Incorrect Assumption That Plaintiff Garcia's**
8       **Copyrighted Performance is a "Joint Work."**

9        In connection with Plaintiff Garcia's obligations to meet and confer with

10  opposing parties prior to bringing a motion, counsel for the parties met on

11  Thursday, October 4, 2012.  (Armenta Decl. ¶ 6.)  Defense counsel finally revealed

12  why YouTube refuses to take down the Film, claiming the work was a "joint work"

13  and therefore Plaintiff and Nakoula may not sue each other.  (Id.)  As set forth

14  below, this position is not supported by Plaintiff's *declaration* nor  Defendant

15  Nakoula's *admissions.*[9]  Nobody from Google or YouTube has ever asked either

16  Plaintiff *or* Nakoula whether they intended to create a joint work.  Neither the

17  *Desert Warrior* footage nor the *Innocence of Muslims* trailer are joint works

18  because the parties had *completely different intentions* at the inception of the work.

19  This Ex Parte Application follows upon YouTube's apparently final decision,

20  related on October 4, 2012,[10] to keep the Film up on its site, losing its DMCA safe

21  harbor.

22

23  [9]    On the afternoon of Monday, October 15, 2012, Nakoula's criminal defense
        attorney advised that Nakoula does not own the rights to the film.  (See Armenta
24  Decl.)  Therefore, the work cannot be "joint" between Nakoula and Garcia under
        *any* legal analysis.  Nakoula's lawyer's statement is a party admission. Fed. R.
25  Evid. 801(d)(2).

26  [10]   YouTube will likely claim the delay between the posting of the film and/or
        death threats and this Application undercuts emergency relief.  But, Plaintiff was
27  *obliged* to work through the DMCA takedown process before initiating this
        Application.  YouTube did not issue its denial until October 3, 2012.  (Hardy Decl.
28  ¶ 11.)

13

## IV.   STANDARD FOR RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION IN COPYRIGHT CASES

The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction. To be entitled to injunctive relief, Plaintiff must demonstrate:  (1) that she is likely to succeed on the merits; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374, 376 (2008); National Meat Ass'n v. Brown, 599 F.3d 1093, 1097 (9th Cir. 2010); see also Beardslee v. Woodford, 395 F.3d 1064, 1067 (9th Cir. 2005).

The Copyright Act provides that a court "may… grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009) (quoting Winter, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008)); see, e.g., Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009).

## V.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiff Clearly Owns the Rights to Her Dramatic Performance.

Once Plaintiff Garcia's performance was put in film, it became a "dramatic work" "fixed in [a] tangible medium of expression" that could be "perceived, reproduced, or otherwise communicated" through "the aid of a machine or device."  17 U.S.C. § 102(a); see Fleet v. CBS, Inc., 50 Cal. App. 4th 1911, 1919-1920 (1996) (once actor's performance was fixed in film, it "came within the subject matter of copyright law protection").  Her individual performance in the film *Desert Warrior* is copyrightable.  See id. (actors' individual performances in film are copyrightable).

14

1    Defendants may argue that an actor's copyright automatically reverts to the

2    filmmaker.  Not true.  First, if that were the law, filmmakers would not engage in the

3    universal practice of requiring their actors to release their copyrights as a condition

4    of appearing in films, which did not occur in this case Second, <u>Laws v. Sony Music</u>

5    <u>Entm't, Inc.</u>, 448 F.3d 1134, 1137 (9th Cir. 2006), and <u>Jules Jordan Video v. 144942</u>

6    <u>Canada</u>, 617 F.3d 1146 (9th Cir. 2010), confirms that in the Ninth Circuit, a

7    performer retains the rights in her performance unless she transfers or assigns them:

8    (1) by virtue of her status as an *employee* of the filmmaker; (2) by a *written*

9    assignment of the copyright; or (3) by executing a *written* work-for-hire agreement.

