M. Cris Armenta (SBN 177403)
THE ARMENTA LAW FIRM APC
11900 W. Olympic Boulevard, Suite 730
Los Angeles, CA 90064
Tel: (310) 826-2826 x 108
Facsimile: (310) 826-5456
Email: cris@crisarmenta.com

Credence E. Sol (SBN 219784)
La Garenne
86300 Chauvigny
France
Telephone: 06 74 90 22 08
Email: credence.sol@sol-law.com

Attorneys for Plaintiff
Cindy Lee Garcia

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CINDY LEE GARCIA, an individual,<br><br>              Plaintiff,<br><br>vs.<br><br>NAKOULA BASSELEY NAKOULA, an individual also known as SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, and/or MALID AHLAWI; GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, and DOES 1 through 10, inclusive.<br><br>              Defendants. | Case No. CV12-8315 MWF (VBKx)<br><br>**(1) REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT; DECLARATION OF M. CRIS ARMENTA IN SUPPORT THEREOF (filed separately);**<br><br>**(2) PLAINTIFF'S RESPONSE TO OBJECTIONS BY GOOGLE, INC. AND YOUTUBE LLC TO EVIDENCE SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND ORDER OF IMPOUNDMENT (filed separately);** |

|  |  |
|---|---|
| 1 | CINDY LEE GARCIA, an individual, | Case No. CV12-8315 MWF (VBKx) |
| 2 | | |
| 3 | Plaintiff, | **(3) PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC., AND YOUTUBE, LLC. IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT (filed separately);** |
| 4 | vs. | |
| 5 | NAKOULA BASSELEY NAKOULA, an individual also | |
| 6 | known as SAM BACILE, MARK BASSELEY YOUSSEF, | |
| 7 | ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, | |
| 8 | AMAL NADA, DANIEL K. CARESMAN, KRITBAG | |
| 9 | DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA | **(4) [PROPOSED] ORDER SUSTAINING PLAINTIFF'S OBECTIONS TO EVIDENCE SUBMITTED BY GOOGLE, INC., AND YOUTUBE LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND AN ORDER OF IMPOUNDMENT (lodged separately)** |
| 10 | BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF | |
| 11 | M. BASSELEY, and/or MALID AHLAWI; GOOGLE, INC., a | |
| 12 | Delaware Corporation; YOUTUBE, LLC, a California | |
| 13 | limited liability company, and DOES 1 through 10, inclusive. | |
| 14 | | |
| 15 | Defendants. | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS…..............................................................................i

TABLE OF AUTHORITIES ..................................................................... iii

REPLY MEMORANDUM OF POINTS AND AUTHORITIES........................... 1

I.     PRELIMINARY STATEMENT.................................................... 1

II.    ARGUMENT ............................................................................ 3

      A.     Plaintiff, Like Any Other Performer, Owns the Rights to Her
            Dramatic Work;Defendants' Suggestion That No Actor Who Is
            Not a"Star" Enjoys Copyright Protection Is Entirely
            Unmeritous…......................................................................3

            1.     Almuhammad in inapposite, and to the extent that it is on
                 point at all, it supports Plaintiff's position.......................4

            2.     An actor's rights do not depend on the length of time that
                 that she appears in the film, and those rights are not
                 reduced because she recited lines written by others...........7

      B.     Defendants' Argument That Plaintiff Cannot Claim a Copyright
            In Those Portions of the Film Containing Her Dramatic
            Performance Is, Simply, Wrong…......................................8

      C.     This Court Should Not Be Misled By Defendants' False Assertion
            That Plaintiff Claims That Defendant Youssef Is The Film's
            "Exclusive Copyright Owner."..................... ...................11

      D.     Ms. Garcia Did Not Provide A "Work-for-Hir.........................12

      E.     Defendants Apparently Concede That All of the Third Parties
            Who Have Uploaded the Film Are Infringers….....................17

      F.     Plaintiff Has Shown Irreparable Harm...............................17

      G.     Plaintiff Has Not Delayed in Seeking Relief............................19

      H.     The First Amendment Does Not Prohibit the Relief Sought
            And the Balance of Equities Tip Sharply in Plaintiff's Favor.........22

III.   CONCLUSION ........................................................... ….24

SUPPLEMENTAL DECLARATION OF M. CRIS ARMENTA....................... att.

i

# TABLE OF AUTHORITIES

Federal Statutes

17 U.S.C. § 107……………………………………………............7

17 U.S.C. § 201 (b) ……………………………………………16

U.S. Constitution

Art. I, § 8, cl. 8…………………..……………………………….1

State Statutes

Cal. Civ. Proc. § 527.6………………………………………18

Cases

Aalmuhammed v. Lee,
202 F.2d 1227, 1233-1234 (9th Cir. 2000) ............. 5,6,8

Antelope Valley Press v. Poizner
162 Cal.App.4[th] 839 (2008) (*cited in* Oppo. Br. at 18), ........... 14

Aymes *v.* Bonelli,
980 F.2d 857 (2d Cir. 1992)............................................... 15

Booth v. Colgate-Palmolive Co.,
362 F.Supp. 343, 347 (S.D.N.Y. 1973)
(*cited in* Opp. Br. at 15),........................................ 8

Brown v. Twentieth Century Fox Film Corp.,
799 F. Supp. 166 (D.D.C. 1992) ................................. 13

Cantwell v. Connecticut,
310 U. S. 296 (1940),.............................................. 23

Community for Creative Non-Violence v. Reid,
490 U.S. 730, 109 S.Ct2166, 104 L.Ed.2d 811
(1989),. ....................................................... 4,14,15,16

Cybermedia Inc v. Symantec Corp.,
19 F. Supp. 2d 1070 (1998)....................................... 21

DeNovellis v. Shalala,
135 F.3d 58, 64 (1st Cir. 1998),........................................ 22,23

Effects Associates, Inc. v. Cohen, et al.,
908 F.2d 555 (9th Cir. 1990), ....................................... 6,8

Ellison v. Robertson,
357 F.3d 1072, 1076 (9th Cir. 2004). ......................................... 3

ii

Enyart v. Nat'l Conf. of Bar Examiners, Inc.,
630 F.3d 1153, 1165 (9th Cir. 2011)........................................ 23

Feiner v. New York,
340 U.S. 315, 321 (1951). ....................................................... 23

Fleet v. CBS, Inc.,
50 Cal. App. 4th 1911, 1919-1920 (1996) .............................. 4,10

Jules Jordan Video v. 144942 Canada,
617 F.3d 1146 (9th Cir. 2010), .................................. 4,7 ,10,11,15

Laws v. Sony Music Entm't, Inc.,
448 F.3d 1134, 1137 (9th Cir. 2006), ............................. 4,7,9,10

Lin-Brook Builders Hardware v. Gertler
352 F.2d 298, 300 (9th Cir. 1965)............................................ 17

Muller v. Walt Disney Productions,
871 F. Supp. 678 (S.D.N.Y. 1994) ........................................... 13

NRDC v. Winter,
530 F. Supp. 2d 1110 (C. D. Cal. 2007) .................................. 17

Oster v. Lightbourne,
2011 U.S. Dist. LEXIS 138191 (N.D. Cal. 2011) ................... 17

Perfect 10 v. Google, Inc.,
653 F.3d 976, 982 (9th Cir. 2011)............................................ 21

Richmond v. Weiner,
353 F.2d 41 (9th Cir. 1965) (cited in Opp. Br. at 16), ............. 12

Rooney v. Columbia Pictures, Inc.,
538 F. Supp. 211 (S.D.N.Y. 1982)........................................... 13

Sampson v. Murray,
415 U.S. 61, 90 (1974), ........................................................... 22

Schenck v. United States,
249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) ............... 23

Selby v. New Line Cinema Corp.,
96 F.Supp.2d 1053 (C.D. Cal. 2000).................................... 11,12

Shegog v. Board of Ed. Of City of Chicago,
94 F. 3d 836 (9th Cir. 1999)..................................................... 22

TMTV Corp. v Pegasus Broad. of San Juan,
490 F Supp. 2d 228 (D.C. Puerto Rico 2007) .......................... 4,7

Trenton v. Infinity Broadcasting Corp.
865 F.Supp. 1416, 1426. .......................................................... 17

iii

Turner v. Gibson,
2011 U.S. Dist. LEXIS 123324 (C. D. Cal. Oct. 25, 2011), .... 17

Twentieth Century Fox Film Corp. v. Entm't. Distrib.,
429 F.3d 869, 880 (9th Cir. 2005) ............................................. 17

Waits v. Frito-Lay,
978 F.2d 1093, 1099 (9th Cir. Aug. 5, 1992) ............................... 9

iv

# REPLY MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

In the Opposition ("Opp. Br.") of Google Inc. ("Google") and YouTube LLC ("YouTube") (collectively, "Defendants") to Plaintiff's Motion for a Preliminary Injunction and Order of Impoundment,[1] Defendants urge this Court to find that actors' performances on film are not protected by copyright law, unless the actor was the star or was also the script writer or director.  Such a finding would turn the entire film industry upside down, and is also in direct contravention to the law in this Circuit and the United States Copyright Act which has its genesis in United States Constitution.  U.S. Const., Art. I, § 8, cl. 8.  As Defendants note, the "custom and practice" in the industry is that producers obtain releases from actors, which transfer the actor's copyright interests in their performances to the producers.  It is because the law is so well settled that actors own a copyright interest in their performances the second they are affixed to a tangible medium (i.e., film) that this very custom and practice of obtaining releases exists.  Defendants' argument – that minor actors simply do not make creative contributions because they are reading a script or do not have marquee billing– denigrates the work of actors and ignores the Copyright Act.

