1  M. Cris Armenta (SBN 177403)
   THE ARMENTA LAW FIRM APC
2  11900 W. Olympic Boulevard, Suite 730
   Los Angeles, CA 90064
3  Tel: (310) 826-2826 x 108
   Facsimile: (310) 826-5456
4  Email: cris@crisarmenta.com

5  Credence E. Sol (SBN 219784)
   La Garenne
6  86300 Chauvigny
   France
7  Tel: 06 74 90 22 08
   Email: credence.sol@sol-law.com
8
   Attorneys for Plaintiff
9  Cindy Lee Garcia

10              **UNITED STATES DISTRICT COURT**

11          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12  CINDY LEE GARCIA, an              Case No. CV12-8315-MWF(VBKx)
    individual,
13                                    **PLAINTIFF'S OBJECTION TO
                                      AND REQUEST TO STRIKE**
14              Plaintiff,            **DECLARATIONS OF TIM
                                      ALGER AND MARK BASSELEY**
15  vs.                              **YOUSSEF; DECLARATIONS OF
                                      M. CRIS ARMENTA, GAYLORD**
16  NAKOULA BASSELEY                 **FLYNN, CINDY LEE GARCIA
    NAKOULA, an individual also       AND JIM BLANCO**
17  known as SAM BACILE, MARK
    BASSELEY YOUSSEF,
18  ABANOB BASSELEY
    NAKOULA, MATTHEW
19  NEKOLA, AHMED HAMDY,
    AMAL NADA, DANIEL K.
20  CARESMAN, KRITBAG
    DIFRAT, SOBHI BUSHRA,
21  ROBERT BACILY, NICOLA
    BACILY, THOMAS J. TANAS,
22  ERWIN SALAMEH, YOUSSEFF
    M. BASSELEY, and/or MALID
23  AHLAWI; GOOGLE, INC., a
    Delaware Corporation;
24  YOUTUBE, LLC, a California
    limited liability company, and
25  DOES 1 through 10, inclusive.

26              Defendants.

27

28

1    Plaintiff Cindy Lee Garcia hereby objects to and requests the Court to strike

2    the Declarations of Tim Alger and Mark Basseley Youssef filed on November 28,

3    2012, only *three business days* prior to the hearing on the Motion for Preliminary

4    Injunction set for December 3, 2012, and which rely entirely on documents which,

5    were they genuine (which Plaintiff can prove are *not*), have been available since

6    2011.[1]  The documents are a forgery, according to a credible forensic document

7    examiner.  See ¶ 8, below. The grounds for the objection are as follows:

8    1.    Defendants Have Neither Sought Nor Been Granted Leave to File Late

9    Evidence, Which Could Have Been Filed Timely, In Violation of F.R.C.P. 6(b),

10   Local Rule 7-9 and this Court's Order Dated October 18, 2012.  Defendants

11   YouTube, LLC, and Google, Inc., neither sought nor obtained leave from this Court

12   to file new "evidence" (specifically, a copyright release that all Defendants now

13   claim that Plaintiff signed in *2011*) three business days before the scheduled

14   hearing.  Federal Rule of Civil Procedure 6(b) requires that "[w]hen an act may or

15   must be done within a specified time," a party must file a "motion … after the time

16   has expired if the party failed to act because of excusable neglect."  The court may

17   properly exclude untimely evidence when a party fails to submit that evidence

18   pursuant to a motion, as Rule 6(b) expressly requires.  Lujan v. Nat'l Wildlife Fed'n,

19   497 U.S. 871, 895-98, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) ("Perhaps it is true

20   that the District Court could have overcome all the obstacles we have described—

21   apparent lack of a motion, of a showing, and of excusable neglect—to admit the

22   affidavits at issue here.  But the proposition that it was compelled to receive them—

23   that it was an abuse of discretion to reject them—cannot be accepted"); see also

24   Fleischer Studios, Inc. v. A.V.E.L.A., Inc. 654 F.3d 958, 966 (9th Cir. 2011)

25   (upholding district court's exclusion of evidence filed late, without any leave from

26

27   [1]    Although this Court initially set the hearing for November 19, 2012, it was
28   delayed for two weeks at the request of Defendants YouTube, LLC, and Google,
     Inc., because lead defense counsel indicated that he was not available on that date.

1  the court).  Pursuant to the Court's Minute Order dated October 18, 2012,

2  Defendants' opposition and any supporting evidence was due on October 29, 2012.

3  Local Rule 7-9 requires that the opposing party submit all evidence within the time

4  prescribed by the rules of the Court.  Defendants, fully aware of the issues involved

5  in this case ever since Plaintiff filed her original case in California state court on

6  September 19, 2012, have had four weeks to assemble their evidence, and clearly

7  have ample resources to employ counsel and investigators to do so.  Lead trial

8  counsel Tim Alger admits that on November 16, 2012, he requested a copy of the

9  documents that Google and YouTube now submit.  Oddly, however, between

10 November 16, 2012, and November 28, 2012, neither Google nor YouTube (nor

11 their new ally, Defendant Youssef[2]) ever filed an *ex parte* application or even

12 requested that Plaintiff's counsel stipulate to Defendants filing evidence late,

13 obtaining a continuance, or conducting briefing on their "new" evidence, despite

14 having had ample time and opportunity to do any of these things.  This late filing

15 shows Defendants' blatant disregard for the rules of this Court, and nothing short of

16 sandbagging Plaintiff, whom Defendants know is a woman of extremely modest

17 means and has virtually no resources to redress Defendants' misconduct.

18       2.   <u>Plaintiff Has No Opportunity to Cross-Examine the Declarants</u>:  Under

19

20  _____
    [2]   It is unclear why Defendant Youssef has suddenly decided to "work with"
21  Google and YouTube and join forces, to the point that Google and YouTube's
    lawyer apparently is drafting Mr. Youssef's declarations.  One possible explanation
22  is that Mr. Youssef was sentenced to death just days ago by an Egyptian court for
    his actions in making the film at issue in this case. *See* Declaration of M. Cris
23  Armenta ("Armenta Decl."), ¶ 6, and Ex. D thereto ("Innocence of Muslims
    Participants Sentenced to Death in Egypt," *The Guardian*, Nov. 28, 2012, *available*
24  *at* http://www.guardian.co.uk/world/2012/nov/28/innocence-of-muslims-death-
    sentence).  This media report is not hearsay, as it is offered merely to show Mr.
25  Youssef's state of mind, *see* FED. R. EVID. 803(3); even if it is hearsay not fitting
    within an exception to the hearsay rule, this Court is entitled to consider it on a
26  motion for preliminary injunction. See Flynt Distrib. Co., 734 F.2d at 1394 (9th Cir.
    1984); see also V.L. v. Wagner, 669 F.Supp.2d 1106, 1115 n.8 (N.D. Cal. 2009)
27  ("[O]n a motion for a preliminary injunction, the Court may consider inadmissible
    evidence, giving such evidence appropriate weight depending on the competence,
28  personal knowledge, and credibility of the declarants.").

1   Local Rule 7-8, Plaintiff is entitled to request, 14 days before the hearing, the right

2   to cross-examine a declarant.  Having learned only three business days before the

3   hearing that Google and YouTube have now joined forces with Mr. Youssef and that

4   Defendants are relying on forged documents,[3] Plaintiff has little opportunity to

5   request the opportunity to cross-examine Defendant Youssef and Mr. Alger.[4]  As a

6   matter of fairness, and because the late-filed evidence may render Local Rule 7-8 a

7   dead letter, Plaintiff respectfully requests that this Court disregard Defendants' late-

8   filed declarations and exhibits in their entirety.  In the alternative, Plaintiff requests

9   that this Court permit Plaintiff's counsel to cross-examine Defendant Youssef and

10   Mr. Alger as requested in her separately submitted Notice of Request.

11          3.      Objections to Mr. Alger's Declaration:

| Paragraph 2, first sentence. | Hearsay (FED. R. EVID. 802), lack of personal knowledge (FED. R. EVID. 602).  Mr. Alger is not competent to testify as to what was "completed and signed" by Plaintiff.  Moreover, because it was Defendant Youssef, an individual convicted of felony fraud, who provided Mr. Alger's purported "knowledge" of whether or not Plaintiff executed the exhibit, this Court should reject all of Mr. Alger's |
| --- | --- |

[3]      *See* Declarations of M. Cris Armenta, Cindy Lee Garcia and Jim Blanco.

[4]      Plaintiff filed a request under the local rules to cross-examine Mark Basseley Youssef.  Mr. Youssef is still housed at the Los Angeles Metropolitan Detention Center.  The objection to the Notice of Request filed today does not properly assert the bases permissible in the Rule 7-8.

4

| | statements that are grounded on Defendant Youssef's statements and representations as not credible. *See* FED. R. EVID. 609(2) (witness's character for truthfulness by evidence of a criminal conviction is appropriately attacked where crime of conviction involved a dishonest act or false statement); QBAS Co. v. C. Walters Intercoastal Corp., 2010 U.S. DIST. LEXIS 143945, *28 (C.D. Cal., Dec. 16, 2010), quoting New England Braiding v. A.W. Chesterton Co., 970 F.2d 878, 884 (Fed. App. 1992) ("A credibility determination is well within the court's province when ruling on a preliminary injunction motion."). |
|---|---|
| Paragraph 3. | Lack of personal knowledge (FED. R. EVID. 602); Mr. Alger is not competent to testify as to what is the "original release" because he lacks personal knowledge.  Moreover, because it was Defendant Youssef, an individual convicted of felony fraud, who provided Mr. Alger's purported "knowledge" of the contents of the |

| | |
|---|---|
| | "original release," this Court should reject all of Mr. Alger's statements that are grounded on Defendant Youssef's statements and representations as not credible. *See* FED. R. EVID. 609(2) (witness's character for truthfulness by evidence of a criminal conviction is appropriately attacked where crime of conviction involved a dishonest act or false statement); <u>QBAS Co. v. C. Walters Intercoastal Corp.</u>, 2010 U.S. DIST. LEXIS 143945, *28 (C.D. Cal., Dec. 16, 2010), quoting <u>New England Braiding v. A.W. Chesterton Co.</u>, 970 F.2d 878, 884 (Fed. App. 1992) ("A credibility determination is well within the court's province when ruling on a preliminary injunction motion."). |
| Paragraph 5, first sentence. | Lack of personal knowledge (FED. R. EVID. 602); Mr. Alger is not competent to testify as to what Mr. Seiden did or did not do.  Notably, there is no declaration from Mr. Seiden, nor any declaration from any member of Mr. Youssef's "family." |

| | |
|---|---|
| | Moreover, because it was Defendant Youssef, an individual convicted of felony fraud, who provided Mr. Alger's purported "knowledge" of the activities of Mr. Seiden and/or Mr. Youssef's "family," this Court should reject all of Mr. Alger's statements that are grounded on Defendant Youssef's statements and representations as not credible.  *See* FED. R. EVID. 609(2) (witness's character for truthfulness by evidence of a criminal conviction is appropriately attacked where crime of conviction involved a dishonest act or false statement); QBAS Co. v. C. Walters Intercoastal Corp., 2010 U.S. DIST. LEXIS 143945, *28 (C.D. Cal., Dec. 16, 2010), quoting New England Braiding v. A.W. Chesterton Co., 970 F.2d 878, 884 (Fed. App. 1992) ("A credibility determination is well within the court's province when ruling on a preliminary injunction motion."). |
| Paragraph 5, second sentence. | Irrelevant (FED. R. EVID. 401).  Ms. |