10   In fact, it is clear that the law, not only of the Ninth Circuit, but also as understood

11   by the United States Patent and Trademark Office and the Copyright Office, ***is and***

12   ***always has been*** that the copyright interest in an actor's performance resides with

13   that actor until and unless it is assigned.  (<u>See</u> RJN at 3.)  The United States publicly

14   affirmed this position in connection with the signing of the WIPO Audiovisual

15   Dramatic Performance Treaty ("AVP Treaty") signed in Beijing, China in July of

16   2012.  (<u>See</u> RJN at 4.)  The United States was instrumental in encouraging other

17   countries to sign the AVP Treaty in order to bring other countries into compliance

18   with the long-standing acknowledgement in the United States that actors, just like

19   musicians, own the rights to their performances unless assigned, unless they are

20   employees, or unless they execute a written instrument indicating their work is a

21   work-for-hire. The formal statement issued by the United States Copyright Office,

22   in connection with the AVP Treaty, states:

23           Under U.S. law, actors and musicians are considered to be "authors"
             of their performances providing them with copyright rights.
24
             Just as the rights established in the U.S. law already provide the
25           protection for musical performers mandated by the WPPT, U.S. law is
             already generally compatible with the AVP provisions ("points of
26           attachment" for parties to this treaty under U.S. law).

27   (<u>See</u> RJN at 4.)

28
                                              15

1   Because U.S. law firmly establishes that actors own the copyrights in their

2   performances unless assigned or otherwise relinquished, Plaintiff Garcia retains the

3   copyright to her performance.  See, e.g., TMTV Corp. v Pegasus Broad. of San

4   Juan, 490 F Supp. 2d 228 (D.C. Puerto Rico 2007) (actors' portrayals of characters

5   rendered them "authors").

6   **B.   Plaintiff Never Assigned Her Copyright Interests.**

7   Plaintiff is aware of no authority requiring *her* to bear the burden to show that

8   she did *not* transfer her rights.  Imposing such a burden on Plaintiff would be

9   entirely inconsistent with the Copyright Act's well established requirement that a

10   copyright assignment be made in writing.  See 17 U.S.C. § 204(a) (exclusive

11   copyright assignment must be in writing; 17 U.S.C. § 201(b) (writing required for

12   work-for-hire).  It is undisputed that Ms. Garcia executed no such writing

13   transferring or assigning her rights.  (Garcia Decl. ¶¶ 7-9.)  However, because

14   counsel for YouTube have expressed difficulty in believing that Defendant Nakoula,

15   *a convicted fraudster,* neglected to obtain a legal release, Plaintiff addresses this

16   point in an abundance of caution.  (See Armenta Decl. ¶ 5.)

17   In some cases, an actor or musician relinquishes his or her copyright interests

18   to a studio or filmmaker *in writing* and loses the right to assert a copyright claim in a

19   performance.  See, e.g., Brown v. Twentieth Century Fox Film Corp., 799 F. Supp.

20   166 (D.D.C. 1992) (James Brown transferred rights to song "*Please, Please,*

21   *Please,*" and could not object to use of a musical clip captured on film); Rooney v.

22   Columbia Pictures, Inc., 538 F. Supp. 211 (S.D.N.Y. 1982) (actor Mickey Rooney

23   signed contracts broad enough to transfer rights in his performances); Muller v.

24   Walt Disney Productions, 871 F. Supp. 678 (S.D.N.Y. 1994) (conductor made

25   writing in which he gave up rights to his performance). That did not happen here.

26   Plaintiff's recollection is coincides with that of other actors, who also did not

27   sign releases.  (See Declarations of Does #1-#3.)  Moreover, the Ninth Circuit has

28

16

1  resoundingly rejected the argument that moviemakers enjoy some special status

2  under the Copyright Act allowing them to avoid the writing requirement.  Effects

3  Associates, Inc. v. Cohen, et al., 908 F.2d 555 (9th Cir. 1990), is instructive.  In that

4  case, the plaintiff created special effects for use in a film, and then brought a

5  copyright infringement action against the producer.  As in this case, the parties had

6  *no written agreement* regarding transfer of the plaintiff's copyright to the producer.