Defendants argue that Plaintiff suffers no irreparable harm because the infringing film was first posted on July 2, 2012.  While the posting of the Film then represented copyright infringement, no grave irreparable harm presented itself to Plaintiff until after the Film was seen worldwide, Plaintiff received death threats,

---

[1]    Plaintiff objects to the entire Opposition Memorandum submitted by Defendants as exceeding the page limits contained in Local Rule 11-6.   The Defendants' 24 page brief contains 17 footnotes, each of which violates Local Rule 11-3.1, requiring all typeface within the brief to be in 14-point type.  By violating Rule 11-3.1, Plaintiff has violated the page limit rule contained in Rule 11-6.  Moreover, many of the footnotes contain World Wide Web URLs without providing the Court with the documentation cited or claimed to exist.  At a minimum, all 17 footnotes should be disregarded in their entirety.

1

1    and a bounty was placed on head through a call by an Egyptian religious figure to

2    "all Muslim youth in America" to kill her.  Plaintiff acted promptly.  (See Defs.

3    RJN.)  She attempted to block the Film, through a state court action, within six

4    days of the attacks in Benghazi and the ensuing worldwide attention to the Film.

5    Blocked by the Communications Decency Act and the inability to find

6    Nakoula/Youssef, who was then in hiding, Plaintiff filed this copyright action in

7    federal court on September 25, 2012.  Defendants accepted service on October 4,

8    2012.  Defense counsel claimed unavailability to handle anything in this case from

9    October 11-16.  The Motion was filed on October 18.   At best, the "delay" in

10   seeking relief was *four* business days.  Defendants' claim of delay is disingenuous

11   given their own delays and the well established timeline of events in this case.

12         Defendants pooh-pooh the explicit and written death threats and worldwide

13   pronouncement of death on Plaintiff, calling them mere "insults."  As Justice Scalia

14   so eloquently put it, however, "Death is different."  Much like the threatened victim

15   in a domestic violence or stalking case, must we wait until Cindy Lee Garcia is

16   murdered for the actual, written, explicit threats of death to have any impact?

17   Additionally, the Court has before it credible evidence from a world-renowned

18   counter-terrorism expert, UCLA law professor and renowned Muslim scholar Abou

19   El Fadl, that Garcia's public efforts in distancing herself from the Film and her

20   ability to take down the Film may ameliorate the threats to her life.  The White

21   House has requested that Defendants review removing the Film, but Defendants

22   refused, and Google's Chairman has steadfastly declared to the world that "the film

23   will stay up."[2]  It is only the actors, with protectable and unassigned interests, who

24   have proper standing to challenge Defendants' continued publication of the Film.

25   Without submitting any admissible evidence, Defendants claim that taking down

26

27   _____

28   [2]      Given that it is the Chairman of Google who made the executive decision to
     keep the Film up, it will be interesting to hear Google's anticipated Motion to
     Dismiss, which is anticipated to argue that Google exerts no control over YouTube.

                                          2

1  the Film will have no impact because third parties also have posted the Film.

2  Defendants ignore the fact that the DMCA takedown notices address all third-party

3  posters on YouTube, none of whom have any rights to post or disseminate the

4  Film.  There is no admissible evidence before the Court that the Film exists or is

5  being published anywhere else except on YouTube.  If the Court agrees with the

6  well settled rule, as acknowledged by WIPO and the United States Trademark

7  Office, that actors do, in fact, own the rights to their performances unless

8  transferred, then Plaintiff can then address any other posters (if they even exist) or

9  publishers, after this Court's ruling.

10       This is *not* a First Amendment Case.  No state action is involved.

11  Defendants' argument, that an injunction would constitute an illegal prior restraint,

12  ignores the entire body of copyright law – copyright law is an *exception* to the First

13  Amendment.  Both are embodied in the United States Constitution.  If Defendants

14  were correct, the First Amendment would prevent courts from *ever* enjoining

15  copyright infringement.  Defendants' own arguments conflict: on the one hand,

16  they argue that the Film has had no real effect or causation of harm of any kind,

17  and on the other hand, they claim that it is a matter of great public concern and

18  debate.  Further, it is evident that the Film's incendiary message, propagadated

19  with digital speed, and resultant effect, constitutes shouting "fire" in our modern,

20  global theater.

21       Plaintiff therefore respectfully requests that the court GRANT the Motion for

22  Preliminary Injunction and Order of Impoundment.

23  **II.   ARGUMENT**

24       **A.   Plaintiff, Like Any Performer, Owns the Rights to Her Dramatic
25            Work; Defendants' Suggestion That No Actor Who Is Not a
             "Star" Enjoys Copyright Protection Is Entirely Unmeritorious.**

26       Plaintiff initially notes that she does not disagree with Defendants'

27  unremarkable observation that copyright infringement requires the plaintiff to have

28

3

CV 12 8315 (VBKx)

owned a copyright and the defendant to have violated it.  See Opp. Br. at 13, citing Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004).  The main disagreement between the parties is that Plaintiff takes the position, consistent with the Ninth Circuit and other federal courts, the California state courts, the U.S. Patent and Trademark Office, the U.S. Copyright Office, and the U.S. Government as a whole, that the copyright interest in an actor's performance resides with that actor until and unless it is assigned.  See Opening Br. at 14-16, citing Fleet v. CBS, Inc., 50 Cal.App.4th 1911, 1919-1920 (1996); Laws v. Sony Music Entm't., Inc., 448 F.3d 1134, 1137 (9th Cir. 2006); Jules Jordan Video v. 144942 Canada, 617 F.3d 1146 (9th Cir. 2010); TMTV Corp. v. Pegasus Broad. Of San Juan, 490 F.Supp.2d 228 (D.C. P.R. 2007); Statements of U.S. Patent and Trademark Office and U.S. Copyright Office; WIPO Audiovisual Dramatic Performance Treaty (July 2012).[3]

Defendants, on the other hand, argue alternatively that an actor's contribution to a motion picture is not sufficiently "creative" to justify copyright protection, or that this particular actor is a "little person" who does not enjoy the same legal protections as would a "star."  See Opp. Br. at 13 (arguing that author is required to be "the" "mastermind" of the work, generally excluding every actor involved in the creation of a film except "possibly the star").  Defendants' argument is not only legally incorrect, it is dangerous, as it would turn both copyright law and the entire entertainment industries on their heads.

       1.   Almuhammad is inapposite, and to the extent that it is on point at all, it supports Plaintiff's position.

To the extent that Defendants argue that the only person entitled to copyright protection is "the" "mastermind," they are incorrect.[4]  The case that they cite for

[3]    In their opposition brief, Defendants ignore both the position of the United States Government in connection with its accession to the WIPO Treaty, and TMTV Corp. v. Pegasus Broad. Of San Juan, 490 F.Supp.2d 228 (D.C. P.R. 2007) (actors' portrayals of characters rendered them "authors").  See Opp. Br., passim.
[4]    Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), the case Defendants cite for the proposition that the

4

1   this proposition, <u>Aalmuhammed v. Lee</u>, 202 F.3d 1227, 1233 (9th Cir. 2000) (<u>cited</u>

2   <u>in</u> Opp. Br. at 13), is not on point at all.  That case involved a dispute between

3   director Spike Lee and many major production companies and studios involved in

4   the making of the film *Malcolm X*, on the one hand, and Jefri Almuhammad, a

5   devout Muslim documentarian whom *Malcolm X* star Denzel Washington asked for

6   assistance in preparation for Mr. Washington's role, on the other.  <u>Aalmuhammed</u>,

7   202 F.3d at 1229.  The district court dismissed Mr. Almuhammad's copyright,

8   quantum meruit, and other claims under Rule 12(b)(6) and on summary judgment.

9   <u>Id</u>.  According to the Ninth Circuit, Mr. Almuhammad submitted evidence that he

10   reviewed the script and suggested revisions that would make the script more

11   historically and religiously accurate, provided translation services, participated in

12   post-production, and met with Islamic organizations to persuade them of the

13   accuracy of the completed film.  <u>Id</u>. at 1229-1230.  Mr. Almuhammad sued the

14   defendants when they credited him as an "Islamic Technical Consultant" rather

15   than as a writer; he claimed that *Malcolm X* was a "joint work" and that he

16   therefore co-owned the copyright.  <u>Id.</u> at 1230.  In contrast, as Defendants

17   themselves admit (<u>see</u> Opp. Br. at 19-20), this case does not involve a "joint work."