| | |
|---|---|
| | Garcia's current telephone number has no bearing on what her telephone number is in 2011, or more specifically, on August 9, 2011, the date on which Defendants claim that Plaintiff signed the "release." |
| Paragraph 5, third and fourth sentences. | What an investigator purportedly told Mr. Alger is hearsay.  FED. R. EVID. 802; <u>X17, Inc. v. Lavandeira</u>, 2007 U.S. Dist. LEXIS 17279, at *8 (C.D. Cal. 2007) (rejecting hearsay evidence and unauthenticated documents at preliminary injunction hearing). |
| Paragraph 9, in its entirety. | Best evidence rule (FED. R. EVID. 1002), improper argument.  Mr. Alger's recitation of the release is inadmissible. |
| Paragraph 10. | Hearsay (FED. R. EVID. 802), speculation.  Mr. Alger's testimony as to what Mr. Youssef would say, if called as a witness, is hearsay and speculation.  <u>See</u> <u>X17, Inc. v. Lavandeira</u>, 2007 U.S. Dist. LEXIS 17279, at *8 (C.D. Cal. 2007) (rejecting hearsay evidence and unauthenticated documents at |

| | preliminary injunction hearing). |
|---|---|
| Paragraph 11. | Hearsay (FED. R. EVID. 802), speculation. Mr. Alger's testimony as to what Mr. Youssef would say, if called as a witness, is hearsay and speculation. See X17, Inc. v. Lavandeira, 2007 U.S. Dist. LEXIS 17279, at *8 (C.D. Cal. 2007) (rejecting hearsay evidence and unauthenticated documents at preliminary injunction hearing). |
| Paragraphs 13-15. | Untimely. Mr. Alger had an opportunity already to rebut Plaintiff's evidence, or to seek leave to do so, and failed to do either. The untimely attack on Plaintiff's declarations is improper, and also materially false, as shown by the Declarations of attorneys M. Cris Armenta, Credence Sol, David Hardy, and Jason Armstrong. FED. R. CIV. PROC. 6(b), C.D. Cal. Local Rule 7-9. |

   4.   Refusal to Permit Inspection of Original.  As demonstrated by the emails exchanged by counsel.  Plaintiff's lead counsel asked Mr. Alger *twice* for an opportunity to inspect the purported "release" documents, including both the original (which would be preferred by any competent handwriting analysis expert)

1  and the purported exhibits to the "release," none of which Plaintiff's counsel has yet

2  seen. *See* Armenta Decl. ¶¶ 2-3, and Exhibits A and B thereto. Mr. Alger refused to

3  accede to those requests. Now, it appears that Mr. Alger has the original in his

4  possession. Yet, Plaintiff has still not inspected the original. *See* Armenta Decl.

5  ¶¶ 2-3, and Exhibits A and B thereto.

6       5.   <u>The Documents Are So Incomplete As To Be Entirely Unreliable:</u>

7          a.  The copy of the "Cast Deal Memo" has the party to the purported

8              agreement crossed out before the acronym "LLC" on the second line.

9              Therefore, it is impossible to discern the identity of the party to that

10              portion of the agreement. Declaration of Mark Basseley Youssef

11              ("Youssef Decl."), Ex. 1.

12          b.  The "Cast Deal Memo" also is unsigned in the space on page 2

13              allocated for "Producer." Youssef Decl., Ex. 1. This omission strongly

14              suggests that the purported "Cast Deal Memo," assuming that it was

15              not fabricated for the purposes of litigation, in reality is merely an

16              unexecuted draft. The "Cast Deal Memo" contains other significant

17              omissions, including: (i) the lack of a signature even purporting to be

18              that of Cindy Lee Garcia on this document (the only document

19              purporting to create a "work for hire" relationship, as the Copyright Act

20              mandates in order for Ms. Garcia to have effectively assigned her

21              copyright interest); (2) the lack of a signature line for Ms. Garcia's

22              signature; (3) the lack of language in the "Cast Deal Memo"

23              incorporating it by reference into the "Personal Release" (the only

24              document of the two purporting to exhibit Ms. Garcia's signature); or

25              (4) the lack of any other reference to the "Personal Release." Youssef

26              Decl., Ex. 1.

27          c.  With respect to the document titled "Personal Release," the name of the

28

1        production company is redacted or concealed, rendering it impossible

2        to discern the identity of the production company.  Youssef Decl., Ex.

3        1.

4    d.  In the first full paragraph of the document titled "Personal Release,"

5        there is no title inserted for the "Picture," and therefore, it is impossible

6        to discern to what "Picture" this document refers.  Youssef Decl., Ex. 1.

7    e.  Finally, on the bottom space below the words "AGREED AND

8        ACCEPTED TO" in the document titled "Personal Release," there is no

9        signature, again suggesting that this document, like the "Cast Deal

10       Memo," is nothing more than an unexecuted draft, assuming that it was

11       not fabricated for the purposes of litigation.  Youssef Decl., Ex. 1.

12   6.   <u>Other Indicia of Unreliability</u>:  The documents bear other indicia of

13   unreliability.  In the "Personal Release," the top handwritten line refers to the title of

14   the project as "Desert Warriors."  Youssef Decl., Ex. 1.  Notably, at the time Cindy

15   Lee Garcia and the rest of her duped castmates appeared in the film, its working title

16   was "Desert Warrior," *not* "Desert Warrior*s*."  Declaration of Gaylord Flynn

17   ("Flynn Decl."), ¶ 2.  However, after this case became the subject of a media

18   maelstrom, some media misreported the name of the film as "Desert Warrior*s*,"

19   instead of its actual name, "Desert Warrior."  It is hard to imagine that at the time

20   the film was actually made, those involved in the legal paperwork and production of

21   the film would get the name of the film wrong.  It seems more reasonable to

22   conclude that someone, *after* the media storm began, created these documents, and

23   made the same mistake as the media.  This conclusion is bolstered by the fact that

24   both of the documents that Defendants have submitted apparently purport to refer to

25   Mr. Youssef as "Sam Bessi (matthew mtta)."  Youssef Decl., Ex. 1.  However, Mr.

26   Youssef has never used the alias "Sam Bessi" (*see* Armenta Decl., ¶ 4, Ex. C, at 6:6-

27   16, 7:13-22 (listing the aliases that Mr. Youssef has used as including "Nakoula

28

1   Basseley Nakoula," "Mark Basseley Youssef," "Sam Bassil, "Sam Bassiel," and

2   "Sam Bacile")), nor do Defendants provide any other explanation as to whom either

3   "Sam Bessi" nor "matthew mtta" are.  Accordingly, because the documents

4   apparently purport to transfer Ms. Garcia's copyright to a non-existent person, it is

5   void.  See Cal. Civ. Code § 1558 ("It is essential to the validity of a contract, not

6   only that the parties should exist, but that it should be possible to identify them");

7   see Westlye v. Look Sports, Inc. 17 Cal. App. 4th 1715, 1778 (1993 (refusing to

8   extend release to parties not identified in the ski liability release); Cisco v. Van Lew,

9   60 Cal. App. 2d 575 (1943 (court refusing contract because party not identified).

10         7.    Ms. Garcia's Castmate Also Has Disavowed the Authenticity of the

11   Purported Documents: Garcia's fellow cast members have sworn that they did not

12   sign papers like the ones Defendants have submitted.[5]  For example, actor Gaylord

13   Flynn, whose role was more substantial than that of Plaintiff, has submitted a sworn

14   declaration testifying that he reviewed both the purported "Personal Release" and

15   "Cast Deal Memo," that he was not presented with any such documents to sign, and

16   that if he had been presented with such documents, he would remember it.  Flynn

17   Decl. ¶ 2; see also Declaration of Dan Sutter, submitted in support of Plaintiff's Ex

18   Parte Application for Temporary Restraining Order, at ¶ 4.

19         8.    **The Writing is a Forgery:**  A credible forensic handwriting has

20   **unequivocally that the handwriting is *not* that of Cindy Lee Garcia.  See**

21   **Declaration of James Blanco.[6]**

22

23   ――――――――――――――

24   [5]     Of course, had Mr. Youssef and his agents required the cast to sign a
     "Personal Release" and/or "Cast Deal Memo," they would have required *all* cast
25   members (not just Plaintiff, whose role in the production and all Defendants have
     now minimized and belittled) to sign such agreements.

26   [6]     Mr. Blanco delivered his oral report to Plaintiff's counsel this morning,
     Friday, November 30, 2012, at 10:15 a.m.  As soon as counsel receives his written
27   report, it will be made immediately available to Defendants and the Court.

28

9.    <u>This Court Should Disregard in Its Entirety the Declaration of Mr.</u>
<u>Youssef.</u>  Mr. Youssef, who was convicted of bank fraud in 2010, is currently
serving time for violating the conditions of his parole, for, significantly, *lying*. *See*
Armenta Decl. ¶ 4, and Ex. C thereto, at 18:2-12.  Mr. Alger, the lawyer for Mr.
Youssef's allies Google and YouTube, apparently prepared Mr. Youssef's
declaration, which he signed at the federal Metropolitan Detention Center.
However, because Mr. Youssef is a convicted felon who committed a crime of
dishonesty, Plaintiff respectfully requests that this Court reject his declaration in its
entirety as not credible.  *See* FED. R. EVID. 609(2) (witness's character for
truthfulness by evidence of a criminal conviction is appropriately attacked where
crime of conviction involved a dishonest act or false statement); <u>QBAS Co. v. C.</u>
<u>Walters Intercoastal Corp.</u>, 2010 U.S. DIST. LEXIS 143945, *28 (C.D. Cal., Dec.
16, 2010), quoting <u>New England Braiding v. A.W. Chesterton Co.</u>, 970 F.2d 878,
884 (Fed. App. 1992) ("A credibility determination is well within the court's
province when ruling on a preliminary injunction motion.").  Indeed, if this Court
were to adjudge Mr. Youssef not credible, it will be the second Court in this district
to do so this month.  *See* Armenta Decl. ¶ 4, and Ex. C thereto, at 18:2-12.  In other
words, this Court should completely disbelieve Mr. Youssef's declaration and
averment that, notwithstanding his many previous lies, he now suddenly is telling
the truth.  His declaration should be stricken in its entirety.