7  The Ninth Circuit held that, as a matter of law, the plaintiff's rights had not

8  transferred:  "Absent an express transfer of ownership, a contributor who is not an

9  employee retains ownership of his copyright."  Id. at 558 (citing Easter Seal Society

10  v. Playboy Enters., 815 F. 2d 323, 329 (5th Cir. 1987)).  The court went on to hold:

> [S]ection 101 specifically addresses the movie and book publishing
> industries, affording moviemakers a simple, straightforward way of
> obtaining ownership of the copyright in a creative contribution –
> namely a written agreement.  The Supreme Court and this circuit,
> while recognizing the custom and practice in the industry, ***have
> refused to permit moviemakers to sidestep section 204's writing
> requirement***.  Accordingly, we find unpersuasive Cohen's contention
> that section 204's writing requirement, which singles out no particular
> group, somehow doesn't apply to him. As section 204 makes no
> special allowances for the movie industry, neither do we.

Id. at 558,emphasis supplied.  See also Oddo v. Ries, 743 F. 2d 630 (9th Cir 1984)

(publishing distorted manuscript exceeded scope of initial contributor and publisher

liable for copyright infringement).  Thus, because no writing exists showing a

transfer of rights, nor a work-for-hire agreement, the copyright in Plaintiffs

performance remains intact.

C.  **Defendant Nakoula and Plaintiff Garcia Never Agreed, in Writing
or Otherwise, to Create a "Joint Work of Authorship," as Google
and YouTube Apparently Claim.**

Plaintiff anticipates YouTube to oppose, claiming Plaintiff may not sue

Defendant Nakoula for copyright infringement (or, by extension, Google and

YouTube for contributory infringement) because Plaintiff and Defendant Nakoula

created a "joint work of authorship."  However, Plaintiff *never* had a meeting of the

17

1   minds with Defendant Nakoula. "Joint work" defenses should be carefully

2   evaluated on a case-by-case basis to determine whether the "authors" intended to

3   create a "unitary work." Here, Defendant Nakoula's fraudulent procurement of

4   Plaintiff's performance did not created a joint agreement on anything related to

5   *Innocence of Muslims*.

6       Initially, Plaintiff notes that the burden is on Defendants, *not on her*, to show

7   that both she and Defendant Nakoula intended that the doctored propaganda film

8   *Innocence of Muslims*, which she was tricked into believing was a desert historical

9   adventure called *Desert Warrior*, would be a joint work of authorship.

> Although the Second and Seventh Circuits do not base their decisions
> [as to joint authorship] on the word 'authors' in the statute, the practical
> results they reach are consistent with ours. These circuits have held
> that a person claiming to be an author of a joint work must prove that
> **both parties intended each other to be joint authors.**

13  <u>Aalmuhammed v. Lee</u>, 202 F.2d 1227, 1233-1234 (9th Cir. 2000) (emphasis added).

14  <u>Aalmuhammad</u> is significant: <u>First</u>, as noted above, it establishes that the burden is

15  on the *putative joint author*, not the person claiming a sole copyright, to prove the

16  intent to create a jointly authored work. <u>Second</u>, it suggests that in this case, where

17  there is no written joint authorship agreement, a contributory infringer such as

18  Google or YouTube cannot establish a joint authorship defense, because it cannot

19  prove Plaintiff or Nakoula's subjective intentions. Perhaps this second point is

20  academic, because in this case the uncontroverted evidence is that Plaintiff never

21  intended to be a "joint author" of *The Innocence of Muslims*, given that Defendant

22  Nakoula tricked her by assuring her that she was appearing in an innocuous action

23  film called *Desert Warrior*.

24      Even if the burden of proof was not an insurmountable obstacle for

25  Defendants, the law of joint authorship would be. While "joint" authors may not

26  sue each other in copyright, <u>see</u> 17 U.S.C. § 101, a "joint work" exists "only when

27  *both authors intended at the time the work was created, 'that their contributions be*

28

                                        18

1   *merged into separate or interdependent parts of a unitary whole.'"* Id.; Childress v.

2   Taylor, 945 F.2d 500 (2nd Cir. 1991)(emphasis supplied.) "Copyright law best

3   serves the interests of creativity when it carefully draws the bounds of 'joint

4   authorship' so as to protect the legitimate claims of both sole authors and co-

5   authors." Id.  "Where the author never intended for his material to be part of a joint

6   work, he retains the right to that material." Siegel v. Time Warner, Inc., 496 F.