18        Even if <u>Almuhammed</u> were on point, it would support Plaintiff's case, not

19   Defendants'.  The Ninth Circuit in <u>Almuhammed</u> reviewed the plaintiff's

20   contributions and noted that the plaintiff "rewrote several specific passages" and an

21   unspecified number of "scenes" that appeared in the finished work, and that those

22   items "would have been independently copyrightable." *Id.* at 1231.  *That work was*

23

24   "author" of a creative work is "the" (singular) "person who translates an idea into a
fixed, tangible expression entitled to copyright protection" is not even a case that is

25   about defining whether a film actor can claim a copyright in her performance.
Rather, that case took up the issue of whether a sculptor who created a statute on an

26   oral commission from a nonprofit unincorporated association was the association's
"employee" for the purposes of determining whether the sculpture was a "work for

27   hire." <u>Id</u>.  The Supreme Court held that the sculptor was not an employee, and
remanded the case to the district court to determine whether the parties had

28   intended to be joint authors who would co-own the copyright.  <u>Id</u>.

5

1    *a full-length feature film:  in other words, in* <u>*Almuhammad*</u> *the Ninth Circuit*

2    *expressly stated that a person who makes even a relatively small creative*

3    *contribution may assert a copyright interest in that contribution.*  <u>See</u> <u>also</u> <u>id</u>. at

4    1232 ("We recognize that a contributor of an expression may be deemed to be the

5    'author' of that expression for purposes of determining whether it is independently

6    copyrightable.").  To the extent that <u>Aalmuhammad</u> asserts to the contrary, it is

7    clear that that court could not come to a decision as to which of the many people

8    involved in the making of a film is the "author" under the Copyright Act – while

9    the court suggested producers, directors, "star[s]," and screenwriters, it never

10   actually made a decision on that issue.  <u>Id.</u> at 1233.  Defendants' heavy emphasis

11   on Ms. Garcia's standing as a supporting actor unworthy of equal protection under

12   the copyright laws overstates <u>Almuhammad's</u> holding.  Moreover, in light of the

13   *fatwa* that has been put on her head as the result of having been made to appear to

14   recite the incendiary lines at the heart of the Film's message, it is grossly offensive.

15        Finally, Defendants completely ignore the on-point controlling Ninth Circuit

16   case, <u>Effects Associates, Inc. v. Cohen, et al.</u>, 908 F.2d 555 (9th Cir. 1990) (cited in

17   Opening Br. at 17), which eviscerates their argument that only individuals with

18   marquee billing may copyright their creative contributions.  As set forth in

19   Plaintiff's opening brief, in <u>Effects Associates</u> the Ninth Circuit held that an

20   individual who created *special effects* for a film, but (like Plaintiff) had signed no

21   written agreement transferring copyright, retained ownership of his copyright.  <u>See</u>

22   Opening Br. at 16, citing <u>Effects Associates</u>, 908 F.2d at 558.  Quite simply, it is

23   the law of the land, as the Ninth Circuit has recognized, that "[t]he Supreme Court

24   and this circuit … have refused to permit moviemakers to sidestep" the Copyright

25   Act's requirement that a copyright be transferred in writing – whether the creator is

26   Tom Cruise or Cindy Lee Garcia.[5]  <u>See id</u>.

27   _____

28   [5]    Perhaps one of the reasons that the Ninth Circuit has hewn so closely to the

                                         6

2.  <u>An actor's rights do not depend on the length of time that she appears in the film, and those rights are not reduced because she recited lines written by others.</u>

Defendants also argue that Plaintiff has no rights in her performance because her appearance was "brief." <u>See</u> Opp. Br. at 13. Defendants cite no authority for this proposition, and Plaintiff is not aware that any such authority exists. Brevity of performance does not affect the copyright interests of the performer. Rather, it is one of the four factors to be considered in a fair use analysis, a defense which the Defendants do not assert in this case. <u>See</u> 17 U.S.C. § 107.

Additionally, Defendants claim that Plaintiff has no rights in her dramatic performance because she (like all actors) "responded to a casting call" and performed lines that were provided to her. Defendants cite no authority for this proposition either. Indeed, that position cannot be true in light of case law holding that performers, virtually all of whom perform lines written by others, *do* enjoy a protectable copyright interest. <u>See</u> <u>Laws v. Sony Music Entm't., Inc.</u>, 448 F.3d 1134, 1137 (9th Cir. 2006), <u>Jules Jordan Video v. 144942 Canada</u>, 617 F.3d 1146 (9th Cir. 2010), and <u>TMTV Corp. v. Pegasus Broad. of San Juan</u>, 490 F.Supp.2d 228 (D.C. P.R. 2007). It is offensive to conclude that actors, stars and not, do not make any "creative contributions," because they are merely readers of a script.

Defendants' assertion in footnote 12 that the Digital Millennium Copyright Act (the "DMCA") is "irrelevant" to the injunctive relief being sought by plaintiff is both obtuse and incorrect.[6] While Defendants correctly identify the DMCA's "safe harbor" provision as defensive in nature (which safe harbor they have by their

---

Copyright Act's writing requirement is the burden on the courts that would result from stretching the requirements of the Act to evaluate creative contributions to movies on a case-by-case basis where there is no writing transferring copyright.

[6]    This is particularly so, since Defendants stated in open court in Los Angeles Superior Court that their conduct is protected by the "safe harbor" provisions of the DMCA, *compelling* Plaintiff to spend days and days sending takedown notices and responding to Defendants' takedown agent, until her receipt of Defendants' final decision to refuse the takedown. (See Supplemental Declaration of M. Cris Armenta at ¶2.)

7

1   own admission made a calculated decision to forsake), the fact that Plaintiff

2   diligently sought compliance by Defendants with the DMCA's streamlined

3   takedown provisions pursuant to Defendants' own published rules and policy lays,

4   in part, the critical foundation for Plaintiff's right to seek injunctive relief.  Given

5   that the DMCA's takedown provisions and procedure are routinely followed by

6   copyright holders and complied with by third party online service providers such as

7   Defendants as the front-line, definitive method in the United States for seeking and

8   obtaining the immediate takedown of infringing content online, for Plaintiff *not* to

9   have diligently sought Defendants' compliance with the DMCA's takedown

10  provisions would have been to deny the immediacy and seriousness of the harm she

11  faces from the Film's continued appearance, copying, and reposting on YouTube.

12  Defendants' almost flippant dismissal in these circumstances of the DMCA and

13  Plaintiff's efforts to obtain Defendants' compliance is disingenuous given

14  Defendants' own prior testimony (*see* Levine Declaration) attesting to the import

15  Defendants emphasize they put on their own swift and impartial compliance with

16  properly filed DMCA takedown requests.

17      **B.      Defendants' Argument That Plaintiff Cannot Claim a Copyright
             In Those Portions of the Film Containing Her Dramatic**
18           **Performance Is, Simply, Wrong.**

19      Next, Defendants argue that Plaintiff cannot hold a copyright in those

20  portions of the Film that contain her performance.  See Opp. Br. at 14-16.  That

21  claim is incorrect.  As set forth above, the Ninth Circuit has held that individual

22  creative contributions to a film *are*, in fact, independently copyrightable, regardless

23  of the "impenetrable thicket of conflicting rights" of which Defendants worry.[7]

24  See, e.g., Aalmuhammed, 202 F.3d at 1231, and Effects Associates, 908 F.2d at

---

[7]     Avoiding this thicket is, no doubt, the primary reason that competent
filmmakers require releases from virtually everybody involved in a film
production.  Notably, Defendants offer no evidence that the producers of the film at
hand were competent, had any prior film experience, or, most significantly, that
any releases were signed by the actors.  The evidence is to the contrary.

8

558.  Moreover, Plaintiff has reviewed Section 106 of the Copyright Act, on which Defendants purport to rely, see Opp. Br. at 14, and nothing in its language supports Defendants' position.[8]

Booth v. Colgate-Palmolive Co., 362 F.Supp. 343, 347 (S.D.N.Y. 1973) (cited in Opp. Br. at 15), a nearly 40-year-old out-of-jurisdiction case, does not aid Defendants' cause.  In that case the plaintiff, actress Shirley Booth, played the title role in the 1960s hit television series *Hazel*, which was based on a copyrighted cartoon character.  Ms. Booth did not own the copyright.  She sued Colgate-Palmolive after the latter broadcast commercials that used the name and likeness of the *cartoon character* that Ms. Booth had originally based her performance on.  Colgate-Palmolive produced the commercials pursuant to a written license agreement with the creator and copyright holder of the cartoon character, and in the commercials, another actress performed the cartoon character's voice.  The Southern District of New York granted summary judgment because the commercials did not name or otherwise identify the plaintiff.  Booth is not on point because that case involved state-law and Lanham Act claims, *not* a claim under the Copyright Act.  Second, the offending performance in Booth did not involve an actual depiction of the plaintiff actress or the use of her performance as a "puppet" with a dubbed-in message, as occurred here.  Third, there apparently was no claim in *Booth*, as there is here, that the actress had not signed a release.  Fourth, the *Ninth Circuit has explicitly rejected the Booth case as a correct statement of federal copyright law as it applies to performers' claims.*  See Waits v. Frito-Lay, 978 F.2d 1093, 1099 (9th Cir. Aug. 5, 1992) (rejecting defendants' argument that Booth,

---

[8]    Without providing the Court or the Plaintiff with the cited law review articles, Defendants attempt to make much of articles describing the denial of actors' protests to colorization of black and white films.  See Opp. Br. at 14 n. 13.  Those articles deal with the actors who *held no copyright interests*, but asserted "moral rights" to keeping their performance in the manner in which it was initially captured.  By contrast, Plaintiff asserts she has a valid copyright interest.