10.    <u>Even if the Documents Are Genuine, Which Plaintiff Can Prove They</u>
<u>Are Not, They Are Void, Because It is Undisputed That They Were Procured by</u>
<u>Fraud</u>:  Based on the evidence before the Court, "Personal Release" and "Cast Deal
Memo," even if genuine, were procured by fraud, as already established by the
Declaration of Cindy Lee Garcia.[7]  Mr. Youssef used a false name and tricked the

---

[7]    Plaintiff expects that, if this Court grants her request to cross-examine Mr.
Youssef, he will admit, as recently reported by the *New York Times*, that he and his
agents (including his son, who apparently is one of the individuals who has posted

1  cast and crew into believing they were participating in an innocuous historical

2  adventure when, in fact, at all times he intended to use the footage to create a piece

3  of anti-religious hate speech.  It is established law in the Ninth Circuit that even if a

4  copyright holder (in this case, an actor) impliedly grants a license to a producer to

5  use her copyrighted content (in this case, Ms. Garcia's performance in "Desert

6  Warrior"), if the scope of that license is exceeded, then the use is unauthorized, the

7  license is invalidated and the original copyright holder's copyright claim against the

8  producer is restored.  Oddo v. Ries, 743 F.2d 630, 633 (9th Cir. 1984); see also

9  Gilliam v. American Broadcasting Cos., 538 F.2d 14, 19-21 (2d Cir. 1976) (license

10  to use underlying work in a particular derivative work does not permit licensee to

11  use underlying work in any other derivative work).

12

13  Dated: November 30, 2012              THE ARMENTA LAW FIRM, A.P.C.

14

15                            By: _____

16                                        M. Cris Armenta
                                          Attorneys for Plaintiff
17                                        Cindy Lee Garcia

18

19

20

21

22

23

24

25  the trailer on YouTube) knew that the film would put the actors at substantial risk,
    and therefore misled them as to the nature of the project. See Armenta Decl., ¶ 7,
26  Ex. E ("From the Man Who Insulted Mohammed, No Regret," New York Times,
    Nov. 25, 2012).  This media report is not hearsay, as it embodies an admission of a
27  party opponent or his agent, see FED. R. EVID. 801(2); even if it is hearsay not fitting
    within an exception to the hearsay rule, this Court is entitled to consider it on a
28  motion for preliminary injunction. See Flynt Distrib. Co., 734 F.2d at 1394; see also
    V.L., 669 F.Supp.2d at 1115 n.8.

# DECLARATION

## DECLARATION OF M. CRIS ARMENTA

I, M. Cris Armenta, declare:

1.      I am an attorney licensed in the State of California and principal of the Armenta Law Firm, counsel of record for Plaintiff Cindy Lee Garcia in this action. I am a member in good standing before the State Bar of California, and admitted to practice before this Court.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      On Sunday, November 18, 2012, I received an email from Tim Alger in which he represented that Plaintiff signed a release, consisting of two documents, of her rights for the film that is the subject of this litigation.  At the time, I was on vacation in Nevada with my two children for Thanksgiving week and not in the office nor at my home office.  Attached as Exhibit A is a true and correct copy of Mr. Alger's email, including both attachments.

3.      The proffered documents were produced to me in .pdf form only.  I immediately contacted my client, because the existence of these documents is inconsistent with her sworn declarations in this Court and inconsistent with the sworn statements of other actors that worked on the film.  Based on my investigation on that Sunday of the Thanksgiving weekend, I advised Mr. Alger early on Monday morning, November 26, 2012, that my legal team had "serious doubts" as to the authenticity of the document.  I asked: (1) that Mr. Alger inform us of the provenance or source of the proffered document; (2) that Mr. Alger provide the missing portions of the document that were either redacted or missing attachments; and (3) to inspect the original of the document.  Mr. Alger informed me that he obtained the document from the criminal attorney representing Defendant Mark Youssef (a/k/a Nakoula Basseley Nakoula, Sam Bacile).  Mr. Alger refused my other requests – to inspect the original and for the missing data or information,

1   and instead threatened to bring Rule 11 sanctions against my client and me.  I

2   informed Mr. Alger that my team was moving very expeditiously to examine the

3   document and that I would be in touch very soon once we were able to complete a

4   responsible analysis of the proffered document(s).  I immediately placed a telephone

5   call to Mr. Seiden, Defendant Youssef's criminal lawyer, to confirm Mr. Alger's

6   representations and to obtain any information possible about the provenance of the

7   document(s).  My email exchanges with Mr. Alger following November 19, 2012, a

8   are attached hereto as Exhibit B.

9        4.    The documents filed by Defendants contain certain indicia of

10  unreliability, which are set forth at length in Plaintiff's objection.  With respect to

11  one of those indicium, the discrepancy between references to "Sam Bessi (matthew

12  mtta)" and the aliases that Judge Christina Snyder of this Court has found Mr.

13  Youssef has used, I attach the transcript of Mr. Youssef's parole violation hearing

14  before Judge Snyder, dated November 7, 2012, as Exhibit C.

15       5.    On Wednesday, November 28, 2012, Plaintiff was able to gather the

16  financial resources to retain a handwriting expert, Jim Blanco.  Mr. Blanco delivered

17  his oral report to me this morning, at 10:15 a.m., on Friday, November 30, 2012 – to

18  the effect that none of the handwriting on the questioned documents belongs to

19  Cindy Lee Garcia.  As soon as I receive his written report, I will make it

20  immediately available to the Court and to the Defendants.

21       6.    According to media reports, this week an Egyptian court sentenced Mr.

22  Youssef, among others, to a sentence of death as a result of the film.  Attached as

23  Exhibit D is a true and correct copy of an article titled "Innocence of Muslims

24  Participants Sentenced to Death in Egypt," *The Guardian*, Nov. 28, 2012, *available*

25  *at* http://www.guardian.co.uk/world/2012/nov/28

26  /innocence-of-muslims-death-sentence).

27

28

7.      *The New York Times* recently reported that Mr. Youssef and his agents (including his son, who apparently is one of the individuals who has posted the trailer on YouTube) knew that the film would put the actors at substantial risk, and therefore misled them as to the nature of the project.  Attached as Exhibit E is an article titled, "From the Man Who Insulted Mohammed, No Regret," *The New York Times*, Nov. 25, 2012).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of November, 2012 at Bozeman, Montana.

M. Cris Armenta

EXHIBIT A

**Cris Armenta**

| | |
|---|---|
| **From:** | Alger, Timothy L.  (Perkins Coie) <TAlger@perkinscoie.com> |
| **Sent:** | Sunday, November 18, 2012 2:39 PM |
| **To:** | Cris Armenta |
| **Subject:** | Garcia v. Nakoula et al |
| **Attachments:** | Garcia Cindy Lee-Releases (2) copy.pdf |

Hi Cris --

Your client executed a release of all claims and assignment of any rights under the Copyright Act on August 9, 2011.  A copy is attached.  We believe you should dismiss the action promptly, and I'll work with you to accomplish that.  I am traveling this evening and Monday but can be reached by cell phone at 650 223 3791.

Tim

**Timothy L. Alger | Perkins Coie LLP**
PARTNER
3150 Porter Drive • Palo Alto, California 94304
Four Embarcadero Center, Suite 2400 • San Francisco, California 94111
PHONE: 650.838.4334 • MOBILE: 650.223.3791 • FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

---

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

## PERSONAL RELEASE

F ~~Desert Warriors~~
Production Company _____ & Matthew mtta.
Address    1040 Hamilton rd.
Durarte Ca. 91010    Date  8/9/11

Ladies and Gentlemen:

I, the undersigned, hereby grant permission to ___ Sam Bessi (matthew mtta)
("Producer") to photograph me and to record my voice, performances, poses, acts, plays and appearances, and use
my picture, photograph, silhouette and other reproductions of my physical likeness and sound as part of the ___
___ Oma Roman _____ tentatively entitled ___
_____ (the "Picture") and the unlimited distribution, advertising,
promotion, exhibition and exploitation of the Picture by any method or device now known or hereafter devised in which
the same may be used, and/or incorporated and/or exhibited and/or exploited.

I agree that I will not assert or maintain against you, your successors, assigns and licensees, any claim, action, suit or
demand of any kind or nature whatsoever, including but not limited to, those grounded upon invasion of privacy, rights
of publicity or other civil rights, or for any other reason in connection with your authorized use of my physical likeness
and sound in the Picture as herein provided.  I hereby release you, your successors, assigns and licensees, and each
of them, from and against any and all claims, liabilities, demands, actions, causes of action(s), costs and expenses
whatsoever, at law or in equity, known or unknown, anticipated or unanticipated, which I ever had, now have, or may,
or shall hereafter have by reason, matter, cause or thing arising out of your use as herein provided.

I affirm that neither I, nor anyone acting for me, gave or agreed to give anything of value to any of your employees or
a representative of any television network, motion picture studio or production entity for arranging my appearance
on the Picture.

The undersigned understands that they will not be compensated for their appearance in the recording.

I have read the foregoing and fully understand the meaning and effect thereof and, intending to be legally bound, I
have signed this release.

Dated  8/9/11 _____    Cindy Garcia
                                   Signature

                                   _____
                                   If a minor, Guardian's Signature

                                   _____
                                   Please Print Name

AGREED AND ACCEPTED TO           _____
                                   Address

                                   _____

By _____     (661)817-3347
                                   Phone Number

Release #1

## Cast Deal Memo

This memo outlines terms of the agreement between *M.M.* ~~Pictures Productions~~ LLC. and *Cindy Garcia* (hereinafter "Producer") related to the production of ~~Desert Warrior~~ (hereinafter "Motion Picture.")

1. *Services*:

_Cindy Garcia_____ agrees to perform the services outlined in Appendix A.

2. *Compensation*:

Subject to the rest of the terms of this agreement, and upon satisfactory completion of the services outlined in Appendix A, Producer agrees to compensate _Cindy Garcia____ at the rate and time designated in Appendix B.

3. *Employment Status*:   [Independent Contractor]

[Independent Contractor:  The parties agree that ____CG_____ is an independent contractor, who is not required to work exclusively for Producer now or in the future, and who, as a professional, is expected to complete the assignment without supervision or training.  No fringe benefits or overtime compensation will be provided and the contractor is solely responsible for all income, self-employment and other taxes due upon this income received in conjunction with the services rendered under this agreement. **The contractor is not entitled to collect unemployment compensation under this agreement.**]

4. *Assignment of Rights*

[____CG_____ assigns to producer all rights necessary for the development, production and exploitation of the Motion Picture, whether denominated copyrights, performance rights, or publicity rights, including the right to reasonable use of his/her name and likeness in conjunction with the development, production and exploitation of the Motion Picture, and waives any right to sue Producer over such use.]

[____CG_____ warrants to Producer that all

writing submitted for the Motion Picture is his own original work. The parties agree the script and all revisions of the script of the film are "works made for hire" as defined under article 101 of Title 17 of the U.S. Code. If for any reason the script should be determined to not be a "work made for hire," _____ CG _____ assigns all rights he may have to the work under U.S. and International copyright law to Producer.

5. *Credits*:

Producer agrees to provide the following credits:

_Sam Bessi_  (matthew moutta)

_____ 8/9/11
                                            Date

Social Security Number

_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_
Address

_____

Producer                          Date

Appendix A:

[Describe the services to be performed in plain English including dates and times required to be available and any equipment to be provided.]

[Examples: actor playing (role); dates; times (or "as needed"); related responsibilities. Writer; responsibilities including revisions/turn around times between dates; Stunts/effects...]

Appendix B:
Describe Compensation Rate

# EXHIBIT B

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, November 26, 2012 10:02 AM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; sbali@perkinscoie.com |
| **Subject:** | RE: Garcia v. Nakoula et al |

Dear Tim:

Based on what we have learned from our own client and from others who worked on this film, we have serious doubts as to the authenticity of the document(s) you sent. What do you offer as the provenance, or ability to authenticate, this document? We can better analyze its authenticity if we know where and from whom Google obtained it. We are examining the issue now and once you provide us with the purported origin of the document, will get back to you very soon.