7   Supp. 2d 1111, 1148 (C.D. Cal. 2007). **Where the parties' intentions at the**

8   **beginning of the creative process are inconsistent**, that "could indicate a lack of

9   intent to form a joint work." See, e.g., Reinsdorf v. Skechers, U.S.A., 2011 U.S.

10  Dist. LEXIS 28293, at *9 (C.D. Cal. Mar. 9, 2011) (use of copyrighted photographs

11  was limited to terms of license, not entitling Skechers to use them as it "saw fit").[11]

12  **D.   YouTube Has Stepped Far Outside the DMCA's Safe Harbor**
    **Provision, Subjecting it To Liability for Copyright Infringement.**

13

14      "The DMCA was enacted in 1998 to implement the World Intellectual

15  Property Organization Copyright Treaty," Universal City Studios, Inc. v. Corley,

16  273 F.2d 429, 440 (2d Cir. 2001), and to update domestic copyright law.  See

17  Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004).  Title II of the DMCA,

18  titled separately the Online Copyright Infringement Liability Limitation Act

19  ("OCILLA") was designed to "clarif[y] the liability faced by service providers who

20

21  [11]   Google and YouTube have not raised the issue of "fair use," but should they
    do so, they would be wrong. 17 U.S.C. § 107. Plaintiff considered the issue of fair
22  use, pursuant to Lenz v. Universal Music Corp., 572 F. Supp. 2d 1150 (N.D. Cal.
    2008).  Google and YouTube are enjoying an economic benefit by drawing 30
23  million "views" using the Film. A&M Records v Napster, Inc., 239 F3d 1004 (9th
    Cir, 2001); see also Worldwide Church of God v. Philadelphia Church of God, 227
24  F.3d 1110, 1118 (9th Cir. 2000) American Geophysical Union v. Texaco, Inc., 60
    F.3d 913, 922 (2d Cir. 1994) (finding that researchers at for-profit laboratory gained
25  indirect economic advantage by photocopying copyrighted scholarly articles);
    Export Establishment etc. v. Columbia Broadcasting Service, Inc., 503 F. Supp.
26  1137, 1147 (S.D.N.Y. 1980) (dramatic ratings boost by using copyrighted Charlie
    Chaplin clips).  The use of Plaintiff's performance goes to the "heart" of the
27  message. Los Angeles News Service v. Tullo, 973 F. 2d 791, 798 (9th Cir. 1992); see
    Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564-65, 105 S.Ct.
28  2218, 85 L.Ed.2d 588 (1985)

                                    19

1   transmit potentially infringing material over their networks." S. Rep. 105-190 at 2

2   (1998).  Congress elected "to create a series of 'safe harbors []' for certain common

3   activities of service providers." Id. at 19.  To that end, OCILLA established a

4   serious of four "safe harbors" that allow qualifying service providers to limit their

5   liability for claims of copyright infringement.  See Viacom, et al. v. YouTube, et al,

6   (2nd Cir . April 5, 2012), Case No. 10-3270 CV (RJN at 4.)  YouTube is such a

7   provider.  See generally id.; see also RJN 6 (2nd Circuit opinion on DMCA issues

8   relative to YouTube).

9        Under 512(c)(1)(A), safe harbor protection is available only if the service

10  provider:

11       (i)     Does not have actual knowledge that the material or an activity using

12               the material on the system or network is infringing;

13       (ii)    In the absence of such actual knowledge, is not aware of facts or

14               circumstances from which infringing activity is apparent; or

15       (iii)   upon obtaining such knowledge or awareness, acts expeditiously to

16               remove or disable access to the material.

17  In short, OCILLA creates a safe harbor for online service providers ("OSPs"), *only*

18  *if* they adhere to the mandatory safe harbor guidelines and "expeditiously" block

19  access to alleged infringing material, or remove that material from their systems

20  when they receive a notification of an infringement claim from a copyright holder or

21  the copyright holder's agent.  OCILLA also includes a counter-notification

22  provision that offers OSPs a safe harbor from liability when users claim that the

23  material in question is not, in fact, infringing.