9

1   among other cases "that rejected entertainers' challenges to imitations of their

2   performances based on federal copyright preemption, were correctly decided …

3   [t]his reasoning suffers from a number of flaws"), amended on other grounds, 978

4   F.2d 1093 (9th Cir. Oct. 6, 1992), amended on other grounds 1992 U.S. App.

5   LEXIS 27031, cert den. 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993).

6        Defendants attempts to distinguish Fleet v. CBS, Inc., 50 Cal.App.4th 1911

7   (1996), Laws v. Sony Music Ent'mt., Inc., 448 F.3d 1134 (9th Cir. 2006), and Jules

8   Jordan Video v. 144942 Canada, 617 F.3d 1146 (9th Cir. 2010) (see Opp. Br. at 15-

9   16), are similarly unavailing. Defendants pooh-pooh Fleet on the grounds that the

10   California appellate court's primary task in that case was to determine whether the

11   Copyright Act preempted the plaintiff actors' state-law misappropriation claims.

12   See Opp. Br. at 15.  What Defendants fail to acknowledge is that in order to

13   determine whether the preemption doctrine applies, a court necessarily *must*

14   conduct a copyright analysis.  See Fleet, 50 Cal.App.4th at 1918-1919 (for

15   preemption to occur, the subject of the claim must be "within the subject matter or

16   scope of copyright protection"); see also Laws, 448 F.3d at 1137-38 (same).  If the

17   actors' performances were not copyrightable, in other words, their state-law claims

18   would not have been preempted, and the California court's decision to affirm

19   summary judgment against those actors would have been different.  Accordingly,

20   Defendants' claim that the analysis set forth in Fleet (and Laws) has no value is

21   simply erroneous.

22        Defendants' insistence that Jules Jordan, 617 F.3d 1146, is inapplicable is

23   similarly misguided.  As Defendants admit, Plaintiff cited Jules Jordan for the

24   unremarkable proposition that a performer retains the copyright interest in her

25   performance unless she transfers or assigns the right to somebody else.  See Opp.

26   Br. at 16.  Then, however, Defendants argue that Jules Jordan does not apply

27   because in that case, the plaintiff pornographic film entrepreneur Ashley Gasper

28

CV 12 8315 (VBKx)

1   directed, produced, and performed in his own films, and therefore had more artistic

2   control than did the Plaintiff in this case. Id.  What Defendants fail to mention is

3   that the very narrow reason that Ninth Circuit found the plaintiff's many roles

4   legally significant.  The trial court in that case held that Mr. Gasper was an

5   employee of his solely owned company, Jules Jordan Video, and therefore Jules

6   Jordan Video was the "author" of the films and Mr. Gasper lacked standing to

7   bring his case.   However, Mr. Gasper had registered the copyrights in his own

8   name, leading to what the Ninth Circuit characterized as the trial court's implicit

9   holding that Jules Jordan Video also "lacked standing because the registration was

10  invalid." Jules Jordan, 617 F.3d at 1155.  The only reason that the Ninth Circuit

11  found that Mr. Gasper's positions as actor, performer, and director were legally

12  significant was because it found that "JJV was Gasper, [and therefore] JJV

13  intended whatever Gasper intended," that there therefore was no dispute between

14  Mr. Gasper and Jules Jordan as to the ownership of the copyright. Id. at 1156.

15  Obviously, the only legally significant similarity between Jules Jordan and this case

16  (save for its rote recitation of fundamental principles of copyright law) is that in

17  this case, too, there apparently is now no claim by Nakoula/Youssef that he has a

18  copyright interest as against Plaintiff.[9] (See Declaration of M. Cris Armenta ¶ 11,

19  and Ex. E thereto.)  Accordingly, Jules Jordan does not help Defendants – it

20  supports Plaintiff.  And as in Jules Jordan, this Court should decline to "permit a

21  third-party infringer" to avoid copyright liability where Nakoula/Youseff is not

22  claiming a copyright interest in Ms. Garcia's performance.

23       Next, Defendants attempt to escape liability by quickly citing mechanical

24  language from Selby v. New Line Cinema Corp., 96 F.Supp.2d 1053 (C.D. Cal.

25  2000) for the proposition that in copyright cases, "scope and protection are not

26

27  [9]   If Nakoula/Youssef quitclaims his putative interest to Ms. Garcia, and/or
    causes his and the other postings of the Film to be removed from YouTube, this
28  case may indeed quickly resolve itself as to Nakoula/Youssef

11

1  synonymous." <u>See</u> Opp. Br. at 15.  It is unclear, however, how <u>Selby</u> applies to

2  this case, other than to reiterate without analysis that Defendants believe Ms.

3  Garcia is not entitled to protect her performance.  Plaintiff is particularly confused

4  as to the reasons for Defendants' reliance on <u>Selby</u> in light of the fact that the

5  plaintiff in that case alleged copyright infringement, a Lanham Act violation, and

6  breach of implied-in-fact contract – *and in the very first paragraph of the opinion,*

7  *the Court notes that the defendants challenged only the Lanham Act and contract*

8  *claims, not the claim for copyright infringement.* <u>Selby</u>, 96 F.Supp.2d at 1054.

9  ### C.   Defendants' Assertion That Nakoula/Youssef Is The "Exclusive Copyright Owner" Is False.

10  Defendants next claim, "By plaintiff's own admission, Youssef was the

11  Film's 'mastermind.'" <u>See</u> Opp. Br. at 16, citing First Amended Complaint.

12  Plaintiff made no such claim.  Accordingly, Plaintiff certainly has *not* identified

13  Defendant Youssef as an individual who had any rights in her dramatic

14  performance.  Indeed, even Nakoula/Youssef has indicated that he does not believe

15  that he has any rights in Ms. Garcia's dramatic performance.  (Armenta Decl. ¶ 11,

16  and Ex. E thereto.)  And, tellingly, Defendants make *no* excuse for their refusal to

17  take down the postings on YouTube by by third party publishers who are

18  completely unrelated to the Film and cannot assert copyright interests.

19  Nevertheless, and despite receipt of numerous takedown notices as to those posters,

20  Defendants steadfastly refuse to remove even those postings of the Film.[10]

21  ### D.   Ms. Garcia Did Not Provide A "Work-for-Hire."

22  Finally,[11] Defendants argue that notwithstanding the lack of *any* evidence of

23

24  [10]   That is just one reason that Defendants' citation to <u>Richmond v. Weiner</u>, 353

25  F.2d 41 (9th Cir. 1965) (cited in Opp. Br. at 16), for a "basic tenant [sic] of copyright law" is baffling.  The other is that the only issue before the court in

26  <u>Richmond</u> was whether the parties were joint owners of a copyright.  Because the Ninth Circuit agreed with the trial court's conclusion that the parties were joint

27  owners, it held that the defendant could not have infringed.  By contrast, in this case all parties seem to agree that Plaintiff and Youssef are not joint owners.

28  [11]   Because the parties apparently do not disagree on the issue of joint

12

a release, Plaintiff's performance was a "work for hire" owned by Nakoula/Youssef.  This argument contravenes the clear statutory language both of Section 201(b) of the Copyright Act (writing required to establish work-for-hire), as well as Section 204(a) of the Act (exclusive copyright assignment must be in writing).  Even more oddly, Defendants fail to acknowledge even that Section 204(a)'s writing requirement even exists. <u>See</u> Opp. Br., <u>passim</u>.  Defendants also ignore the plethora of authority cited in Plaintiff's opening brief in which courts have noted that it is through *writing* that a performer may lose her rights. *See* Opening Br. at 16, citing <u>Brown v. Twentieth Century Fox Film Corp.</u>, 799 F.Supp. 166 (D. D.C. 1992); <u>Rooney v. Columbia Pictures, Inc.</u>, 538 F. Supp. 211 (S.D.N.Y. 1982); <u>Muller v. Walt Disney Prods.</u>, 871 F.Supp. 678 (S.D.N.Y. 1994).

 Essentially, Defendant asks this Court to make the following logical leaps:

 (1) Neither Ms. Garcia nor her fellow actors signed work-for-hire agreements.  Defendants have submitted no evidence to the contrary;

(2) Because Cindy Garcia "claims to be a professional actress," she *should* have signed "the kind of agreement [i.e., work-for-hire] that is part-and-parcel of the industry";

(3) Because Cindy Garcia may not be "a professional, and not an attorney," she wouldn't be able "to competently describe the legal effect or limitations of a contract" regardless of the recollections of her and her fellow actors; ***and therefore***

 (4) Cindy Lee Garcia "was clearly an 'employee' under the law."
<u>See</u> Opp. Br. at 17-18, and n.15 therein.  This argument *makes absolutely no sense* under copyright law, which requires an agreement in writing in order for a performer to transfer her rights under a work-for-hire agreement. <u>See</u> 17 U.S.C.