Cris

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Sunday, November 18, 2012 2:39 PM
**To:** Cris Armenta
**Subject:** Garcia v. Nakoula et al

Hi Cris --

Your client executed a release of all claims and assignment of any rights under the Copyright Act on August 9, 2011. A copy is attached. We believe you should dismiss the action promptly, and I'll work with you to accomplish that. I am traveling this evening and Monday but can be reached by cell phone at 650 223 3791.

Tim

**Timothy L. Alger | Perkins Coie LLP**
PARTNER
3150 Porter Drive • Palo Alto, California 94304
Four Embarcadero Center, Suite 2400 • San Francisco, California 94111
PHONE: 650.838.4334 • MOBILE: 650.223.3791 • FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

**Cris Armenta**

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, November 26, 2012 10:13 AM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; sbali@perkinscoie.com |
| **Subject:** | RE: Garcia v. Nakoula et al |

In addition: (1) the second document you transmitted references attachments which we did not receive.  Do you have those?  And: (2) Do you have an original of these documents?  If so, we would like to inspect them immediately.

Cris

**From:** Cris Armenta
**Sent:** Monday, November 26, 2012 10:02 AM
**To:** 'Alger, Timothy L. (Perkins Coie)'
**Cc:** Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; sbali@perkinscoie.com
**Subject:** RE: Garcia v. Nakoula et al

Dear Tim:

        Based on what we have learned from our own client and from others who worked on this film, we have serious doubts as to the authenticity of the document(s) you sent.  What do you offer as the provenance, or ability to authenticate, this document?  We can better analyze its authenticity if we know where and from whom Google obtained it.  We are examining the issue now and once you provide us with the purported origin of the document, will get back to you very soon.

Cris

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Sunday, November 18, 2012 2:39 PM
**To:** Cris Armenta
**Subject:** Garcia v. Nakoula et al

Hi Cris --

Your client executed a release of all claims and assignment of any rights under the Copyright Act on August 9, 2011.  A copy is attached.  We believe you should dismiss the action promptly, and I'll work with you to accomplish that.  I am traveling this evening and Monday but can be reached by cell phone at 650 223 3791.

Tim

**Timothy L. Alger │ Perkins Coie LLP**
PARTNER
3150 Porter Drive • Palo Alto, California  94304
Four Embarcadero Center, Suite 2400 • San Francisco, California  94111
PHONE: 650.838.4334 • MOBILE: 650.223.3791 • FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

1

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, November 26, 2012 10:26 AM |
| **To:** | 'Alger, Timothy L.  (Perkins Coie)' |
| **Cc:** | Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; Bali, Sunita  (Perkins Coie) |
| **Subject:** | RE: Garcia v. Nakoula et al |

Thank you for advising us on the first query.   Our client CANNOT confirm its authenticity.  We are not inclined or disinclined at this point.  We have had the document for 3 business days, one of which was the day before Thanksgiving, and I was on vacation all last week.  We will get back to you as soon as we can.

Thanks.

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Monday, November 26, 2012 10:08 AM
**To:** Cris Armenta
**Cc:** Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; Bali, Sunita (Perkins Coie)
**Subject:** Re: Garcia v. Nakoula et al

We obtained it from Mr. Nakoula's criminal counsel.  I would think your client would be able to confirm or deny its authenticity.  If you are not inclined to dismiss the matter, let me know this morning and I will file it with the court with appropriate authentication. It's been a full week since I provided this document to you.

**From:** Cris Armenta <cris@crisarmenta.com>
**Date:** Mon, 26 Nov 2012 10:01:59 -0800
**To:** TIMOTHY ALGER <talger@perkinscoie.com>
**Cc:** "Jason Armstrong (armstronglaw@me.com)" <armstronglaw@me.com>, "David Hardy (David.Hardy@DMCASolutions.com)" <David.Hardy@DMCASolutions.com>, "Sol, Credence (credence.sol@sol-law.com)" <credence.sol@sol-law.com>, Heather Rowland <heather@crisarmenta.com>, "Bali, Sunita (Perkins Coie)" <SBali@perkinscoie.com>
**Subject:** RE: Garcia v. Nakoula et al

Dear Tim:

        Based on what we have learned from our own client and from others who worked on this film, we have serious doubts as to the authenticity of the document(s) you sent.   What do you offer as the provenance, or ability to authenticate, this document?  We can better analyze its authenticity if we know where and from whom Google obtained it.   We are examining the issue now and once you provide us with the purported origin of the document, will get back to you very soon.

Cris

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Sunday, November 18, 2012 2:39 PM

1

**To:** Cris Armenta
**Subject:** Garcia v. Nakoula et al

Hi Cris --

Your client executed a release of all claims and assignment of any rights under the Copyright Act on August 9, 2011.  A copy is attached.  We believe you should dismiss the action promptly, and I'll work with you to accomplish that.  I am traveling this evening and Monday but can be reached by cell phone at 650 223 3791.

Tim

**Timothy L. Alger │ Perkins Coie LLP**
PARTNER
3150 Porter Drive  •  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  •  San Francisco, California  94111
PHONE: 650.838.4334  •  MOBILE: 650.223.3791  •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

---

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

*  *  *  *  *  *  *  *  *  *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, November 26, 2012 10:54 AM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; Bali, Sunita (Perkins Coie) |
| **Subject:** | RE: Garcia v. Nakoula et al |

Dear Tim:

We received the document(s) on the Sunday before Thanksgiving during a time when you informed us that you would not be available due to other commitments in Austin and I was out of state on vacation.  I am sure you are cognizant that it is our duty and obligation to investigate the authenticity of the proffered document, especially in light of the fact that it is inconsistent with: (1) our client's recollection; (2) the recollections of other actors on the film; and (3) Mr. Seiden's previous direct representation to me.   Obviously, there are also major issues of fraud also involved. We cannot simply dismiss based on YOUR representation that this is Ms. Garcia's release.  You would do no different, I am sure.  We have asked for the original of the document and to inspect the original.  I am sure you are also aware that any competent examiner would want to examine the original.  Please furnish us with the original, and as soon as our investigation is complete, we will advise you of our decision.  Obviously, we are moving very quickly in order to have a decision before the hearing next week, so that the positions are clear and we can make a responsible recommendation to our client prior to the hearing.

If you have any other information or can tell us how you intend to authenticate these document(s) or the missing portions of the documents (s) (both those that are redacted or crossed out or the missing attachments), that would likewise be helpful to an expedient analysis.

Cris

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Monday, November 26, 2012 10:28 AM
**To:** Cris Armenta
**Cc:** Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; Bali, Sunita (Perkins Coie)
**Subject:** Re: Garcia v. Nakoula et al

I think you're going to have to decide right now whether you want to challenge the authenticity of this document at the risk of Rule 11 sanctions and a damages claim under 17 USC 512(f), both of which my clients are prepared to pursue.  We've waited a full week to hear from you and are prepared to move forward in court now.

**From:** Cris Armenta <cris@crisarmenta.com>
**Date:** Mon, 26 Nov 2012 10:01:59 -0800
**To:** TIMOTHY ALGER <talger@perkinscoie.com>
**Cc:** "Jason Armstrong (armstronglaw@me.com)" <armstronglaw@me.com>, "David Hardy (David.Hardy@DMCASolutions.com)" <David.Hardy@DMCASolutions.com>, "Sol, Credence (credence.sol@sol-law.com)" <credence.sol@sol-law.com>, Heather Rowland <heather@crisarmenta.com>, "Bali, Sunita (Perkins Coie)" <SBali@perkinscoie.com>
**Subject:** RE: Garcia v. Nakoula et al

Dear Tim:

      Based on what we have learned from our own client and from others who worked on this film, we have serious doubts as to the authenticity of the document(s) you sent.   What do you offer as the provenance, or ability to authenticate, this document?  We can better analyze its authenticity if we know where and from whom Google obtained it.   We are examining the issue now and once you provide us with the purported origin of the document, will get back to you very soon.

Cris

---

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Sunday, November 18, 2012 2:39 PM
**To:** Cris Armenta
**Subject:** Garcia v. Nakoula et al

Hi Cris --

Your client executed a release of all claims and assignment of any rights under the Copyright Act on August 9, 2011.  A copy is attached.  We believe you should dismiss the action promptly, and I'll work with you to accomplish that.  I am traveling this evening and Monday but can be reached by cell phone at 650 223 3791.

Tim

**Timothy L. Alger | Perkins Coie LLP**
**PARTNER**
3150 Porter Drive · Palo Alto, California  94304
Four Embarcadero Center, Suite 2400 · San Francisco, California  94111
PHONE: 650.838.4334 · MOBILE: 650.223.3791 · FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

---

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

## Cris Armenta

| | |
|---|---|
| **From:** | Alger, Timothy L. (Perkins Coie) <TAlger@perkinscoie.com> |
| **Sent:** | Monday, November 26, 2012 11:05 AM |
| **To:** | Cris Armenta |
| **Cc:** | Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; Bali, Sunita (Perkins Coie) |
| **Subject:** | Re: Garcia v. Nakoula et al |

I'll assume you are unwilling to voluntarily dismiss the action and will proceed accordingly.

---

**From:** Cris Armenta <cris@crisarmenta.com>
**Date:** Mon, 26 Nov 2012 10:53:43 -0800
**To:** TIMOTHY ALGER <talger@perkinscoie.com>
**Cc:** "Jason Armstrong (armstronglaw@me.com)" <armstronglaw@me.com>, "David Hardy (David.Hardy@DMCASolutions.com)" <David.Hardy@DMCASolutions.com>, "Sol, Credence (credence.sol@sol-law.com)" <credence.sol@sol-law.com>, Heather Rowland <heather@crisarmenta.com>, "Bali, Sunita (Perkins Coie)" <SBali@perkinscoie.com>
**Subject:** RE: Garcia v. Nakoula et al

Dear Tim:

We received the document(s) on the Sunday before Thanksgiving during a time when you informed us that you would not be available due to other commitments in Austin and I was out of state on vacation. I am sure you are cognizant that it is our duty and obligation to investigate the authenticity of the proffered document, especially in light of the fact that it is inconsistent with: (1) our client's recollection; (2) the recollections of other actors on the film; and (3) Mr. Seiden's previous direct representation to me. Obviously, there are also major issues of fraud also involved. We cannot simply dismiss based on YOUR representation that this is Ms. Garcia's release. You would do no different, I am sure. We have asked for the original of the document and to inspect the original. I am sure you are also aware that any competent examiner would want to examine the original. Please furnish us with the original, and as soon as our investigation is complete, we will advise you of our decision. Obviously, we are moving very quickly in order to have a decision before the hearing next week, so that the positions are clear and we can make a responsible recommendation to our client prior to the hearing.

If you have any other information or can tell us how you intend to authenticate these document(s) or the missing portions of the documents (s) (both those that are redacted or crossed out or the missing attachments), that would likewise be helpful to an expedient analysis.