24       **E.      Even if Defendant Nakoula Had a Joint Copyright Interest with
             Plaintiff Garcia, All of the Third Parties Who Have Copied and**

25           **Re-Posted the Film on YouTube Have No Right to Copy and Re-
             Post the Film, and Are Infringing on Plaintiff Garcia's Copyright.**

26       While YouTube and Google may raise the issue of "joint work" and joint

27  copyright as between Plaintiff Garcia and Defendant Nakoula (albeit Plaintiff

28                                          20

1  absolutely contests that argument as stated above), there is no such issue with

2  respect to the hundreds of third parties who have copied the Film and re-posted it on

3  YouTube, accounting for tens of millions of views for YouTube.  These third parties

4  have no right to copy and re-post the Film, and are clearly infringing.  Defendants

5  YouTube and Google cannot argue otherwise.  The eight DMCA takedown notices

6  delivered by Plaintiff's DMCA takedown agent specifically named and identified

7  these third party YouTube URLs and requested that YouTube remove or disable

8  them.  Defendants YouTube and Google have refused.

9  **VI.   PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE TRO**
        **AND INJUNCTION ARE NOT GRANTED**

10 A temporary restraining order preserves the status quo and prevents

11 irreparable harm until a hearing can be held on a preliminary injunction application.

12 See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,

13 415 U.S. 423, 429, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). The irreparable injury

14 must be both likely and immediate.  Winter v. Nat. Res. Defense Council, Inc., 555

15 U.S. 7, 129 S.Ct. 365, 374-75, 172 L.Ed.2d 249 (2008); Caribbean Marine Services

16 Co.., Inc. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988) ("a plaintiff must

17 demonstrate immediate threatened injury as a prerequisite to preliminary injunctive

18 relief").  Risk of death constitutes "irreparable harm."  See, e.g., Harris v. Board of

19 Supervisors, 366 F.3d 754, 766 (9th Cir. 2004) (affirming preliminary injunction

20 barring Los Angeles County from closing hospital and reducing public hospital beds

21 due to risk of irreparable harm to patients including death); Yue v. Conseco, CV 11-

22 9506 AHM, 2012 U.S. Dist. LEXIS 46565, 40-41 (C.D. Cal. Apr. 2, 2012)

23 (preliminary injunction warranted against increased cost of life insurance because

24 loss of "security" and "peace of mind" constitutes irreparable injury).

25 Plaintiff more than meets her burden.  As set forth above and in the

26 accompanying declarations, she has suffered and will continue to suffer immediate

27 and irreparable harm if the Film is not taken down.  For instance: (1) Plaintiff has

28

21

received credible threats of death and harm against both herself and her family (one individual threatened to rape her daughter repeatedly); (2) Plaintiff has had to move her personal residence due to threats and harassment; (3) Plaintiff has been advised repeatedly and in the strongest terms to take the most stringent security measures possible to protect herself; and (4) Every moment the Film remains on YouTube, her copyright continues to be violated.

## VII.   THE BALANCE OF EQUITIES IS IN PLAINTIFF GARCIA'S FAVOR

Under the circumstances of this case – not just the serious intellectual property issues raised by Plaintiff's claim, but more importantly, the credible threats of *death* against her, the hardship to Plaintiff if the Film is not removed is grave indeed.  It is true that the law requires this Court to "balance" the relative hardships to the parties when evaluating a request for a temporary restraining order.  To this day, Defendants have provided Plaintiff with *no* rationale for their cruel decision to continue to endanger her life by continuing to publish the video:  the only excuses that Defendants have made for themselves are:  (1) Defendant Nakoula's racist belief that "the Muslims" have killed unspecified "innocent" people; and (2) Google Chairman Eric Schmidt's disingenuous claim that the problems experienced by innocent people (such as Plaintiff) due to the Film can simply be cured with "more speech."   In reality, the circumstantial evidence is far more damning, particularly to Google and YouTube.  As set forth on the YouTube site, the Film has received more than 30 million page "views" in English alone.  Since YouTube derives income from advertising revenues and "views", it has 30 million reasons to leave the video trailer where it is, and let Plaintiff simply to fend for herself.