---

ownership/authorship, Plaintiff will not waste this Court's time responding to Defendants' argument on that issue. <u>See</u> Opening Br. at 17-19, and Opp. Br. at 19-20 (both arguing that Plaintiff and Nakoula/Youssef are not joint owners).

CV 12 8315 (VBKx)

1   201(b).  Nor does it make any sense to fault Plaintiff for *not giving up her rights*.

2   Nor has Defendant provided *any* authority for the proposition that it is Plaintiff's

3   burden to prove a negative:  that is, that she did not sign a work-for-hire agreement.

4   Defendants' failure to provide such authority is odd in light of the fact that Plaintiff

5   invited them to do so on page 16 of her opening brief.  Nor have Defendants

6   offered any evidence that Plaintiff agreed to a work-for-hire arrangement.[12]

7        All that notwithstanding, even if it was theoretically possible for Plaintiff to

8   have become an employee providing a work-for-hire performance without knowing

9   it, Defendants have failed to show that she did.  Defendants cite eleven factors set

10  forth in <u>Community for Creative Non-Violence</u>, 490 U.S. at 751, to wit:

11      [1] the skill required; [2] the source of the instrumentalities and tools;
        [3] the location of the work; [4] the duration of the relationship

12      between the parties; [5] Whether the hiring party has the right to
        assign additional projects to the hired party; [6] the extent of the hired

13      party s discretion over when and how long to work; [7] the method of
        payment; [8] the hired party's role in hiring and paying assistants;[9]

14      whether the work is part of the regular business of the hiring party;
        [10] whether the hiring party is in business; the provision of employee

15      benefits; and [11] the tax treatment of the hired party.

16  <u>See</u> Opp. Br. at 18.  Notwithstanding their citation of eleven factors, Defendants

17  focus on only one, arguing that it is the most important:  the level of control factor.

18  <u>See</u> Opp. Br. at 18-19.  However, the case they cite for this proposition, <u>Antelope</u>

19  <u>Valley Press v. Poizner</u>, 162 Cal.App.4th 839 (2008) (<u>cited in</u> Opp. Br. at 18), is not

20  a case involving issues of work-for-hire versus employee status under federal

21  _____

22  [12]    Plaintiff notes that Defendants object to the submission of two declarations
    by Ms. Garcia's fellow actors in the Film, Gaylord Flynn and Dan Sutter, whose

23  recollection of not having signed releases is identical to Ms. Garcia's recollection.
    Defendants' objection is spurious.  Messrs. Flynn and Sutter's declarations were

24  not offered for the purpose of proving what was in Ms. Garcia's contract; rather,
    they were offered because the fact that their own contracts did not include releases

25  tends to show that Ms. Garcia's more likely than not failed to include such
    language either when *working on the same film*.  Significantly, despite Defendants'

26  vast resources (infinitely more vast than Plaintiff's), they apparently have failed to
    turn up a single member of the cast or crew to controvert Ms. Garcia or her fellow

27  declarants' account of their contracts.  At any rate, it is manifestly unfair for
    Defendants to imply that Ms. Garcia is not to be trusted, yet then turn around and

28  argue that her fellow actors' similar recollections should not be heard.

copyright law: it is a California state law case in which the court had to decide whether workers were employees or independent contractors under the California Labor Code. Interestingly, cases that *were* decided in the context of the copyright laws tend to consider a broader range of factors than that urged by the Defendants. See, e.g., Aymes v. Bonelli, 980 F.2d 857 (2d Cir. 1992) (ordering district court to weigh all employment factors "with special emphasis given to tax and benefit treatment of programmer as independent contractor").

Jules Jordan Video is not dispositive on this issue due to the unique factual circumstances of that case, on whether an actor is an "employee." An individual analysis of the Community for Creative Non-Violence factors, though, shows that in this case, Ms. Garcia was *not* an employee:

(1) While, as the old saying goes, "everybody's a critic," Defendants do not contest that Ms. Garcia's performance required her to use her own acting ability (much like any actor who practices this craft) and this factor weighs in favor of her not having been an employee.

(2) The "source of the instrumentalities and tools" factor likely weighs in favor of Nakoula/ Youssef, as Plaintiff does not dispute that she did not provide the filming equipment or sets, unless one considers the actor's voice, likeness, character, abilities, as the "instrumentalities."

(3) The "location of the work" factor likely is a neutral factor: although the work was not performed at Ms. Garcia's place of business, neither was it performed, on information and belief, at any place of business habitually used by Mr. Youssef.

(4) The "duration of the relationship" factor weighs decidedly in Ms. Garcia's favor. As Defendants point out time and again, she played a supporting role in the movie. Moreover, it is undisputed that Ms. Garcia's professional relationship with Nakoula/Youssef was quite

15

1    short—she was only on the set for a few days.

2    (5) The "right to assign additional projects to the hired party" likely

3    weighs in favor of Ms. Garcia, who agreed to play her role only.

4    (6) The "when and how long to work" factor weighs in

5    Nakoula/Youssef's favor, as he determined the hours on-set for the

6    few days Ms. Garcia was there.

7    (7) The "method of payment" factor weighs in Ms. Garcia's favor.

8    She received a one-time flat fee, with no deductions for taxes,

9    insurance, or other benefits.

10   (8) The "hiring assistants" factor is neutral; neither party asserts that

11   Ms. Garcia required assistants in connection with her role.

12   (9) The "part of the regular business of the hiring party" factor weighs

13   in Ms. Garcia's favor.  There is no evidence in the record to indicate

14   that Mr. Youssef ever made a film prior to the one at issue here.

15   (10) Likewise, the "in business" and "provision of employee benefits"

16   also weigh in Ms. Garcia's favor:  there is no evidence that

17   Nakoula/Youssef is habitually in the moviemaking business and no

18   evidence that he provided employee benefits of any sort.

19   (11) Finally, the "tax treatment of the hired party" factor is either

20   neutral or weighs in favor of Ms. Garcia.  As noted above, there is no

21   evidence in the record that Mr. Youssef deducted any taxes from Ms.

22   Garcia's flat-fee payment.  Although the deadline to send tax

23   documents for 2012 has not yet arrived, it seems unlikely that Mr.

24   Nakoula/Youssef will be sending W-2s from federal prison.

25   As this Court can see, the vast majority of the Community for Creative Non-

26   Violence factors favor Ms. Garcia; that is, weigh in favor of her *not* having been an

27   employee of Nakoula/Youssef or anyone else during the few days she was on the

28

16

set of the Film.  Accordingly, the presumption that Defendants so ardently seek this Court to apply – that is, that Ms. Garcia provided a work-for-hire, no writing needed to transfer the copyright[13]—would be highly inappropriate under both the law and the facts of this case.

### E.   Defendants Apparently Concede That All of the Third Parties Who Have Uploaded the Film Are Infringers.

In Plaintiff's Opening Brief at pages 20-21, she argued that "hundreds of third parties have copied the Film and re-posted it on YouTube … and are clearly infringing," as set forth in eight DMCA takedown notices that "specifically named and identified" the third parties and URLs involved.  Significantly, Defendants do not even attempt to rebut this argument; Plaintiff assumes they concede the point.

### F.   Plaintiff Has Shown Irreparable Harm

The threat of injury or death unquestionably constitutes irreparable harm. See, e.g., Mr. R. Dreyfus, 2012 U.S. App. LEXIS 12427 (June 9, 2012) (injunction appropriate upon showing that reduction of health services would likely cause pain, injuries or death); Oster v. Lightbourne, 2011 U.S Dist. LEXIS 138191 at *7 (N.D. Cal. Dec. 1, 2011) (distinguishing mere economic harm to defendants with threat of death or imminent injury to Plaintiff and enjoining reduction of medical services because balance of "hardships tips strongly" when faced with threat of death or injury); NRDC v. Winter, 530 F. Supp. 2d 1110 (C. D. Cal. 2007) (threat of death to whales warranted injunction).  Although conclusory statements about death threats are insufficient to support an injunction, Turner v. Gibson, 2011 U.S. Dist. LEXIS 123324 (C. D. Cal. Oct. 25, 2011), in this case, Plaintiff has submitted to the Court actual written threats of death and threats to rape her daughter and to kill Plaintiff. As Professor El Fadl put it, it is only Plaintiff's "filing of this lawsuit, public

---

[13]     See Opp. Br. at 19, citing Twentieth Century Fox Film Corp. v. Entm't. Distrib., 429 F.3d 869, 880 (9th Cir. 2005); Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965); Trenton v. Infinity Broadcasting Corp., 865 F.Supp. 1416, 1426.

17

1   attempts to clear her name and condemn the Film, and the possibility of disabling
2   the content, are acts of extraordinary courage that may be keeping her alive."