Cris

---

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Monday, November 26, 2012 10:28 AM
**To:** Cris Armenta
**Cc:** Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Sol, Credence (credence.sol@sol-law.com); Heather Rowland; Bali, Sunita (Perkins Coie)
**Subject:** Re: Garcia v. Nakoula et al

1

I think you're going to have to decide right now whether you want to challenge the authenticity of this document at the risk of Rule 11 sanctions and a damages claim under 17 USC 512(f), both of which my clients are prepared to pursue.  We've waited a full week to hear from you and are prepared to move forward in court now.

---

**From:** Cris Armenta <cris@crisarmenta.com>
**Date:** Mon, 26 Nov 2012 10:01:59 -0800
**To:** TIMOTHY ALGER <talger@perkinscoie.com>
**Cc:** "Jason Armstrong (armstronglaw@me.com)" <armstronglaw@me.com>, "David Hardy (David.Hardy@DMCASolutions.com)" <David.Hardy@DMCASolutions.com>, "Sol, Credence (credence.sol@sol-law.com)" <credence.sol@sol-law.com>, Heather Rowland <heather@crisarmenta.com>, "Bali, Sunita (Perkins Coie)" <SBali@perkinscoie.com>
**Subject:** RE: Garcia v. Nakoula et al

Dear Tim:

        Based on what we have learned from our own client and from others who worked on this film, we have serious doubts as to the authenticity of the document(s) you sent.   What do you offer as the provenance, or ability to authenticate, this document?  We can better analyze its authenticity if we know where and from whom Google obtained it.  We are examining the issue now and once you provide us with the purported origin of the document, will get back to you very soon.

Cris

---

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Sunday, November 18, 2012 2:39 PM
**To:** Cris Armenta
**Subject:** Garcia v. Nakoula et al

Hi Cris --

Your client executed a release of all claims and assignment of any rights under the Copyright Act on August 9, 2011.  A copy is attached.  We believe you should dismiss the action promptly, and I'll work with you to accomplish that.  I am traveling this evening and Monday but can be reached by cell phone at 650 223 3791.

Tim

**Timothy L. Alger │ Perkins Coie LLP**
PARTNER
3150 Porter Drive  •  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  •  San Francisco, California  94111
PHONE: 650.838.4334  •  MOBILE: 650.223.3791  •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

---

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error,

2

please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Wednesday, November 28, 2012 10:49 AM |
| **To:** | talger@perkinscoie.com |
| **Cc:** | Jason Armstrong (armstronglaw@me.com); Sol, Credence (credence.sol@sol-law.com); David Hardy (David.Hardy@DMCASolutions.com); Heather Rowland |
| **Subject:** | Garcia |
| **Attachments:** | 3527_001.pdf |

Dear Tim:

Enclosed is the declaration of Gaylord Flynn, whom we believe was the most experienced of the actors on the set. He disavows having ever been presented with the documents you claim were signed by Ms. Garcia. He also states that had he been presented with such documents, he would recall such an event.

Our investigation continues, but to date, we have no evidence or information to suggest that the documents you have provided us are authentic. In fact, our investigation so far, as well as the sworn testimony of our client, reveals the exact opposite. Nevertheless, we continue to investigate the claims out of a need to be as thorough as possible.

Cris

**From:** scanner@crisarmenta.com [mailto:scanner@crisarmenta.com]
**Sent:** Tuesday, November 27, 2012 2:29 PM
**To:** Heather Rowland; Cris Armenta
**Subject:** Attached Image

1

# EXHIBIT C

1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3           HONORABLE CHRISTINA A. SNYDER, JUDGE PRESIDING

4    UNITED STATES OF AMERICA,          )
                                        )
5                                       )
                                        )
6                        Plaintiff,     )
                                        )
7                                       )
                                        )
8         Vs.                           )   No. CR 09-617 CAS
                                        )
9                                       )
                                        )
10   MARK BASSELEY YOUSSEF,             )
                                        )
11                                      )
                                        )
12                       Defendant.     )
                                        )
13   _____ )

14

15

16                  REPORTER'S TRANSCRIPT OF

17         FINAL REVOCATION OF SUPERVISED RELEASE

18                 LOS ANGELES, CALIFORNIA

19         WEDNESDAY, NOVEMBER 7, 2012; 1:32 P.M.

20

21

22            LEANDRA AMBER, CSR 12070, RPR
          OFFICIAL U.S. DISTRICT COURT REPORTER
23             312 NORTH SPRING STREET, # 408
              LOS ANGELES, CALIFORNIA 90012
24                 www.leandraamber.com
                     (213) 894-6603
25

2

1                    **A P P E A R A N C E S**

2

3     **IN BEHALF OF THE PLAINTIFF,**
      **UNITED STATES OF AMERICA:**

4                                    U.S. DEPARTMENT OF JUSTICE
                                     U.S. ATTORNEY'S OFFICE
5                                    BY:  ROBERT DUGDALE, AUSA
                                     312 NORTH SPRING STREET
6                                    12TH FLOOR
                                     LOS ANGELES, CA 90012
7                                    (213) 894-4685
                                     robert.dugdale@usdoj.gov
8

9

10

11

12    **IN BEHALF OF THE DEFENDANT,**
      **MARK BASSELEY YOUSSEF:**         LAW OFFICE OF STEVEN A. SEIDEN
13                                     BY:  STEVEN A. SEIDEN, ESQ.
                                     3800 EL SEGUNDO BOULEVARD
14                                   SUITE 201
                                     HAWTHORNE, CA 90250
15                                   (310) 644-5003

16

17

18    **ALSO APPEARING:**

19         HISHAM A. MALEK, ARABIC INTERPRETER
           CURTIS SAMSON, U.S.P.O.
20         GRACIELA GUDINO, U.S.P.O.

21

22

23

24

25

UNITED STATES DISTRICT COURT

3

1                            **I N D E X**

2                                                                **PAGE**

3

4      **HEARING:**    FINAL REVOCATION OF SUPERVISED RELEASE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1            LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 7, 2012

 2                           1:32 P.M.

 3                            -o0o-

 4

 5

 6            THE CLERK:  Calling calendar item two, case number

 7    CR 09-617, United States of America versus Mark Basseley

 8    Youssef.

 9            Counsel, please state your appearances.

10            MR. DUGDALE:  Good afternoon, your Honor.

11            Robert Dugdale on behalf of the United States of

12    America, and I'm present at counsel table with Graciela

13    Gudino and Curtis Samson of the United States Probation

14    Office.

15            THE COURT:  Good afternoon.

16            MR. SEIDEN:  Good afternoon, your Honor.

17            Steven Seiden on behalf of Mr. Youssef.  He is

18    present with counsel.

19            THE COURT:  All right.  Good afternoon.

20            MR. SEIDEN:  Thank you.

21            THE COURT:  Okay.  A few preliminary matters --

22            Mr. Youssef, first of all, we have a stand by

23    Arabic interpreter.  Do you wish to proceed with the

24    assistance of the interpreter?

25            THE DEFENDANT:  Yes.
```

1            THE COURT:  Okay.

2            THE DEFENDANT:  Thank you.

3            THE COURT:  Secondly, as a housekeeping matter,

4    before we proceed, Mr. Youssef, you submitted to me a letter

5    in Arabic, and I have not had an opportunity to read your

6    letter because we have been attempting to find the

7    appropriate procedure to fund, and now we have found the

8    procedure to fund a -- an interpreter translating it to me.

9            I don't know that your counsel has necessarily had

10   an opportunity to go over it, and my question to you is,

11   before we proceed today, do you want us either at sidebar or

12   in camera to read -- have that translated?

13           THE DEFENDANT:  No.

14           THE COURT:  Okay.  Do you wish to tell us in

15   summary form anything that was contained in that

16   communication?

17           THE DEFENDANT:  No.

18           THE COURT:  All right.  Then why don't we place

19   Mr. Youssef under oath, and I will proceed to ask him

20   regarding certain allegations.

21           THE CLERK:  Please raise your right hand to the

22   best that you can.

23           Do you solemnly swear that you will answer

24   truthfully the questions that the Court will ask you so help

25   you God?

6

| | |
|---|---|
| 1 | THE DEFENDANT:  Yes. |
| 2 | THE CLERK:  Thank you. |
| 3 | THE COURT:  All right.  Mr. Youssef, I'm going to |
| 4 | be asking you about allegations and again whether you admit |
| 5 | or deny those allegations. |
| 6 | First of all, having been ordered by the Court not |
| 7 | to use for any purpose or in any manner any name other than |
| 8 | his true legal name or names without the prior written |
| 9 | approval of the Probation Officer, from December 26, 2010, to |
| 10 | the present, Nakoula Basseley Nakoula, you used the name |
| 11 | Nakoula Basseley Nakoula on all documentation provided to the |
| 12 | Court and the Probation Officer.  Whereas on or about |
| 13 | October 1, 2002, in the Superior Court of California, County |
| 14 | of Orange, decree changing name, case number A 21-5011, upon |
| 15 | his own motion, the Superior Court ordered his name changed |
| 16 | from Nakoula Basseley Nakoula to Mark Basseley Youssef. |
| 17 | Do you admit or deny that? |
| 18 | THE DEFENDANT:  (Through interpreter) admit. |
| 19 | (In English) admit. |
| 20 | THE COURT:  Second, having been ordered by the |
| 21 | Court not to use for any purpose or in any manner any name |
| 22 | other than his true local name or names without the prior |
| 23 | written approval of the Probation Officer, from December 26, |
| 24 | 2010, to the present, Nakoula Basseley Nakoula has possessed |
| 25 | a California driver's license under the name Nakoula Basseley |

UNITED STATES DISTRICT COURT

1    Nakoula without prior written approval of the Probation

2    Officer.

3              Do you admit or deny that?

4              THE DEFENDANT:  Admit.

5              THE COURT:  Okay.  Third, having been ordered by

6    the Court pursuant to general order 318 to not commit another

7    federal, state, or local crime, from December 26, 2010, to

8    the present, Nakoula Basseley Nakoula possessed a

9    fraudulently obtained California driver's license in

10   violation of California Vehicle Code section 14610.

11             Do you admit or deny that?

12             THE DEFENDANT:  Admit.

13             THE COURT:  Okay.  And then my understanding is

14   that I am to go to allegation number five.

15             Having been ordered by the Court pursuant to

16   General Order 318 to answer truthfully all inquiries by the

17   Probation Officer on September 15, 2012, Nakoula Basseley

18   Nakoula falsely stated to the Probation Officer that he had

19   not used the name Sam Bassil and/or the variations of Sam

20   Bassiel and Sam Bacile.

21             Do you admit or deny that, sir?

22             THE DEFENDANT:  Admit.

23             THE COURT:  All right.  It's my understanding that

24   pursuant to the agreement between Government and the defense,

25   those are the only allegations that remain active; is that

1    correct, Mr. Dugdale?

2            MR. DUGDALE:  Yes, your Honor.

3            Basically as a result of the defendant's admissions

4    to Allegations One, Two, Three, and Five, the Government will

5    agree to dismiss Allegations Four, Six, Seven, and Eight.

6            THE COURT:  All right.

7            MR. DUGDALE:  And in addition there are several

8    other provisions that we have agreed to or agreements that

9    we've reached as a result of this disposition.

10           The Government has agreed not to charge the

11   defendant with a violation of Title 18 United States Code

12   Section 1001, which is false statements based upon the

13   Allegations Seven and Eight.

14           The parties have agreed to stipulate that the

15   appropriate sentence in this case following the necessary

16   revocation of the defendant's supervised release is 12 months

17   imprisonment to be followed by an additional four-year period

18   of supervised release.

19           And also the parties have agreed that the defendant

20   will participate in a proffer with the United States

21   Probation Office and the United States Attorney's Office

22   pursuant to the terms of the Government's standard proffer

23   agreement to truthfully answer all questions concerning his

24   finances, his assets, his employment, and his income.

25           And provided he truthfully answers questions along

```
 1    those subject lines, the Government has agreed it won't

 2    pursue further violations of the conditions of the

 3    defendant's supervised release based upon those subjects and

 4    those answers.