The balance of hardships cannot tip to any side other than to Plaintiff.  "The balance of equities strongly favors [the Plaintiff] because Defendants' only interest is fiscal, whereas the [Plaintiff] faces *life or death consequences*."  See Oster v. Lightbourne,  2011 U.S. Dist. LEXIS 138191 (N.D. Cal. 2011)

22

## VIII. **AN INJUNCTION IS DECIDLY IN THE PUBLIC INTEREST**

Finally, Plaintiff must show that an injunction is in the public interest. <u>Winter v. Natural Res. Def. Council, Inc.</u>, 129 S.Ct. 365, 374, 376 (2008); <u>National Meat Ass'n v. Brown</u>, 599 F.3d 1093, 1097 (9th Cir. 2010); <u>see also</u> <u>Beardslee v. Woodford</u>, 395 F.3d 1064, 1067 (9th Cir. 2005). It is. Defendants' actions have not just put the life of Cindy Lee Garcia in danger. They have endangered the lives of every actor and crew member who is a subject of the *fatwa*. Media reports have already reported on numerous deaths caused by the violence. The web giant known as Google, a name derived from the number 10 with 100 zeroes, pursues mammon at the expense of the innocent.

Plaintiff anticipates that Defendants may attempt to argue that the First Amendment trumps the worldwide carnage sparked by the Film. It does not. First, Plaintiff is a private individual who is not acting in concert with the state; she therefore is not capable of violating the First Amendment. <u>See, e.g., Law v. Miller</u>, 2011 U.S. Dist. LEXIS 102527 (E.D. Cal. 2011) (rejecting claim that non-governmental parties violated plaintiff's First Amendment rights where defendants were not state employees and there was no nexus between the defendants and the state such that the defendants' actions might be fairly treated as those of the state). Second, the First Amendment does not protect copyright infringement. <u>Columbia Pictures, Inc. v. Bunnell</u>, 245 F.R.D. 443 (C.D. Cal. 2007) ("To the extent that the users are engaged in copyright infringement, the First Amendment affords them no protection whatsoever.")(citing <u>Harper & Row</u>, 471 U.S. at 559). Third, even if the Film did not violate Plaintiff's copyright, by now it is clear that Defendants' actions can be compared to falsely shouting "Fire!" in a theater, creating a "clear and present danger" outside the protections of the First Amendment. <u>Schenck v. United</u>

23

<u>States</u>, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470.  The public interest is protected best by removing the video.[12]

Further, Defendant Nakoula violated the terms of his federal criminal probation by posting the Film – he was prohibited from using a computer or accessing the Internet.  (<u>See</u> RJN 5 & Ex. B.)  As the worldwide events described in this brief unfolded, Defendant Nakoula was arrested on a probation violation and now sits, without bail, in the Metropolitan Detention Center in Los Angeles. Magistrate Judge Segal found that he may have violated the terms of his probation, used aliases, and is both a flight risk and danger to the community.  (See RJN 5 & Ex. B.)  The public has an interest in ensuring that criminal defendants do not violate probation terms -- and that Google and YouTube not continue to aid and abet him in doing so[13] – which is exactly what has here been done.

## IX.   THE RELIEF REQUESTED

Based on the above, Plaintiff requests the Defendants be temporarily restrained:

1.   From publishing, reproducing, disclosing, or otherwise allowing the Copyrighted Performance (the original, un-dubbed script of which is identified in Exhibit A to Ms. Garcia's Complaint) to be uploaded or shown on YouTube.com and any other Websites operated by Defendants, or any of them, and from copying

---

[12]   YouTube's own guidelines prohibit the posting of "hate speech" -- a clearer case of hate speech is hard to imagine. YouTube can hardly claim an interest in keeping up globally condemned film.

[13]   "Whoever commits an offense against the United States or aids, abets, counsels, commends, induces or procures its commission, is punishable as a principal."  18 U.S.C. § 2.  In this case, Defendants Google and YouTube are now *knowingly* aiding and abetting Defendant Nakoula's continued violation of his federal probation by keeping the video posted.  Counsel for Plaintiff have provided counsel for YouTube and Google the Judgment and Commitment for Nakoula showing that he was prohibited from using the Internet, computers or ISPs without the permission of the United States Probation Officer.