3       Defendants characterize the threats Plaintiff received as mere "insults," and
4   "unfair and upsetting," which do not justify injunctive relief.  Even an ordinary
5   stalking victim in California need only show a "credible threat of violence" to
6   obtain a restraining order.  Cal. Civ. Proc. § 527.6.   The following threats,
7   submitted as evidence in this case, can hardly be described as merely "insults":

8

9       "I am ready to die for MUHAMMAD [PBAH] and I would Like to
10      Kill all those Who contributed to in the Shape of Acting or Financial
11      or any other Kind of Support in Shameless Movie."

12

13      "And If You Wanna to save your life and we consider your innocent
14      then Just Kill Sam and Terry Jones."

15

16      "Dear the end is near. "

17

18      "cindy lee I want to kill you . . why you make the Innocence of
19      Muslims . . .If I reached to you than I finished you to kill u . If I find
20      u anywhere I will fuck you deep bitch"

21

22      "I kill who ever hand in insulting my prophet"

23

24      "Hey u bitch who u make the movie innocence of muslim.  Delete
25      this movie otherwise I am the mafia don"

26

27

28                                     18

1    Despite the clarity of the direct threats on Garcia's life because of the Film,

2    Defendants claim blithely that no "causal connection" exists between the Film's

3    continued posting on YouTube and the threats lodged at Plaintiff.   Defendants

4    provide the Court with *no admissible evidence* whatsoever that the clear threats are

5    to be understood in other than at face value.  They provide the Court with no

6    expert declaration and no evidence of any kind that would support Defendants'

7    conclusions that the written, explicit death threats are simply "unfair."  In short,

8    Defendants have provided the Court with nothing to undermine the evidence

9    before the Court that the threats are real, actual, credible, and are directly

10   connected to the continued posting of the Film on YouTube.

11        Defendants also make widespread and incorrect statements of fact in the

12   opposition brief, which are nowhere supported by any admissible evidence.  For

13   instance, Defendants claim that Plaintiff disclosed her hometown of Bakersfield

14   when interviewed on television.  (Opp. Br. at 11:15-16).  That alleged interview is

15   nowhere in the record – to the contrary, Plaintiff states in her declaration that news

16   reporters were camped out at her house *before* she gave any interviews.  (Garcia

17   Decl. ¶ 14.) And it was only *after* then that she publicly denounced the Film. (Id.)

18   Defendants also assert incorrectly and without any supporting evidence that the

19   people who were first "angry" with Plaintiff are no longer angry with her, without

20   citing any evidence for that outlandish proposition.  (Opp. Br. at 11:17-19).   In

21   fact, a *fatwa* is still in place and there is no evidence that the bounty on Plaintiff's

22   head has been rescinded. (See Garcia Decl. ¶ 14, El Fadl Decl. ¶¶ 14-15.)

23        **G.   Plaintiff Has Not Delayed in Seeking Relief**

24        Defendants claim that Plaintiff is not entitled to an injunction because she

25   unreasonably delayed in seeking relief.  First, although the initial posting of the

26   Film on July 2, 2012, constituted copyright infringement, there did not exist any

27   exigency or physical threat to Plaintiff until September 11, 2012, after the Film

28

19

1    went "viral" and the media revealed Plaintiff's identity.  In July 2012, the Film

2    garnered no attention and it is fair to infer that Plaintiff took no action then because

3    the Film was simply one of millions of unseen videos on YouTube.  Second, it is

4    reasonable that Plaintiff would wait to act until learning on September 15, 2012,

5    that Google had rejected the White House's request that the Film be taken down.

6    Third, once Plaintiff became aware of the Film's worldwide dissemination and

7    Defendants' refusal to remove it, she sought relief on September 19, 2012.  So,

8    *within four business days*, she sought relief in state court.   The state court denied

9    her ex parte application, on the grounds that the Communications Decency Act

10   barred tort causes of action against Google and YouTube and because

11   Nakoula/Youssef could not be found to be served.  Plaintiff dismissed the state case

12   and immediately filed a copyright registration and this case in in this Court on

13   September 25, 2012.  Fourth, it was not until September 27, 2012, that Google

14   stated publicly, through its Chairman Eric Schmidt, that the "video will stay up."

15   Then, Google and YouTube did not accept service until October 4, 2012.  Fifth,

16   within one business day, Plaintiff insisted that the meet and confer on the motion

17   take place; it was held on October 5, 2012.  In that conference, defense counsel

18   argued that the claim failed because it was a "joint work" between

19   Nakoula/Youssef and Garcia or the other actors.  Plaintiff's counsel immediately

20   consulted with pre-eminent copyright experts on the subject of "joint works."

21   Sixth, defense counsel informed Plaintiff's counsel that he would be unavailable

22   from October 11-16 and therefore, would not claim any delay caused by that

23   agreed-upon freeze period.  Seventh, only two days after defense counsel became

24   available, on October 18, 2012, Plaintiff filed the Application, which was

25   converted into this Motion.  Plaintiff has been extraordinarily diligent in seeking

26   relief, investigating her claims and also waiting for pivotal events to unfold so as to

27   not waste the Court's time or resources unnecessarily.  Eighth, Plaintiff diligently

28

20

1  worked through the DMCA takedown process, sending numerous takedown notices
2  to the Google representative identified as YouTube's takedown agent.  It was not
3  until October 4, 2012, that Google responded with its final position.  See
4  Cybermedia Inc v. Symantec Corp., 19 F. Supp. 2d 1070 (noting that six month
5  delay in investigating claims not unreasonable, especially where plaintiff was a
6  small company and it was prudent to proceed with caution against Symantec, a
7  company with considerable size and resources).   Plaintiff proceeded with all
8  deliberate speed, while exercising appropriate caution when suing two behemoths
9  such as YouTube and Google.

10        Defendants cite Perfect 10 v. Google, Inc., 653 F.3d 976, 982 (9th Cir. 2011,
11  for the proposition that Plaintiff cannot establish a "causal connection" between the
12  posting of the Film and her injuries.  (Opp. at 8:1-6.)  Perfect 10 is not applicable
13  for that proposition.  In Perfect 10, the copyright claimant alleged that refusing the
14  injunction would push Perfect 10 into bankruptcy.  However, Perfect 10 failed to
15  show that it was on a solid financial position otherwise.  653 F.3d  at 981-82.
16  "Perfect 10 has not shown that an injunction would forestall that fate
17  [bankruptcy]."  Id.  By contrast, here, Plaintiff *has* submitted competent evidence
18  of a renowned expert that the removal of the Film has a high likelihood of saving
19  her life, her ability to travel, and her career.  Defendants have submitted no
20  contrary evidence.

21        Defendants also use Perfect 10 to argue that an injunction against the
22  YouTube posting would do nothing because the Film is freely available elsewhere.
23  First, in the Perfect 10, case Perfect 10 "freely acknowledged" that other search
24  engines were likewise infringing.  See id. at 982.  In this case, there is *no evidence*
25  that other websites have posted the Film or that it is available elsewhere.  And,
26  Defendants (once again) make this broad and false statement without any
27  evidentiary support.  For the unsupported proposition that the Film was "viewed

28

21

1  and copied by countless individuals," Defendants cite to Paragraph 3 of the First

2  Amended Complaint.  Paragraph 3 contains no such allegation or admission.  The

3  only pertinent allegation is that other posters have posted the Film *on YouTube* and

4  that Defendants refuse to remove it.

5  Defendants also conclude that "even if the Film has affected Plaintiff's

6  career prospects, that harm is not irreparable as a matter of law." (Opp. at 10:21-22

7  citing Sampson v. Murray, 415 U.S. 61, 90 (1974), DeNovellis v. Shalala, 135 F.3d

8  58, 64 (1st Cir. 1998), Shegog v. Board of Ed. Of City of Chicago, 94 F. 3d 836 (9th

9  Cir. 1999).  Defendants are incorrect.  The Ninth Circuit has acknowledged that the

10 loss of an opportunity for a party to pursue her chosen profession is irreparable

11 harm.  Enyart v. Nat'l Conf. of Bar Examiners, Inc., 630 F.3d 1153, 1165 (9th Cir.

12 2011).   The cases cited by Defendants are inapplicable.

13 In Sampson, the United States Supreme Court held that "a loss of

14 employment can amount to irreparable harm," but concluded in that case that a

15 federal temporary employee who was still entitled to administrative hearings could

16 not base an injunction on the possibility of temporary income loss, where the

17 administrative panel had the right to pay income retroactively.  In DeNovellis, the

18 denial of the injunction resulted because the Plaintiff could allege only a decrease

19 in her pay if she accepted a transfer.  And in Shegog, the First Circuit decided that

20 a temporary loss of specific income by teachers after a lay-off was compensable

21 without an injunction.  In other words, the cases cited by Defendants involve only

22 temporary and easily compensable losses.  The closest case factually to the

23 predicament now faced by Ms. Garcia is Enyart – that because of Defendants'

24 actions, Plaintiff is entirely foreclosed from pursuing her profession.