 5            THE COURT:  Thank you.

 6            Mr. Seiden, do you agree?

 7            MR. SEIDEN:  We do agree, your Honor.  We're going

 8    to be requesting of the Court to at sentencing for home

 9    confinement per the judge -- the Court's consideration.

10            Also, if the Court does not agree to that, we're

11    asking that you make a recommendation that he be housed in

12    the Southern California area.

13            THE COURT:  All right.

14            MR. SEIDEN:  Thank you.

15            THE COURT:  First of all, let me state that given

16    the fact that Mr. Youssef has admitted Allegations One, Two,

17    Three, and Five, the Court finds him to be in violation of

18    the terms and conditions of his supervised release.

19            Let me hear from Mr. Dugdale regarding the request

20    for home confinement.

21            MR. DUGDALE:  Yes, your Honor.

22            That wasn't exactly our agreement, but the

23    Government stands here relatively confident that the

24    appropriate sentence is one of imprisonment regardless of

25    what that request would be.
```

1          So I would briefly talk about the four things that

2     illustrate that this was a serious breach of the Court's

3     trust through these violations that's deserving of the

4     one-year sentence that the Government is recommending here

5     through imprisonment to be followed by the four years of

6     supervised release.

7          First of all, these were serious violations.  They

8     were violations that basically fall into two categories,

9     either the defendant's persistent use of names other than his

10    own true legal name or dishonesty with the Probation Office.

11    And obviously both of these things are important to the

12    ability of the Government and the Probation Office to

13    supervise the defendant.

14         Paramount is that he is honest with them.  So when

15    asked questions about names he has used, employment that he's

16    had, things of that nature -- it's essential that people on

17    supervised release are truthful with Probation to allow them

18    to do their jobs.  And this defendant was not truthful as he

19    admitted when he admitted violation number five.

20         And the alias issue was also a serious issue here

21    as well.  And it's a serious issue because of the history and

22    characteristics of this particular defendant.  As the Court

23    will remember back in 2009, 2010, in the underlying case,

24    this is a defendant who participated in a massive fraudulent

25    scheme involving the use of a whole host of fraudulent

1   identities.

2        Well over 640 -- 641 credit and debit cards in

3   names other than his own were found in his possession that he

4   used to open no less than 60 different bank accounts to

5   defraud the victim banks in this case of approximately

6   $800,000.

7        In this particular case, as the Court now knows, he

8   changed his name from Nakoula Basseley Nakoula to Mark

9   Basseley Youssef back in troubling.  Despite that fact, even

10  including the litigation before this Court, he was using a

11  different name, his old name, Nakoula Basseley Nakoula.  And

12  he has persisted in using that name throughout the term of

13  his supervised release even though he knows he knows as

14  well -- well knows that that is not his true legal name.

15       And perhaps most troubling he has carried

16  identification in these two different names during the period

17  of his supervised release.  He has a passport in the name of

18  Mark Basseley Youssef.  He has a driver's license in the name

19  of Nakoula -- Nakoula Basseley Youssef.

20       And as this Court should appreciate, as a result of

21  his criminal past including the use of aliases and multiple

22  forms of identification other than his true legal name, this

23  is not a defendant that we want out there using a name other

24  than his true name.  This is not a defendant the Court should

25  want out in the streets using multiple forms of

1    identification and having multiple forms of identification in

2    names other than his own.

3            And then of course there's the use of the name Sam

4    Bacile, which relates to Allegation Number Five to which the

5    defendant admitted, which is an entirely new identity that he

6    put forward to other people for fraudulent purposes as I'll

7    explain in a minute.

8            So because of that, these are serious allegations.

9    Because of his history and characteristics particularly

10   serious as it relates to this defendant.

11           Second, as the Probation Office noted in its

12   lengthy letter to the Court, this is a defendant who has

13   engaged in a long running pattern of deception really dating

14   back to when he first appeared in front of this Court and

15   misrepresented what his true name is all the way through up

16   to his arrest back in September in this case.

17           So his dishonesty goes back years.  It's a

18   defendant with a criminal history which includes not only the

19   fraudulent conduct that resulted in victimization of the

20   banks to the tune of almost $800,000 but also a prior

21   conviction related to methamphetamine manufacturing, even

22   selling nonconforming gas.

23           So his own businesses he has not operated on the up

24   and up.  He's been dishonest with this Court.  He's been

25   dishonest with the Probation Office.  He's been dishonest

```
 1    with the officials in California who issued him that driver's
 2    license that's not in his true name.  He's been dishonest
 3    with the people that he has done business with including the
 4    people who appeared in the film that I'll talk about in a
 5    second.
 6            A third reason why a period of incarceration of
 7    12 months is appropriate is because he was given a break
 8    before by this Court and appropriately so at the time,
 9    probably fully with the expectation of this Court that we
10    wouldn't be seeing him back here so quickly.
11            The United States Sentencing Guidelines provide in
12    section 7B1.4, application note three, that when an original
13    sentence was a result of a downward departure, as it was in
14    this case, that is something the Court should consider in
15    revocation conduct and perhaps grant an upward departure.
16            When -- because you got the break before did not
17    take advantage of that break and find yourself so soon in
18    front of the Court again as a result of engaging in violation
19    conduct in the legal conduct, that is something the Court
20    should take into account when sentencing him now.
21            As the Court will probably recall, he received a
22    21-month sentence when he was looking at a guideline range at
23    that time obviously purely advisory a 41 to 51 months.
24            THE COURT:  Right.  And I believe it was a 5K1.1
25    motion --
```

1          MR. DUGDALE:  There was.

2          THE COURT:  -- that triggered the downward

3    departure by this Court, but nonetheless you are correct.

4          MR. DUGDALE:  That is correct.  And the application

5    note that I cite specifically talks about getting a downward

6    departure as a reward for substantial assistance.

7          And how, if you come back after something like

8    that, because you've engaged in violation conduct, that

9    should be taken into account and is an aggravating factor,

10   and the Government is citing it as so in this case.

11         And the last point as to why this was a serious

12   offense worthy of the punishment that frankly I thought the

13   parties had agreed to before a minute ago, is the fact that

14   his deception actually caused real harm to people.

15         I'm not going to say much about the movie.  He's

16   not here because of the content of this movie --

17         THE COURT:  Agreed.

18         MR. DUGDALE:  -- but the way that he went about

19   making this movie is the problem because he did defraud

20   people.  He portrayed to people that he was Sam Bill, not

21   Nakoula Basseley Nakoula, not even that person, not even Mark

22   Youssef -- not Basseley Youssef, but this other identity.

23         So the people who got involved with this -- the

24   actors and actresses who answered the casting call that he

25   made -- they had no idea that he was a recently released

1    federal felon with a history as extensive as I mentioned

2    before who had defrauded banks out of close to $800,000.

3            And had these people known that, had they been

4    given this true name and known his background, they might

5    have had some second thoughts before they joined in on that

6    project.  But they didn't have that opportunity because the

7    defendant defrauded them by betraying something as

8    fundamental as his identity to them.

9            And second, as far as how he went about making the

10   movie -- and this is mentioned in the Probation Officer's

11   lengthy letter -- is then he committed a second deception

12   with these people.  After they had filmed their scenes, he

13   went back and dubbed in language which made the film the film

14   that people have considered offensive.

15           And this is not a choice that these actors or

16   actresses had to made.  It's the choices he made for them.

17   So if the defendant wanted to be a lightning rod for

18   controversy or attach himself to a project like this, as

19   amateurish as it was, and as offensive as people might view

20   it, that was his choice.

21           But he made this choice for other people who were

22   not on board with that decision and had no idea he was doing

23   so.  And that's a substantial fraud.  And as a result, these

24   people have come forward to the Probation Office and reported

25   that they have experienced death threats, they're afraid for

UNITED STATES DISTRICT COURT

1    their lives, they feel like they're careers have been

2    ruined -- all as a result of what this man did to defraud

3    them.  So again it fits within the pattern of deceit that the

4    Probation Office has -- has cited to the Court.

5          As you know, the Probation Office actually in its

6    letter remitted two years.  I will tell that you we've had

7    discussions with the Probation Office.  They are on board

8    with the one-year recommendation in light of the defendant's

9    acceptance of responsibility in this case, which should of

10   course be considered as a mitigator by this Court.

11         But all in all as a result of the factors that I've

12   laid out here, your Honor, the United States does submit that

13   a one-year period of incarceration is an appropriate sentence

14   in light of the seriousness of the offenses and the damage

15   that he has done to other people as a result of this

16   longstanding pattern of fraudulent behavior that this

17   defendant has engaged in.

18         So unless the Court has any additional questions, I

19   will submit, your Honor.  Thank you.

20         THE COURT:  All right.  Anything further?

21         MR. SEIDEN:  Thank you, your Honor.

22         I'm not sure why the Government had to go into a

23   lengthy recitation of what we had already discussed

24   previously.  We have an agreement.  We worked very hard

25   towards a disposition in this matter.  We've reached it.  My

1        client's made his admissions to the Court.

2               And as far as the movie goes, which I'm not sure

3        why that was brought up, but like any movies, people who are

4        involved in the making of the movies have the right to change

5        dialogue, change titles, change everything.  These actors and

6        actresses whom nobody ever knew before signed releases.  I

7        don't know why that's any part of any discussion today.

8               But my client has admitted that.  We have agreed on

9        the disposition of the one-year confinement.  We're just

10       asking the Court to consider home detention.  He has not been

11       able to see any members of his family for the last five weeks

12       but for glances in court proceedings.  He's had a very

13       difficult time getting his son and daughter in to see him at

14       the detention center.  That will be corrected in the future.

15              And we're asking this Court to give him some

16       consideration.  He has avoided a lengthy hearing probably by

17       allowing me to engage in discussions with the Government to

18       resolve this matter which we've done in a timely fashion I

19       believe.  And we ask the Court to consider the home detention

20       that we're requesting.

21              Thank you.

22              THE COURT:  Well, I am strongly of the opinion that

23       the one year in custody is appropriate for the reasons

24       indicated by the Government.  The -- as far as I'm concerned,

25       Mr. Youssef has struck a deal far more favorable than he