24

or allowing the content to be copied into any computer database, information service, storage facility, archives or other computerized network or facility:

2.      From disclosing or displaying, or causing to be disclosed or displayed, any portion of the Copyrighted Performance;

3.      From destroying or concealing, or in any way disposing of any reproduction, facsimile, excerpt, or derivative of any work related to the Copyrighted Performance that is in Defendants' possession, custody or control.

Plaintiff further seeks an order to show cause as to why a preliminary injunction should not be issued affording the same relief set forth above.

Plaintiff further seeks an impoundment order, such that Defendants turn over for impoundment, to remain in the custody of Ms. Garcia's counsel during the pendency of this action, all unauthorized copies of in their custody, possession or control of the copyrighted works of Ms. Garcia, including but not limited to:

1.      All copies of the Copyrighted Performance, whether contained in the Film as titled *Desert Warrior* or *Innocence of Muslims*, in the possession, custody, or control of Defendants.

2.      Any and all media in which the Copyrighted Performance is stored within the possession, custody, or control of Defendants, including but not limited to computers, computer disks, cassette tapes, hard drives, CD-ROMs, DVDs, USB sticks, and other media.

## X.      CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court GRANT the Application for the relief requested.

Dated: October 17, 2012          THE ARMENTA LAW FIRM, A.P.C.

By: _____
       M. Cris Armenta

25

CV 12 8315 (VBKx)

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

On October 17, 2012 I served the following document(s) described as:

**(1) *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

**(2)  REQUEST FOR JUDICIAL NOTICE**

**(3) DECLARATIONS OF CINDY LEE GARCIA, DAN SUTTER, GAYLORD FLYNN, DR. KHALED ABOU EL FADL, ALL IN SUPPORT OF EX PARTE APPLICATION**

**(4) DECLARATION OF DAVID HARDY IN SUPPORT OF EX PARTE APPLICATION**

**(5) DECLARATION OF M. CRIS ARMENTA IN SUPPORT OF EX PARTE APPLICATION**

**(6) DECLARATION OF ZAHAVAH LEVINE IN SUPPORT OF EX PARTE APPLICATION**

**(7) [PROPOSED] ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

on the interested parties in this action by placing true copies thereof addressed as follows:

**Timothy L. Alger**
**Sunita Bali**
**Perkins Coie LLP**
**3150 Porter Drive**
**Palo Alto, CA 94304-1212**
**TAlger@perkinscoie.com**
**sbali@perkinscoie.com**

☑     BY ELECTRONIC MAIL, pursuant to the consent of the above counsel

I declare under penalty of perjury under the law of the State of California that the above is true and correct and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on  October 17, 2012 in Los Angeles, California.

Heather Rowland

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

  I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 1511 West Beverly Blvd, Los Angeles, California 90026.

  On _____ I served the following document(s) described as:

**(1) *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

**(2)   REQUEST FOR JUDICIAL NOTICE**

**(3) DECLARATIONS OF CINDY LEE GARCIA, DAN SUTTER, GAYLORD FLYNN, DR. KHALED ABOU EL FADL, ALL IN SUPPORT OF EX PARTE APPLICATION**

**(4) DECLARATION OF DAVID HARDY IN SUPPORT OF EX PARTE APPLICATION**

**(5) DECLARATION OF M. CRIS ARMENTA IN SUPPORT OF EX PARTE APPLICATION**

**(6) DECLARATION OF ZAHAVAH LEVINE IN SUPPORT OF EX PARTE APPLICATION**

**(7) [PROPOSED] ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

1

**PROOF OF SERVICE**

*Nakoula B. Nakoula*
*c/o*
*Los Angeles County Sheriff's Department*
*Stanley Mosk Courthouse*
*110 North Grand Avenue Room 525*
*Los Angeles, 90012*

☐   PERSONAL SERVICE: On _____ I served the foregoing
documents listed above by personally handing them to

_____

*I declare under penalty of perjury under the law of the United States of America that the above is true and correct and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.*

Executed on _____ in Los Angeles, California.

_____

**PROOF OF SERVICE**

2