25 **H.   The First Amendment Does Not Prohibit the Relief Sought And the Balance of Equities Tip Sharply in Plaintiff's Favor.**

26 Defendants claim that Plaintiff seeks to "stifle" public debate that has

27 erupted about the Film.  Not true.  Debate pertaining to Islam is likely to continue

28

22

on long after this case is decided.  The issue in this case, however, is the takedown of the Film itself under the Copyright Act.  Plaintiff does not wish to stifle debate or opinion.  For that reason, the cases cited by Defendants are inapplicable.  See Opp. Br. at 23.  Taking the Film would in no way "stifle" any other lawful speech, news reports, or opinions about its content.  But, if the First Amendment is implicated, it is significant that Defendants have no standing to assert the free speech rights of Nakoula/Youssef.  See Opp. Br. at 21:5.  Moreover, limits *do exist* to the First Amendment.  Just as shouting fire in a crowded theatre can be punished and restrained, see Schenck v. United States, 249 U.S. 47, 52 (1919), speech in today's global theater can likewise be restrained when it rises to the "incitement" level.  The Supreme Court has observed that, in certain circumstances, it may be appropriate to restrict speech in order to prevent a potentially violent audience from causing imminent harm to the speaker.  Feiner v. NewYork, 340 U.S. 315, 321 (1951).   As Chief Justice Vinson quoted aptly in that case:

> The language of Cantwell v. Connecticut, 310 U. S. 296 (1940), is appropriate here. "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." 310 U. S. at 308.

In this digitized age, issues of proximity are much more immediate than merely the inside of a crowded movie theater or a street corner.  With the touch of a button, a domestic speaker (such as Nakoula/Youssef) can incite riots and violence across the world, inciting violence both against U.S. embassies and within our borders against Plaintiff.   If there ever was a case that should set proper limits on inciteful speech within the contours of our new, digitized, global theater, this is the one.

23

III.    **CONCLUSION**

In summary, Defendants' argument that Garcia owns no copyright in her dramatic performance is insupportable.  If this Court adopted Defendants' view of copyright law, it would turn the entire media and music industry on their heads. Further, Defendants offer this Court no evidence whatsoever for their invitation to the Court to find that Garcia either was an employee or signed a "work-for-hire" agreement.   Plaintiff has shown that immediately upon understanding the harm she was faced with as a result of the infringing postings by YouTube and Google, she acted immediately.  Finally, careful review should be given to the cases cited by Defendants, which are wholly inapplicable or distorted to suit Defendants' views.

Based on the foregoing, Plaintiff respectfully requests that the Court GRANT the Motion in its entirety.

Dated: November 5, 2012                THE ARMENTA LAW FIRM, A.P.C.


By: _____
                        M. Cris Armenta
                        Attorneys for Cindy Lee Garcia

24

CV 12 8315 (VBKx)

**DECLARATION OF M. CRIS ARMENTA**

I, M. Cris Armenta, declare:

1.       I am an attorney licensed in the State of California and principal of the Armenta Law Firm, counsel of record for Plaintiff Cindy Lee Garcia in this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

Timeline of Events

2.       My firm was retained by Plaintiff on September 14, 2012.  By September 19, 2012, my firm prepared and filed a Complaint in Los Angeles Superior Court, and sought a restraining order on September 20, 2012.  At the hearing, attorney Tim Alger argued successfully that the state law tort claims against Google and YouTube were barred by the Communications Decency Act.  He also mentioned a "safe harbor" provision.

3.       On September 24, 2012, Plaintiff requested dismissal of the state court complaint.

4.       On September 26, 2012, Plaintiff filed this federal complaint.

5.       On September 27, 2012, Plaintiff offered Defendants' counsel the service papers and asked if they would accept service.  Tim Alger responded that he would and the papers were provided to him immediately and electronically. Attached is as Exhibit A is a true and correct copy of email transmissions between Tim Alger and me on the dates and times indicated.

6.       On October 3, 2012, Tim Alger wrote and suggested that he had not yet been served with the Complaint.  Attached as Exhibit B is a true and correct copy of his mail dated October 3, 2012.  Mr. Alger also suggested that the complaint be amended to re-name Nakoula as Mark Youssef.

7.       On October 4, 2012, Plaintiff amended the Complaint to rename Nakoula as Youssef and served counsel for Defendants Google and YouTube.

1

SUPPLEMENTAL DECLARATION OF
M. CRIS ARMENTA IN REPLY TO DEFENDANT'S
OPPOSITION
CV 12 8315 (VBKx)

8.     On Friday, October 5, 2012, Plaintiff telephoned Tim Alger and requested a telephonic meet and confer in advance of filing an application for a TRO or a Motion for Preliminary Injunction.  The conference was held that afternoon. During that conversation, Plaintiff's counsel heard YouTube and Google's legal position for the very first time – Alger purported that the work was a joint one between Garcia and the other actors and the producers or Nakoula.  Mr. Alger also informed Plaintiff's counsel that he would not be available from October 11 through October 16 to respond to any Application or Motions.  Enclosed as Exhibit C is a true and correct copy of an email that I sent to Mr. Alger on Tuesday, October 9, 2012, indicating that Plaintiff was looking at the issues raised by Mr. Alger during counsel's conference.  During that time period, I also contacted a pre-eminent expert in the area of "joint works" in the copyright context to obtain expert views on whether Google and YouTube's position had any merit.  I also engaged Plaintiff's team of lawyer s—four lawyers – to research diligently the issues of joint works and to call the actors on the Film or their representatives with whom we are in touch.

9.     On October 15, 2012, I spoke with Nakoula/Youssef's criminal defense attorney who indicated to me for the first time that Nakoula/Youssef is not the copyright owner. I immediately provided this information to Tim Alger.  Attached as Exhibit D is a true and correct copy of that email dated October 15. I also informed Mr. Alger that we were delaying the filing "out of respect for your schedule" as Mr. Alger had indicated he was not available to receive any papers until after he returned from his trip.

10.     On October 17, 2012, the Application was filed.  It was denied on October 18, 2012, and I immediately provided this Notice to Mr. Alger.  A true and correct copy of my email transmission is attached hereto as Exhibit E.

11.     Mr. Flynn signed his declaration on October 12, 2012.  Between October 12, 2012, and the time that the Application was filed, I had a conversation

2

with Mr. Flynn in which he consented to the filing of the entire declaration without redacting his name or seeking a sealing order.  For that reason, the declaration was filed in its entirety.  If there is any error in citing the declaration or explaining this last-minute change, it is mine alone.

I declare under the penalty of perjury under the laws of the United States of America and that I executed this declaration on November 5, 2012.

Dated: November 5, 2012          THE ARMENTA LAW FIRM, A.P.C.


By: _____
                    M. Cris Armenta
                 Attorneys for Plaintiff
                  Cindy Lee Garcia

3

EXHIBIT A

**Cris Armenta**

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Thursday, September 27, 2012 9:33 AM |
| **To:** | 'Alger, Timothy L.  (Perkins Coie)' |
| **Cc:** | Heather Rowland |
| **Subject:** | RE: Filed Complaint |

Heather – please email tim all the papers, including the ancillary papers and prepare a proof of service dated today per his email.  thanks

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Thursday, September 27, 2012 9:32 AM
**To:** Cris Armenta
**Subject:** RE: Filed Complaint

Hi Cris, I'll accept service of the complaint and related papers.  Tim

**Timothy L. Alger** | **Perkins Coie LLP**
PARTNER
3150 Porter Drive • Palo Alto, California  94304
Four Embarcadero Center, Suite 2400 •  San Francisco, California  94111
PHONE: 650.838.4334 •  MOBILE: 650.223.3791 •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

**From:** Cris Armenta [mailto:cris@crisarmenta.com]
**Sent:** Thursday, September 27, 2012 9:21 AM
**To:** Alger, Timothy L. (Perkins Coie)
**Subject:** FW: Filed Complaint

If you accept service, we will provide all the ancillary papers.  If I do not hear from you by noon, we will serve the registered agent.

M. Cris Armenta
The Armenta Law Firm, APC
11900 W. Olympic Boulevard, Suite 730
Los Angeles, California 90064
Telephone: (310) 826-2826
Facsimile: (310) 826-5456
www.crisarmenta.com

**From:** Heather Rowland
**Sent:** Wednesday, September 26, 2012 8:07 PM
**To:** Cris Armenta
**Cc:** Heather Rowland; Sol, Credence (credence.sol@sol-law.com)
**Subject:** Filed Complaint

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

EXHIBIT B

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Wednesday, October 03, 2012 11:07 AM |
| **To:** | 'Alger, Timothy L.  (Perkins Coie)' |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); David Hardy (David.Hardy@DMCASolutions.com); Hassell, Johnette (jhassell@electronicevidenceretrieval.com) |
| **Subject:** | RE: Service of summons |

I had you down as already having accepted service.  Nevertheless, I will discuss with my team.  Seems like we might amend the complaint, given the Court's order in the criminal case, and serve on you tomorrow.  We plan to serve Nakoula as well, with his new name.