```
 1    might have otherwise suffered had he proceeded to try this
 2    case.  I appreciate his acceptance of responsibility, but I
 3    am also mindful of the fact that he has engaged in continuing
 4    deception.
 5          I might even add to the laundry list of Mr. Dugdale
 6    that, as I recall, we placed Mr. Youssef under oath; and for
 7    purposes of his guilty plea he presented himself as
 8    Mr. Nakoula, which obviously was incorrect and a fraud on
 9    this Court.
10          That's not why we're here either today.  We're here
11    because of his continuing conduct in this regard and the fact
12    that he has not dealt honestly with Probation.
13          So I do think that one year in custody is
14    appropriate followed by four years of supervised release, and
15    that is what my sentence is going to be.
16          MR. SEIDEN:  Your Honor, I appreciate that.  Could
17    I just -- I neglected to mention one thing.
18          In the 2009 Presentence Report given to this Court,
19    the very first name under aliases was the name Mark Basseley
20    Youssef, and Probation never did anything further to confirm
21    at that time that that was in fact his legal name under the
22    name change that occurred in 2002.
23          And I wish they had.  I wish his counsel at that
24    time had done that.  We wouldn't be here today.
25          THE COURT:  Well, you were not counsel at that
```

time, but obviously all of us were led to believe that he had
a different name than his true name.

MR. SEIDEN:  Well, that's true.  I'm just saying
they must have known because they put it in the Presentence
Report.

THE COURT:  I understand your point.

MR. SEIDEN:  Thank you.  And with that I submit.
Thank you very much.

THE COURT:  And so that is going to be my sentence
in this case.  I'm going to revoke supervised release and
sentence Mr. Youssef to 12 months in custody followed by four
years of supervised release.

Mr. Youssef shall make the proffer that was
discussed by Mr. Dugdale and to which Mr. Seiden agreed.  And
I believe you asked for a recommendation that Mr. Youssef be
placed at a Southern California facility.  And to the extent
possible, I will make that recommendation.

MR. SEIDEN:  Thank you very much, your Honor.

MR. DUGDALE:  Thank you, your Honor.

Just one quick thing.  There were some additional
conditions of supervised release that the Probation Office
had requested in its letter.

THE COURT:  Yes.

MR. DUGDALE:  Rather than put the Court on the spot
with this, perhaps we will just submit a proposed order along

 1    those lines.  And Mr. Seiden, if he has issues with those,

 2    can object to those.  But I'll deal with it however the Court

 3    would like.

 4              THE COURT:  Well, I'll do either way.  I'm sure I

 5    have the letter here, and I'm sure I can deal with it now if

 6    we want to wrap it up now.  But if you would prefer to deal

 7    with it and discuss it with one another, I'm happy to let you

 8    do that.

 9              MR. DUGDALE:  I think that might be best just to

10    make sure that we have it all correct.

11              THE COURT:  That sounds fine.

12              MR. DUGDALE:  So we will submit that to the Court,

13    your Honor.

14              And the only other housekeeping matter is to -- the

15    Government will move to dismiss the remaining allegations

16    which are Allegations Four, Six, Seven, and Eight in the

17    interest of justice.

18              THE COURT:  All right.  That motion will be

19    granted.

20              And I think we should probably, in light of

21    Mr. Youssef's earlier comments, return to him the submission

22    that arrived yesterday.

23              MR. SEIDEN:  Very good, your Honor.

24              THE COURT:  Anything further, Counsel?

25              MR. SEIDEN:  Thank you for accommodating us and

21

1    allowing us to be heard today.  Thank you.  Your Honor, we

2    appreciate it.

3              MR. DUGDALE:  Yes, thank you, your Honor.

4              THE COURT:  Thank you.

5              THE CLERK:  This Court is adjourned.

6              (Whereupon, at 1:53 p.m. , the proceeding

7              concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

22

CERTIFICATE OF REPORTER


COUNTY OF LOS ANGELES )
                      ) ss.
STATE OF CALIFORNIA   )


I, LEANDRA AMBER, OFFICIAL FEDERAL COURT REPORTER, REGISTERED

PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES

CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS

IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

CONFERENCE OF THE UNITED STATES.




DATE:   _____




_____/s/_____

LEANDRA AMBER, CSR 12070, RPR

FEDERAL OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT

EXHIBIT D

Innocence of Muslims participants sentenced to death in Egypt | Wor... http://www.guardian.co.uk/world/2012/nov/28/innocence-of-muslims...

**the guardian**

Printing sponsored by:

**Kodak**
All-in-One Printers

# Innocence of Muslims participants sentenced to death in Egypt

### Seven Egyptian Christians were tried in absentia for taking part in anti-Islam video produced in US that sparked violent protests

Reuters in Cairo
guardian.co.uk, Wednesday 28 November 2012 07.20 EST



An anti-US protest in Jammu, India, in September over the Innocence of Muslims video. Photograph: AFP/Getty Images

A court in Cairo has sentenced to death seven Egyptian Christians who were tried in absentia for participating in an anti-Islam video that prompted violent protests in many Muslim countries.

"The seven accused persons were convicted of insulting the Islamic religion through participating in producing and offering a movie that insults Islam and its prophet," said the judge, Saif al-Nasr Soliman.

The crude, low-budget video, Innocence of Muslims, produced privately in California, denigrated the prophet Muhammad, and its circulation online triggered anti-US protests and attacks on western embassies in September.

| **More from the Guardian** | What's this? | **More from around the web** | What's this? |
|---|---|---|---|
| Qatari poet jailed for life after writing verse inspired by Arab spring 29 Nov 2012 | | Filipino Catholics celebrate saint's canonization (Inquirer.net) | |
| Why the British elite insist on more austerity (it's not that they're stupid) 27 Nov 2012 | | Bristol Palin Wears Mini-Dress to 'DWTS' After-Party & Shows Everyone What a Hot Mom She Is (PHOTO) (CafeMom) | |
| 'White witch coven' took part ritualistic sex abuse of young girls, court told 28 Nov 2012 | | Sheen Gives Lohan $100,000 to Put Towards Taxes (Bloomberg) | |

What Rachida Dati's paternity case tells us about sexism in France 26 Nov 2012

They Cracked This 250-Year-Old Code, and Found a Secret Society Inside (Wired)

Well done, Jenny Johnson, for standing up to Chris Brown 26 Nov 2012

How German Traditions Work (HowStuffWorks)

Innocence of Muslims particulars.. death threat.. Egypt.. World... http://www.guardian.co.uk/2012/nov/28/innocence-muslims...

Egyptian city of Damanhour clash on Sunday, after a 15-year-old boy is killed in an attack on the headquarters of the Muslim Brotherhood

© 2012 Guardian News and Media Limited or its affiliated companies. All rights reserved.

11/30/2012 11:27 AM

EXHIBIT E

Case 2:12-cv-08315-MWF-VBK Document 37    Filed 11/30/12 Page 64 of 74 Page ID #:957

# The New York Times

November 25, 2012

# From Man Who Insulted Muhammad, No Regret

**By SERGE F. KOVALESKI and BROOKS BARNES**

LOS ANGELES — Fuming for two months in a jail cell here, Nakoula Basseley Nakoula has had plenty of time to reconsider the wisdom of making "Innocence of Muslims," his crude YouTube movie trailer depicting the Prophet Muhammad as a bloodthirsty, philandering thug.

Does Mr. Nakoula now regret the footage? After all, it fueled deadly protests across the Islamic world and led the unlikely filmmaker to his own arrest for violating his supervised release on a fraud conviction.

Not at all. In his first public comments since his incarceration soon after the video gained international attention in September, Mr. Nakoula told The New York Times that he would go to great lengths to convey what he called "the actual truth" about Muhammad. "I thought, before I wrote this script," he said, "that I should burn myself in a public square to let the American people and the people of the world know this message that I believe in."

In explaining his reasons for the film, Mr. Nakoula, 55, a Coptic Christian born in Egypt, cited the 2009 massacre at Fort Hood, Tex., as a prime example of the violence committed "under the sign of Allah." His anger seemed so intense over the years that even from a federal prison in 2010, he followed the protests against the building of an Islamic center and mosque near ground zero in New York as he continued to work on his movie script.

Until now, only the barest details were known about the making of the film that inspired international outrage. Initial reports made it seem as if the film had been thrown together in about a year.

But a longer, more intricate and somewhat surreal story emerges from interviews with Mr. Nakoula, church and law enforcement officials and more than a dozen people who worked on the movie — those who knew its real subject and those who were tricked into believing it was to be a sword-and-sandal epic called "Desert Warriors." Together, they paint a picture of a financially desperate man with a penchant for fiction who was looking to give meaning and means to a life in shambles.

There is a dispute about how important the video was in provoking the terrorist assault on the American diplomatic mission in Benghazi, Libya, that killed the United States ambassador and three other Americans. Militants interviewed at the scene said they were unaware of the video until a protest in Cairo called it to their attention. But the video without question led to protests across the globe, beginning in Cairo and spreading rapidly in September to Yemen, Morocco, Iran, Tunisia, Sudan, Iraq, Pakistan, Lebanon, Indonesia and Malaysia.

The making of the film is a bizarre tale of fake personas and wholesale deception. And as with almost everything touched over the years by Mr. Nakoula — a former gas station manager, bong salesman, methamphetamine ingredient supplier and convicted con man — it is almost impossible to separate fact from fabrication.

A few years ago, Mr. Nakoula told some of the crew members he had gathered, supposedly to make "Desert Warriors," that the project would have to be put off. He had cancer. Treatment was needed, far away, and they would not be able to reach him. His family shared a similar story with church officials.

Mr. Nakoula, it turns out, was not going away for cancer treatment, although the time did overlap with the prison sentence for bank fraud, which the crew knew nothing about. (Mr. Nakoula pleaded guilty this month to violating his supervised release in that case and received a one-year sentence.)

He claims that he only wrote the film — five versions of the script — and served as a "cultural consultant." One of Mr. Nakoula's sons, Abanob Basseley Nakoula, 21, said in an interview that his father had written the script in Arabic and then translated it into English. The son said he helped him with grammar.

But Mr. Nakoula, who described himself to some cast members as the writer and producer, explained to a confidant that his plan was to fool actors into thinking they were making a movie built around an ancient tribal villain named George, dubbing in the name "Muhammad" later whenever anybody said "George."

As early as 2008, he had cobbled together a 20-page treatment for a film he wanted to call "The First Terrorist."

In Mr. Nakoula's responses to questions from The Times, conveyed through his lawyer, Steve Seiden, he had no second thoughts about the way he had handled the cast. "They had signed contracts before they went in front of any camera, and these contracts in no way prevented changes to the script or movie," he said.

Abanob Nakoula said: "The actors were misled. My dad thought the film would create a stir, and as a precaution for their safety, there are no acting or production credits at the end of the trailer or the full-length movie."

## A Slippery Identity

The amateurish project might have disappeared quietly, the way many forgettable messes do in Hollywood's underbelly. Yet three years after completing his script treatment, Mr. Nakoula was on a makeshift movie set inside the suburban Los Angeles headquarters of a nonprofit organization called Media for Christ, whose founder has been critical of Islam. There Mr. Nakoula was surrounded by actors wearing false beards, and there was a goat slipping on a tile floor. Alongside him was his director for hire: Alan Roberts, known for soft-core pornography movies like "The Happy Hooker Goes Hollywood."