-----Original Message-----
From: Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
Sent: Wednesday, October 03, 2012 11:04 AM
To: Cris Armenta
Subject: Service of summons

Hi Cris --

We spoke last Thursday about acceptance of service of the summons and complaint, but no process server has come by my office and I haven't yet received a notice and waiver pursuant to FRCP 4(d).  Can you let me know what you are planning to do in that regard?  Perhaps, if you are going to amend the complaint (and that might be the simplest way to solve the problem of getting Nakoula's name corrected), you should serve (or request waiver for) the amended complaint.  If you still haven't served Nakoula, maybe that makes the most sense, so there is a single, served, operative pleading and there is no dispute about the response date.

Please shoot me an email or call if you want to discuss further.

Tim


Timothy L. Alger |  Perkins Coie LLP
PARTNER
3150 Porter Drive  *  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  *  San Francisco, California  94111
PHONE: 650.838.4334  *  MOBILE: 650.223.3791  *  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com


IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

1

\* \* \* \* \* \* \* \* \* \*

NOTICE:  This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

# EXHIBIT C

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Tuesday, October 09, 2012 1:26 PM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com) |
| **Subject:** | RE: Garcia v. Nakoula |

We are working on the papers now.  Since we only first understood your position on Thursday evening, we are working to address the issues you raised.  First, we do not believe the work was joint, because it is clear that Nakoula never intended to vest the rights jointly and since intention is the cornerstone of that analysis, we have serious doubts with your position, or even that Google or YouTube should be undertaking such an analysis in any event under the DMCA.  Further, as to the issue you raised previously – whether Garcia transferred her rights – it is clear to us now that she did not.

I raise one additional point with you.  Doesn't YouTube's terms of service make the poster warrant that they are acting within the law?  Nakoula's conditions of probation prohibited him from using the internet or computers.  You indicated trhat you had not seen the conditions of probation.  They are publicly available on pacer.  YouTube an Google appear to be ignoring the fact that the poster is PROHIBITED BY LAW from using a computer, and hence, posting the content in violation of the law.  WE are considering whether it is appropriate to include this in our papers, and will let you know once the papers are ready.

That said, our intention is to file this week, likely Friday.  If you need us to delay until Monday, although we are well aware of the size and resources of both your firm and clients, please let us know and we will do what we can to accommodate you, provided that it is clear that the delay is due to your personal schedule and not because emergency relief is not warranted or necessary.

Cris

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Tuesday, October 09, 2012 1:12 PM
**To:** Cris Armenta
**Subject:** Garcia v. Nakoula

Hi Cris --

We met and conferred by telephone last Friday about your planned ex parte application for TRO and OSC re preliminary injunction.  During that conference, I raised with you our view that Nakoula, as copyright owner of the entire film, was entitled to post the film on YouTube notwithstanding any claimed co-ownership of your client to portions of the film.  I also suggested that if you had any authority to the contrary, we would appreciate seeing it, and would seriously consider it.  Also during that conference, you said you were unsure when you would be filing the ex parte application.  Having not heard further from you, are you reconsidering whether to proceed with the ex parte application (or, perhaps, with the action in its entirety)?  If you are proceeding with an ex parte application, will you please let me know when you intend to file your application?  You first told me of plans to seek a TRO and/or PI almost two weeks ago, and I have been trying to keep my calendar clear, given the short turnaround for filing an opposition, but this is becoming increasingly difficult as days pass.  I am traveling on Thursday (Oct. 11) and will be outside the country from Friday through Monday (Oct. 12-15), and Google/YT will need adequate time to prepare and file an opposition to your application.  If your application is filed while I am traveling or out of the country, I will let the Court know of my communications with you on this point.  My hope, of course, is that if plaintiff still intends to proceed by ex parte application rather than noticed motion (which we believe is more appropriate), the parties will cooperate regarding scheduling and will not need to burden the Court with a dispute.

Also, I would like to meet and confer with you regarding our intention to file a motion to dismiss, pursuant to Local Rule 7-3. I propose that we do this next Wednesday, October 17, at a time convenient to you.  Please let me know.

Tim

**Timothy L. Alger | Perkins Coie LLP**
PARTNER
3150 Porter Drive  •  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  •  San Francisco, California  94111
PHONE: 650.838.4334  •  MOBILE: 650.223.3791  •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

EXHIBIT D

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, October 15, 2012 12:52 PM |
| **To:** | talger@perkinscoie.com |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Andy Schapiro (AndrewSchapiro@quinnemanuel.com); Heather Rowland; 'sbali@perkinscoie.com' |
| **Subject:** | Innocence of Muslims |

We are filing our papers tomorrow out of respect for your schedule.

I have just been informed by Nakoula's attorney that Nakoula (aka Sam Bacile or Sam Basel) DOES NOT OWN the rights to the film and will not claim copyright ownership or the rights to the film. We believe it is YouTube's burden to identify the correct copyright owner, in light of Garcia's allegation that she owns the rights to her dramatic performance. In light of your comments during our meet and confer that YouTube's position that the work is joint between Nakoula and Garcia. This party admission will be in our papers. In light of this admission, we believe you should revisit YouTube's refusal to take down the content because Nakoula is not a copyright owner, pursuant to his attorney's admission of a few minutes ago. We do not believe that YouTube can identify any copyright owner other than Garcia – therefore she has the right to stop third party infringers, including Nakoula, YouTube and all the other posters. Feel free to call him to verify – Steve Seiden in Hawthorne.
Please advise us if your position.

Cris

1

EXHIBIT E

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Thursday, October 18, 2012 12:11 PM |
| **To:** | 'Alger, Timothy L.  (Perkins Coie)' |
| **Cc:** | sbali@perkinscoie.com; Heather Rowland; Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com) |
| **Subject:** | RE: Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO |

You are welcome.

You should probably sign up for the electronic alert system in the case.

I will be applying for an order to serve Nakoula with this order as well.  Do you want me to include that your opposition may be served via USM to Nakoula or not mention it at all?  Your call.

---

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Thursday, October 18, 2012 12:09 PM
**To:** Cris Armenta
**Subject:** RE: Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO

Cris, thanks for forwarding this.  Tim


**Timothy L. Alger | Perkins Coie LLP**
**PARTNER**
3150 Porter Drive •  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400 •  San Francisco, California  94111
PHONE: 650.838.4334 •  MOBILE: 650.223.3791 •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

---

**From:** Cris Armenta [mailto:cris@crisarmenta.com]
**Sent:** Thursday, October 18, 2012 12:00 PM
**To:** Alger, Timothy L. (Perkins Coie)
**Subject:** FW: Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO

---

**From:** cacd_ecfmail@cacd.uscourts.gov [mailto:cacd_ecfmail@cacd.uscourts.gov]
**Sent:** Thursday, October 18, 2012 11:58 AM
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits**

1

attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered on 10/18/2012 at 11:57 AM PDT and filed on 10/18/2012

| | |
|---|---|
| **Case Name:** | Garcia et al v. Google Inc et al |
| **Case Number:** | 2:12-cv-08315-MWF-VBK |
| **Filer:** | |
| **Document Number:** | 15 |

**Docket Text:**
**MINUTES (IN CHAMBERS) by Judge Michael W Fitzgerald: On 10/17/2012, Plaintiff filed an Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause Re Preliminary Injunction, and Order of Impoundment [12]. The Application is DENIED. For the reasons stated above and given that the alleged infringement seems to have commenced almost three months ago on 7/2/2012 (see Application at 2), the Court declines to consider this Application on an ex parte basis. Instead, the Court CONSTRUES the Application as a MOTION for a Preliminary Injunction. Accordingly, the Court ORDERS the following: Defendants shall file any opposition brief on or before 10/29/2012. Garcia shall file any reply brief on or before 11/5/2012. The hearing on Garcia's motion for preliminary injunction is hereby scheduled for 11/19/2012 at 10:00 AM. (jp)**

**2:12-cv-08315-MWF-VBK Notice has been electronically mailed to:**

M Cris Armenta     heather@crisarmenta.com, cris@crisarmenta.com

Credence E Sol     credence.sol@sol-law.com

**2:12-cv-08315-MWF-VBK Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

     I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

     On November 5, 2012 I served the following document(s) described as:

**(1) REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT;  DECLARATION OF M. CRIS ARMENTA IN SUPPORT THEREOF (filed separately);**

**(2) PLAINTIFF'S RESPONSE TO  OBJECTIONS BY GOOGLE, INC. AND YOUTUBE LLC TO EVIDENCE SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND ORDER OF IMPOUNDMENT (filed separately);**

**(3) PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC., AND YOUTUBE, LLC. IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT (filed separately);**

**(4) [PROPOSED] ORDER SUSTAINING PLAINTIFF'S OBECTIONS TO EVIDENCE SUBMITTED BY GOOGLE, INC., AND YOUTUBE LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND AN ORDER OF IMPOUNDMENT (lodged separately)**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

**Timothy L. Alger**
**Perkins Coie LLP**
**3150 Porter Drive**
**Palo Alto, CA 94304-1212**

     ***BY MAIL:***  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.  (C.C.P. § 1013 (a) and 1013a(3))

     Executed on November 5, 2012 in Los Angeles, California.

                           Heather Rowland

1

**PROOF OF SERVICE**