Mr. Nakoula noted that the head of Media for Christ, Joseph Nassralla Abdelmasih, was "a friend for five years." Mr. Abdelmasih attended the 2010 protests against the Islamic center near ground zero. Other contacts in the world of anti-Islam activism would also play pivotal roles. Helping to publicize the film were Morris Sadek and Elaia Basily — activist Copts living in Northern Virginia — and Terry Jones, the Florida preacher whose own Koran burnings had stirred violence abroad.

That Mr. Nakoula is a hard man to pin down is no accident. He told the cast and crew that his name was Sam Bassil, which he sometimes spelled differently. Federal prosecutors convicted him in 2010 under the name Nakoula Basseley Nakoula, but he recently admitted to the court that he had changed his name in 2002 to Mark Basseley Youssef.

What he did not mention at the time, however, was that in 2009, according to court records, he changed his name yet again, this time to Ebrahem Fawzy Youssef. (His lawyer said Mr. Nakoula was unaware until recently that the latest change had been finalized.)

Facts presented by Mr. Nakoula as rock solid tend to weaken upon inspection. For instance, he told federal probation officials that he first came to Los Angeles in 1984 for the Olympics as part of the Egyptian soccer team. But a Web site listing official players on that team does not include Mr. Nakoula. Nor was there evidence that he was on the squad's staff.

He claimed during production that the budget for the film was $5 million, raised mainly from Jewish donors. Actually, it cost no more than $80,000, apparently raised through his second ex-wife's Egyptian family and donations from other Copts, according to a person who discussed the financing with him.

Even though the shoot lasted only 15 days, there was enough footage for a feature-length

movie, which exists, running roughly one hour and 40 minutes. Mr. Basily, the Virginia activist who has donated to Media for Christ, said he watched the entire film on DVD early this year and found it historically accurate.

All that has been seen on the Web is the 14-minute YouTube trailer, which by the time it hit the Internet in July was titled "Innocence of Muslims."

Mr. Nakoula was able to finish the project even though people who ran into him over the years found him puzzling. When he rented offices in suburban Los Angeles, other tenants noticed that he came around only at night for the most part and stored stacks of Marlboro cartons there, among other things. When he took a stall at a flea market to sell drug paraphernalia and tobacco merchandise, other stall holders noted that his wares never seemed to move and that he spent most of his time on the phone, shouting in Arabic.

And Coptic Church officials said they considered Mr. Nakoula an unlikely candidate for the kind of religious zeal behind "Innocence of Muslims" because he had attended services so infrequently. But Mr. Nakoula said fervor and witnessing persecution are what drove him to create the film.

Mr. Nakoula agreed last month to be interviewed by The Times at the Metropolitan Detention Center here, where he has been held since his September arrest. But the warden refused to allow the interview.

In his written responses to questions, Mr. Nakoula reeled off "atrocities" by Muslims that went back many years and formed his views, focusing on shootings, a bombing and the torture of his fellow Copts. After the Fort Hood massacre, in which an Army psychiatrist with ties to Muslim extremism has been charged, "I became even more upset and enraged," he said.

Abanob Nakoula said: "My dad is not an evil man. He has had a hard life. He did something — the movie, something he felt strongly about — that was not frowned upon by the Constitution. He would always say, 'Don't fight Muslims; fight their ideology.' "

**From Prison to Studio**

Nakoula Basseley Nakoula grew up in Egypt but came to the United States and wed Ingrid N. Rodriguez in 1986 in Nevada, according to state marriage records. They divorced in 1990, the records show. Soon afterward, while living in California, he married an Egyptian woman, Olivia Ibrahim, with whom he has three children. Although the couple divorced, the family members all lived together on a cul-de-sac in Cerritos until going into hiding after the video spread.

Mr. Nakoula declared bankruptcy in 2000. By then he was a felon: a police sting caught him trading crates of a methamphetamine ingredient for $45,000 in cash. He was sentenced to one year in prison but did community service instead. A little over a decade later, Mr. Nakoula, while at work on his movie, was arrested for bank fraud. He was behind bars for almost 21 months before getting out in the summer of last year.

"He said it might have been a blessing to go to prison because he had time to work on the script," his son said.

Mr. Nakoula's supervised release barred him from using aliases. But he resumed work on his movie under the name Sam Baccil, said Jimmy Israel, who assisted with preproduction. Mr. Israel, who still thought Mr. Nakoula had been away battling cancer, placed casting notices on Backstage.com. One advertised 11 roles that included "George: male, 20-40, a strong leader, romantic, tyrant, a killer with no remorse, accent." Mr. Israel said Mr. Nakoula told him that "Muhammad would be named George to mislead the actors."

Mr. Nakoula found his director through a circuitous route. During the time of his bank fraud scheme, he rented five offices in a building owned by a man named Shlomo Bina, who, as it happened, had once aspired to a movie career, too, crossing paths with Mr. Roberts, the director. Chatting one day, Mr. Bina pointed him toward Mr. Roberts, whose real name is Robert Alan Brownell, records show. Attempts to reach Mr. Roberts through lawyers were unsuccessful.

A few Coptic immigrants in the United States have built media outlets with the help of programming that is anything but favorable toward Islam. One of them is Mr. Abdelmasih of Media for Christ. Not only did he provide Mr. Nakoula with 10 days of free studio space, but he also helped get the promotion going for the YouTube trailer by contacting Mr. Sadek in Virginia.

Mr. Sadek wrote in an e-mail that "my friend," Mr. Abdelmasih, "told me that Mr. Nakoula had created a movie about the Copts' persecution in Egypt." Mr. Sadek then publicized the YouTube trailer on his Web site and to his contacts. Mr. Basily, the activist, also spread word about the trailer using social media. Mr. Sadek also put Mr. Nakoula in touch with another important promotional partner: Mr. Jones, the Florida pastor.

Mr. Abdelmasih said Mr. Nakoula called one day to ask to use his facility. "He said to me the movie was about persecution of Christians by the government, combined with radical Muslims," Mr. Abdelmasih recalled in an interview.

**'Not Tech-Savvy'**

Media for Christ provided no cameras or any other production help, Mr. Abdelmasih said. He also insisted that Media for Christ's "work is not against Muslims," and he said he was "shocked" by the final product. But his studio has been used to produce "Wake Up America," a program hosted by Steve Klein, an insurance salesman in Hemet, Calif., and a staunch anti-Islam activist. Mr. Klein served as a consultant for Mr. Nakoula after they first met at Media for Christ.

When Dan Sutter, cast as George's grandfather, arrived at Media for Christ's offices in early August last year, Mr. Nakoula was there, greeting people as Sam. Mel Gibson's "Passion of the Christ" played on a television in a break room.

Eight months or so after shooting ended, Mr. Nakoula contacted a few of the actors to return to Media for Christ for looping, a standard part of moviemaking in which inaudible dialogue is rerecorded. Lily Dionne, an extra with no lines who was called to dub for another actress, said that a fellow actor had also been asked back and that Mr. Nakoula told him to say "Muhammad" into a microphone. He did.

On July 2, the trailer was posted on YouTube by someone using the name Sam Bacile. Mr. Nakoula's son said he was the one who did it.

"My dad is not tech-savvy at all, and does not know how to work social media," Abanob Nakoula said. "So he asked me to take the initiative to spread the word, and I did my best."

He explained that using the name Sam Bacile, he created a Facebook account before production started and then the YouTube account.

Abanob Nakoula added, "My dad wanted to show the trailer on TV as a commercial, and I told him that was not going to happen because it costs a lot of money and the networks would not show a 14-minute trailer, especially if they knew the content."

*Ana Facio-Krajcer and Noah Gilbert contributed reporting from Los Angeles, and Mai Ayyad from Cairo. Jack Begg contributed research.*

# DECLARATION

## DECLARATION OF GAYLORD FLYNN

1.       I am an actor who appeared in the film originally titled *Desert Warrior* and posted to YouTube with the title *Innocence of Muslims*. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.       I have reviewed the two documents attached hereto as Exhibit A. These documents do not look familiar to me. I do not believe that I signed documents like this in connection with the film "Desert Warrior." I also notice that on the "personal release" document, the picture is mis-titled "Desert Warriors," instead of Desert Warrior, which was the working name of the film. If I had signed documents like this, I would remember it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 26th day of November, 2012, at La Quinta, California.

Gaylord Flynn

# DECLARATION

## DECLARATION OF CINDY LEE GARCIA

I, Cindy Lee Garcia, declare:

1.    I am over eighteen years of age and the Plaintiff in this action. I make this declaration based on my own personal knowledge, and if called as a witness, would testify competently as follows:

2.    I am an actor who appeared in the film originally titled *Desert Warrior* and posted to YouTube with under title *Innocence of Muslims*. I am the Plaintiff in this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

3.    I have reviewed the declaration of Mark Basseley Youssef and the attachments. The handwriting on those pages is not mine. I did sign *a* document, which involved my getting IMDB credit for the film "Desert Warrior." During the filming of "Desert Warrior," I was presented with a single sheet of paper, which *I* insisted upon because my main motivation in participating in this film as a new actress, was to obtain IMDB credits. That single piece of paper also referred to payment to me.

4.    Mr. Alger's declaration, where he talks about what Mr. Youssef (although I knew him as "Sam Bacile"), is totally inaccurate. He says that Mr. Youssef would say that I worked for two hours on a single day. This is false. In fact, I worked two full days on the set of "Desert Warrior." Mr. Alger claims that Mr. Youssef would say that I was paid $75.00. This is also false. I was paid $75.00 the first day, either $125 or $150 for the second day. Later, I was paid an additional $150 for some voice work.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is truthful and accurate.

Executed on this 30th day of November, 2012, at Bakersfield, California.

_Cindy Lee Garcia_
Cindy Lee Garcia

1

DECLARATION OF CINDY LEE GARCIA
CV 12 8315 (VBKx)

1

## PROOF OF SERVICE

2  **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**
      I am employed in the County of Los Angeles, State of California.  I am over

3  the age of eighteen years and not a party to the within action.  My business address

4  is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

5        On November 30, 2012 I served the following document(s) described as:

6      **PLAINTIFF'S OBJECTION TO AND REQUEST TO STRIKE**
7  **DECLARATIONS OF TIM ALGER AND MARK BASSELEY YOUSSEF;**
    **DECLARATIONS OF M. CRIS ARMENTA, GAYLORD FLYNN, CINDY**
8      **LEE GARCIA AND JIM BLANCO**

9  on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes
10  addressed as follows:

                    **Timothy L. Alger**
11                     **Perkins Coie LLP**
                   **3150 Porter Drive**
12                **Palo Alto, CA 94304-1212**
13           **(by mail and courtesy email)**

14               **Nakoula B. Nakoula aka**
             **Mark Basseley Youssef**
15           **Metropolitan Detention Center**
             **Inmate #56329-112**
16            **180 N. Los Angeles St.**
17             **Los Angeles, CA 90012**
              **(by mail only)**

18
19      ***BY MAIL:***  I am "readily familiar" with the firm's practice of collection and processing
20  correspondence for mailing with the United States Postal Service.  Under that practice, it
would be deposited with the United States Postal Service that same day in the ordinary
21  course of business.  Such envelope(s) were placed for collection and mailing with postage
thereon fully prepaid at Los Angeles, California, on that same day following ordinary
22  business practices.  (C.C.P. § 1013 (a) and 1013a(3))

23      Executed on November 30, 2012 in Los Angeles, California.

24
25                              Heather Rowland

26
27
28

1
**PROOF OF SERVICE**