

**RECEIVED**
CLERK, U.S. DISTRICT COURT

7/11/14

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MAT _____ DEPUTY

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| CINDY LEE GARCIA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>GOOGLE, INC., a Delaware<br>Corporation; YOUTUBE, LLC, a<br>California limited liability company,<br>*Defendants-Appellees*,<br><br>and<br><br>NAKOULA BASSELEY NAKOULA, an<br>individual, AKA Sam Bacile; MARK<br>BASSELEY YOUSSEF; ABANOB<br>BASSELEY NAKOULA; MATTHEW<br>NEKOLA; AHMED HAMDY; AMAL<br>NADA; DANIEL K. CARESMAN;<br>KRITBAG DIFRAT; SOBHI BUSHRA;<br>ROBERT BACILY; NICOLA BACILY;<br>THOMAS J. TANAS; ERWIN<br>SALAMEH; YOUSSEFF M. BASSELEY;<br>MALID AHLAWI,<br><br>*Defendants*. | No. 12-57302<br><br>D.C. No.<br>2:12-cv-08315-<br>MWF-VBK<br><br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted
June 26, 2013—Seattle, Washington

Filed February 26, 2014
Amended July 11, 2014

Before: Alex Kozinski, Chief Judge, Ronald M. Gould
and N. Randy Smith, Circuit Judges.

Opinion by Chief Judge Kozinski;
Dissent by Judge N.R. Smith

## SUMMARY[*]

### Copyright / Preliminary Injunction

The panel filed (1) an order amending a previous opinion and dissent and stating that a petition for rehearing en banc remained pending, (2) an amended opinion, and (3) an amended dissent in an appeal from the district court's denial in a copyright case of a preliminary injunction requiring the removal from YouTube.com of an anti-Islamic film that used a performance that the plaintiff made for a different film.

Reversing the district court's denial of the preliminary injunction, the panel concluded that the plaintiff established a likelihood of success on the merits of her claim of infringement of her performance within the film because she proved (1) that she likely had a protectible interest in the performance and (2) that the filmmaker did not own an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

interest as a work for hire and exceeded any implied license to use the plaintiff's performance.

The panel held that the plaintiff established the likelihood that irreparable harm would result if an injunction did not issue because she was subject to death threats and took action as soon as she began receiving the threats.  The plaintiff also established sufficient causal connection between the infringement of her copyright and the harm she alleged.

The panel also held that the balance of the equities and the public interest weighed in favor of injunctive relief.

Dissenting, Judge N.R. Smith wrote that the facts and law did not clearly favor issuing a mandatory preliminary injunction to the plaintiff.  He wrote that the plaintiff did not establish a likelihood that she had a copyrightable interest in her acting performance, nor did she clearly show that the performance was not a work made for hire.  In addition, the district court did not abuse its discretion in its ruling on irreparable harm, and the balance of the equities and the public interest did not favor the issuance of a preliminary injunction.

---

**COUNSEL**

M. Cris Armenta (argued), The Armenta Law Firm APC, Los Angeles, California and Credence Sol, Chauvigng, France, for Plaintiff-Appellant.

Timothy L. Alger (argued) and Sunita Bali, Perkins Coie LLP, Palo Alto, California, for Defendants-Appellees.

---

4                GARCIA V. GOOGLE, INC.

## ORDER

The opinion and dissent filed February 26, 2014, and reported at 743 F.3d 1258, are amended to conform to the attached Amended Opinion and Amended Dissent, 12-57302. No further petitions for rehearing will be entertained. The petition for rehearing en banc remains pending.

## OPINION

KOZINSKI, Chief Judge:

While answering a casting call for a low-budget amateur film doesn't often lead to stardom, it also rarely turns an aspiring actress into the subject of a fatwa. But that's exactly what happened to Cindy Lee Garcia when she agreed to act in a film with the working title "Desert Warrior."

The film's writer and producer, Mark Basseley Youssef—who also goes by the names Nakoula Basseley Nakoula and Sam Bacile—cast Garcia in a minor role. Garcia was given the four pages of the script in which her character appeared and paid approximately $500 for three and a half days of filming. "Desert Warrior" never materialized. Instead, Garcia's scene was used in an anti-Islamic film titled "Innocence of Muslims." Garcia first saw "Innocence of Muslims" after it was uploaded to YouTube.com and she discovered that her brief performance had been partially dubbed over so that she appeared to be asking, "Is your Mohammed a child molester?"

These, of course, are fighting words to many faithful Muslims and, after the film aired on Egyptian television, there were protests that generated worldwide news coverage. An Egyptian cleric issued a fatwa, calling for the killing of everyone involved with the film, and Garcia soon began receiving death threats. She responded by taking a number of security precautions and asking that Google remove the video from YouTube.

In all, Garcia filed eight takedown notices under the Digital Millennium Copyright Act. *See generally* 17 U.S.C. § 512. When Google resisted, she supplied substantive explanations as to why the film should be taken down. Google still refused to act, so Garcia applied for a temporary restraining order seeking removal of the film from YouTube, claiming that the posting of the video infringed her copyright in her performance.[1]  The district court treated the application as a motion for a preliminary injunction, and denied it because Garcia had delayed in bringing the action, had failed to demonstrate "that the requested preliminary relief would prevent any alleged harm" and was unlikely to succeed on the merits because she'd granted Youssef an implied license to use her performance in the film.

## I.  Discussion

While we review the denial of a preliminary injunction for abuse of discretion, *Alliance for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), the "legal premises underlying a preliminary injunction" are reviewed de novo. *A&M Records, Inc.* v. *Napster, Inc.*, 284 F.3d 1091,

---

[1] Although Garcia's suit also named the film's producers, only Google, which owns YouTube, answered the complaint.

1096 (9th Cir. 2002).  In granting or denying a preliminary injunction, the district court must consider four factors: a plaintiff's likely success on the merits, the likelihood that irreparable harm will result if an injunction doesn't issue, the balance of equities and the public interest.  *Winter* v. *Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  The district court found against Garcia on the first two factors and didn't consider the last two.[2]

## A.  Likelihood of Success on the Merits

Garcia doesn't claim a copyright interest in "Innocence of Muslims" itself; far from it.  Instead, she claims that her performance within the film is independently copyrightable and that she retained an interest in that copyright.  To succeed on this claim, Garcia must prove not only that she likely has an independent interest in her performance but that Youssef doesn't own any such interest as a work for hire and that he doesn't have an implied license to use her performance.

---

[2] The dissent suggests that we must defer to the district court's statement that "the nature of [Garcia's] copyright interest is not clear."  But we defer to a lower court's *decision*, not its equivocation.

It's worth noting what the district court's three-page order doesn't do: It doesn't decide whether Garcia has a copyright interest in her performance, whether her performance is a "work," whether Garcia is the "author" of her performance or whether her performance is a work for hire.  Nor does it address the balance of the equities or the public interest, despite the fact that a district court must "weigh in its analysis the public interest implicated by [an] injunction, as *Winter* now requires." *Stormans, Inc.* v. *Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

### 1.  An Independent Copyright Interest

A film is typically conceived of as "a joint work consisting of a number of contributions by different 'authors.'" 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.05 at 6–14 (1990).  Garcia argues that she never intended her performance to be part of a joint work, and under our precedent she doesn't qualify as a joint author.  *See Aalmuhammed* v. *Lee*, 202 F.3d 1227, 1231–36 (9th Cir. 2000).  The dissent claims that "Garcia's interest in her acting performance may best be analyzed as a joint work with Youssef."  Dissent 25 n.3.  But work is joint only if the authors involved in its creation *intend* that it be so.  *See* 17 U.S.C. § 101.  Garcia expressly disclaims such intent and there is no evidence that Youssef intended to create a joint work.  We thus have no basis for finding a joint intent on this record.

But just because Garcia isn't a joint author of "Innocence of Muslims" doesn't mean she doesn't have a copyright interest in her own performance within the film.  Whether an individual who makes an independently copyrightable contribution to a joint work can retain a copyright interest in that contribution is a rarely litigated question.  *See Thomson* v. *Larson*, 147 F.3d 195, 206 (2d Cir. 1998) (dismissing similar argument on procedural grounds); *see also* David Nimmer, Address, *Copyright in the Dead Sea Scrolls: Authorship and Originality*, 38 Hous. L. Rev. 1, 186–87 & n.942 (2001).  Nothing in the Copyright Act suggests that a copyright interest in a creative contribution to a work simply disappears because the contributor doesn't qualify as a joint author of the entire work.  17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium . . . .").  Where, as here, the artistic

contribution is fixed, the key question remains whether it's sufficiently creative to be protectible.[3]

Google argues that Garcia didn't make a protectible contribution to the film because Youssef wrote the dialogue she spoke, managed all aspects of the production and later dubbed over a portion of her scene.  But an actor does far more than speak words on a page; he must "live his part inwardly, and then . . . give to his experience an external embodiment."  Constantin Stanislavski, *An Actor Prepares* 15, 219 (Elizabeth Reynolds Hapgood trans., 1936).  That embodiment includes body language, facial expression and reactions to other actors and elements of a scene.  *Id.* at 218–19.  Otherwise, "every shmuck . . . is an actor because everyone . . . knows how to read."  Sanford Meisner & Dennis Longwell, *Sanford Meisner on Acting* 178 (1987).

An actor's performance, when fixed, is copyrightable if it evinces "some minimal degree of creativity . . . 'no matter how crude, humble or obvious' it might be."  *Feist Publ'ns, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) (quoting 1 *Nimmer on Copyright* § 1.08[C][1]).  That is true whether the actor speaks, is dubbed over or, like Buster Keaton, performs without any words at all.  *Cf.* 17 U.S.C. § 102(a)(4) (noting "pantomimes and choreographic works" are eligible for copyright protection).  It's clear that Garcia's performance meets these minimum requirements.

---

[3] Neither party raised the issue of whether the author of a dramatic performance must personally fix his work in a tangible medium.  Because the question is not properly before us, we do not decide it.  The parties are free to raise it in the district court on remand.

*Aalmuhammed* isn't to the contrary because it does not, as the dissent would have it, "articulate[] general principles of authorship." Dissent 27. *Aalmuhammed* only discusses what is required for a contributor to a work to assert joint ownership over the *entire* work: "We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution." 202 F.3d at 1232. *Aalmuhammed* plainly contemplates that an individual *can* make a "copyrightable contribution" and yet not become a joint author of the whole work. *Id.* For example, the author of a single poem does not necessarily become a co-author of the anthology in which the poem is published. It makes sense to impose heightened requirements on those who would leverage their individual contribution into ownership of a greater whole, but those requirements don't apply to the copyrightability of all creative works, for which only a "minimal creative spark [is] required by the Copyright Act and the Constitution." *Feist Publ'ns*, 499 U.S. at 363.[4]

Nor does *Midler* v. *Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988), speak to the problem before us. First, of course, *Midler* isn't a copyright case at all—it's a right of publicity case that happens to discuss copyright in the context of preemption, not infringement. Second, *Midler* discusses the copyrightability of a performer's *voice*—not her performance.

---

[4] Our decision today does not "read[] the authorship requirement out of the Copyright Act and the Constitution." Dissent 28. An author "in a constitutional sense" is one "'to whom anything owes its origin; originator; maker.'" *Feist Publ'ns*, 499 U.S. at 346 (quoting *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U.S. 53, 58 (1884)). In other words, the creator of copyrightable artistic expression is an author. Which is why, for example, Sinéad O'Connor can claim a copyright in her performance of "Nothing Compares 2 U" even though the song was written by Prince.

*See* 849 F.2d at 462.  A performer's voice is analogous to her image, which we've said "is not a work of authorship" under the Copyright Act.  *Downing* v. *Abercrombie & Fitch*, 265 F.3d 994, 1004 (9th Cir. 2001).  But that doesn't answer the question of whether the artist's creativity, expressed *through* her voice or image, is protected by copyright.  Just because someone's voice—its particular timbre and quality—can't be copyrighted, doesn't mean that a performance made using that voice can never be protected. In fact, many vocal performances *are* copyrighted.  *See, e.g.*, *Laws* v. *Sony Music Entm't, Inc.*, 448 F.3d 1134, 1141 (9th Cir. 2006).

Recognizing that Garcia may have a copyright interest in her performance isn't the end of the inquiry.  A screenplay is itself a copyrightable creative work and a film is a derivative work of the screenplay on which it is based.  *See Gilliam* v. *Am. Broad. Cos.*, 538 F.2d 14, 20 (2d Cir. 1976); *see also* 17 U.S.C. § 101; 2 *Nimmer on Copyright* § 2.10[A] n.8. Where, as here, an actor's performance is based on a script, the performance is likewise derivative of the script, such that the actor might be considered to have infringed the screenwriter's copyright.  And an infringing derivative work isn't entitled to copyright protection.  *See* 17 U.S.C. § 103(a); *see also U.S. Auto Parts Network, Inc.* v. *Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012).

Of course, by hiring Garcia, giving her the script and turning a camera on her, Youssef implicitly granted her a license to perform his screenplay.  *See Effects Assocs., Inc.* v. *Cohen*, 908 F.2d 555, 558–59 (9th Cir. 1990).  This doesn't mean that Garcia owns a copyright interest in the entire scene:  She can claim copyright in her own contribution but not in "preexisting material" such as the words or actions

spelled out in the underlying script. 17 U.S.C. § 103(b); *see also U.S. Auto Parts Network, Inc.*, 692 F.3d at 1016. Garcia may assert a copyright interest only in the portion of "Innocence of Muslims" that represents her individual creativity, but even if her contribution is relatively minor, it isn't de minimis. *See Feist*, 499 U.S. at 359, 363. We need not and do not decide whether every actor has a copyright in his performance within a movie. It suffices for now to hold that, while the matter is fairly debatable, Garcia is likely to prevail based on the record and arguments before us.

Nothing we say today precludes the district court from concluding that Garcia doesn't have a copyrightable interest, or that Google prevails on any of its defenses. We note, for example, that after we first issued our opinion, the United States Copyright Office sent Garcia a letter denying her request to register a copyright in her performance. Because this is not an appeal of the denial of registration, the Copyright Office's refusal to register doesn't "preclude[] a determination" that Garcia's performance "is indeed copyrightable." *OddzOn Prods., Inc.* v. *Oman*, 924 F.2d 346, 347 (D.C. Cir. 1991). But the district court may still defer to the Copyright Office's reasoning, to the extent it is persuasive. *See Inhale, Inc.* v. *Starbuzz Tobacco, Inc.*, 739 F.3d 446, 448–49 (9th Cir. 2014).

After we first published our opinion, amici raised other issues, such as the applicability of the fair use doctrine, *see* 17 U.S.C. § 107, and section 230 of the Communications Decency Act, *see* 47 U.S.C. § 230. Because these defenses were not raised by the parties, we do not address them. The district court is free to consider them if Google properly raises them.

As the above discussion makes clear, any analysis of the rights that might attach to the numerous creative contributions that make up a film can quickly become entangled in an impenetrable thicket of copyright. But it rarely comes to that because copyright interests in the vast majority of films are covered by contract, the work for hire doctrine or implied licenses. *See* F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures Under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 238, 317–18, 327–33 (2001). Here, Google argues that Garcia's performance was a work made for hire or, alternatively, that she granted Youssef an implied license to use her performance in "Innocence of Muslims."

### 2. Work For Hire

Under the work for hire doctrine, the rights to Garcia's performance vested in Youssef if Garcia was Youssef's employee and acted in her employment capacity or was an independent contractor who transferred her interests in writing. *See* 17 U.S.C. §§ 101, 201(b); *see also Cmty. for Creative Non-Violence* v. *Reid*, 490 U.S. 730, 751 (1989).

The "term 'employee'" refers "to a hired party in a conventional employment relationship," and the question of employment is analyzed under traditional principles of agency. *Reid*, 490 U.S. at 743, 751. Garcia's case is a good example of why it is difficult to categorize an actor, particularly one in a small role, as a conventional employee. Youssef hired Garcia for a specific task, she only worked for three days and she claims she received no health or other traditional employment benefits. *See id.* at 751–52. As we've recognized, this difficulty is why 17 U.S.C. § 101 "specifically addresses the movie . . . industr[y], affording

moviemakers a simple, straightforward way of obtaining ownership of the copyright in a creative contribution—namely, a written agreement." *Effects Assocs.*, 908 F.2d at 558. Youssef didn't obtain a written agreement,[5] and Garcia simply doesn't qualify as a traditional employee on this record.

The dissent believes Garcia was an employee primarily because "Youssef controll[ed] both the manner and means of making the film, including the scenes featuring Garcia" and Youssef "was engaged in the business of film making at the time." Dissent 34. But there's no evidence in the record that Youssef directed the film or that he controlled the manner in which any part of the film—much less Garcia's scene—was shot. In fact, Youssef has claimed only that he wrote the screenplay.

There's nothing in the record to suggest that Youssef was in the "regular business" of making films. *Reid*, 490 U.S. at 752. He'd held many jobs, but there's no indication he ever worked in the film industry. And there's no evidence he had any union contracts, relationships with prop houses or other film suppliers, leases of studio space or distribution agreements. The dissent would hold that Youssef was in the "regular business" of filmmaking simply because he made "Innocence of Muslims." But if shooting a single amateur

---

[5] Neither party claims that Garcia signed a work for hire agreement. In the district court, Google produced an agreement, purportedly signed by Garcia, that transferred all of her rights in her performance to the film's producers. Garcia responded by submitting the declaration of a handwriting expert opining that Garcia's signature had been forged. The district court didn't address the agreement or its authenticity.

film amounts to the regular business of filmmaking, every schmuck with a videocamera becomes a movie mogul.

### 3. Implied License

A non-exclusive license may be implied from conduct and arises where a plaintiff "create[s] a work at defendant's request and hand[s] it over, intending that defendant copy and distribute it." *Effects Assocs.*, 908 F.2d at 558. We've found an implied license where the plaintiff's contribution to a film or other work would otherwise be worthless or of "minimal value." *Id.* at 559; *see also Oddo* v. *Ries*, 743 F.2d 630, 634 (9th Cir. 1984). That is the case here. Garcia auditioned for a role in a particular film, was paid for her performance and had every reason to believe Youssef would eventually release the film. Without an implied license, the performance for which she was paid would be unusable. Therefore, we agree with Google that Garcia granted Youssef an implied license.

Any such license must be construed broadly. If the scope of an implied license was exceeded merely because a film didn't meet the ex ante expectation of an actor, that license would be virtually meaningless. *See Foad Consulting Grp., Inc.* v. *Azzalino*, 270 F.3d 821, 837–38 (9th Cir. 2001) (Kozinski, J., concurring). A narrow, easily exceeded license could allow an actor to force the film's author to re-edit the film—in violation of the author's exclusive right to prepare derivative works. *See* 17 U.S.C. § 106(2). Or the actor could prevent the film's author from exercising his exclusive right to show the work to the public. *See* 17 U.S.C. § 106(4). In other words, unless these types of implied licenses are

construed very broadly, actors could leverage their individual contributions into de facto authorial control over the film.[6]

Nevertheless, even a broad implied license isn't unlimited. *See Oddo*, 743 F.2d at 634. Garcia was told she'd be acting in an adventure film set in ancient Arabia. Were she now to complain that the film has a different title, that its historical depictions are inaccurate, that her scene is poorly edited or that the quality of the film isn't as she'd imagined, she wouldn't have a viable claim that her implied license had been exceeded. But the license Garcia granted Youssef wasn't so broad as to cover the use of her performance in *any* project. Here, the problem isn't that "Innocence of Muslims" is not an Arabian adventure movie: It's that the film isn't intended to entertain at all. The film differs so radically from anything Garcia could have imagined when she was cast that it can't possibly be authorized by any implied license she granted Youssef.

A clear sign that Youssef exceeded the bounds of any license is that he lied to Garcia in order to secure her participation, and she agreed to perform in reliance on that lie. Youssef's fraud alone is likely enough to void any agreement he had with Garcia. *See* 26 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 69:4 (4th ed. 2003). But even if it's not, it's clear evidence that his inclusion of her performance in "Innocence of Muslims"

---

[6] Construing such implied licenses narrowly would also undermine our joint authorship jurisprudence. Most actors don't qualify as joint authors. *See Aalmuhammed*, 202 F.3d at 1232–33. Yet, if any actor who doesn't like the final version of a movie could keep it from being released, he'd have more control over the film than a joint author. *See* 1 *Nimmer on Copyright* § 6.10[A][1][a], at 6–36 ("[A] joint owner may exploit the work himself, without obtaining the consent of the other joint owners.").

exceeded the scope of the implied license and was, therefore, an unauthorized, infringing use.

The situation in which a filmmaker uses a performance in a way that exceeds the bounds of the broad implied license granted by an actor will be extraordinarily rare. But this is such a case. Because it is, Garcia has demonstrated that she's likely to succeed on the merits of her claim. *Winter*, 555 U.S. at 20.

## B. Irreparable Harm

Garcia argues that she suffers irreparable harm both because of the ongoing infringement of her copyright and because that infringement subjects her to continuing, credible death threats. Irreparable harm isn't presumed in copyright cases. *Perfect 10, Inc.* v. *Google, Inc.*, 653 F.3d 976, 980–81 (9th Cir. 2011). Therefore, Garcia must show that the damage to her reputation and threats against her life constitute irreparable harm.

The district court found that Garcia failed to make this required showing, primarily because she didn't bring suit until several months after "Innocence of Muslims" was uploaded to YouTube. It's true that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc.* v. *Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). But this is so because a preliminary injunction is based "'upon the theory that there is an urgent need for speedy action'" and by "'sleeping on its rights a plaintiff demonstrates [a] lack of'" urgency. *Lydo Enters., Inc.* v. *City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gillette Co.* v. *Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).

There's no dispute that, here, Garcia took legal action as soon as the film received worldwide attention and she began receiving death threats—in other words, as soon as there was a "need for speedy action." *Id.* Because the need for immediate action didn't arise until she was threatened, Garcia wasn't dilatory in bringing the lawsuit.

The harm Garcia complains of is real and immediate. *See City of L.A.* v. *Lyons*, 461 U.S. 95, 111 (1983). She has provided unrefuted evidence that the threats against her are ongoing and serious, she has already been forced to take significant security precautions when traveling and she moved to a new home and relocated her business as a safety measure. Although past injuries aren't sufficient to establish irreparable harm for purposes of an injunction, *id.* at 103, Garcia has amply demonstrated that, absent an injunction, she'll continue to suffer concrete harms—whether in the form of ongoing security requirements or actual harm to her person.

Beyond establishing that she faces an imminent harm, Garcia must show a "sufficient causal connection" between that harm and the conduct she seeks to enjoin such that the injunction would effectively curb the risk of injury. *Perfect 10*, 653 F.3d at 981–82. Despite her understandable focus on the threats against her life, Garcia has brought a copyright action. Therefore, she needs to show that the harm she alleges is causally related to the infringement of her copyright.

She's made such a showing. Youssef's unauthorized inclusion of her performance in "Innocence of Muslims" undisputedly led to the threats against Garcia. Google argues that any harm arises solely out of Garcia's participation in

"Innocence of Muslims" and not out of YouTube's continued hosting of the film.  But Garcia has shown that removing the film from YouTube will help disassociate her from the film's anti-Islamic message and that such disassociation will keep her from suffering future threats and physical harm. Although Google asserts that the film is so widespread that removing it from YouTube will have no effect, it has provided no evidence to support this point.[7]  Taking down the film from YouTube will remove it from a prominent online platform—the platform on which it was first displayed—and will curb the harms of which Garcia complains.

It is not irrelevant that the harm Garcia complains of is death or serious bodily harm, which the dissent fails to mention.  Death is an "irremediable and unfathomable" harm, *Ford* v. *Wainwright*, 477 U.S. 399, 411 (1986), and bodily injury is not far behind.  To the extent the irreparable harm inquiry is at all a close question, we think it best to err on the side of life.

## C.  Balance of the Equities and The Public Interest

Youssef lied to Garcia about the project in which she was participating.  Her performance was used in a way that she

---

[7] Contrary to the dissent's suggestion, Garcia's declaration doesn't establish that the film has been "widely discussed and disseminated." Dissent 36.  It states only that Garcia reached out to the media to let the world know that she "d[id] not condone the film."  We reject the dissent's uncharitable argument that Garcia should be penalized for attempting to protect her life and reputation by distancing herself from "Innocence of Muslims."  We also reject Google's preposterous argument that any harm to Garcia is traceable to her filing of this lawsuit.  Any publicity generated by Garcia's lawsuit is a necessary product of her attempt to protect herself and her legal rights after Google refused to do so.

found abhorrent and her appearance in the film subjected her to threats of physical harm and even death.  Despite these harms, and despite Garcia's viable copyright claim, Google refused to remove the film from YouTube.  It's hard to see how Google can defend its refusal on equitable grounds and, indeed, it doesn't really try.   Instead, it argues that an injunction would be inequitable because of the overwhelming public interest in the continued hosting of "Innocence of Muslims" on YouTube.

The problem with Google's position is that it rests entirely on the assertion that Garcia's proposed injunction is an unconstitutional prior restraint of speech.  But the First Amendment doesn't protect copyright infringement.  *Cf. Eldred* v. *Ashcroft*, 537 U.S. 186, 219–220 (2003).  "First Amendment protections are 'embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas,' and in the 'latitude for scholarship and comment' safeguarded by the fair use defense."  *Golan* v. *Holder*, 132 S. Ct. 873, 890 (2012) (*quoting Harper & Row Publishers, Inc.* v. *Nation Enters.*, 471 U.S. 539, 560 (1985)).  Google hasn't raised fair use as a defense in this appeal, *see* page 11 *supra*, so we do not consider it in determining its likelihood of success.  This does not, of course, preclude Google from raising the point in the district court, provided it properly preserved the defense in its pleadings.

Because Garcia has demonstrated a likelihood of success on her claim that "Innocence of Muslims" infringes her copyright, Google's argument fails.  The balance of equities therefore clearly favors Garcia and, to the extent the public interest is implicated at all, it, too, tips in Garcia's direction.

\*          \*          \*

This is a troubling case.  Garcia was duped into providing an artistic performance that was used in a way she never could have foreseen.  Her unwitting and unwilling inclusion in "Innocence of Muslims" led to serious threats against her life.  It's disappointing, though perhaps not surprising, that Garcia needed to sue in order to protect herself and her rights.

But she has sued and, more than that, she's shown that she is likely to succeed on her copyright claim, that she faces irreparable harm absent an injunction and that the balance of equities and the public interest favor her position.  The district court abused its discretion in finding otherwise.

**REVERSED AND REMANDED**[8]

---

N.R. SMITH, Circuit Judge, dissenting

Because the facts and law do not "clearly favor" issuing a preliminary injunction to Garcia, the district court did not abuse its discretion in denying Garcia's requested relief. As a result, I must dissent.

---

[8] Concurrent with this opinion, we have issued an order directing Google to take down all copies of "Innocence of Muslims" from YouTube and any other platforms within its control and to take all reasonable steps to prevent further uploads.  This temporary injunction shall remain in place until the district court is able to enter a preliminary injunction consistent with our opinion.

## I.   Standard of Review

The majority opinion omits applying the requisite standard of review that is especially pertinent to Garcia's requested relief. Mandatory preliminary injunctions, similar to the one issued today, are "particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

Different from the usual "prohibitory injunction," a "mandatory injunction goes well beyond simply maintaining the status quo *pendente lite*." *Id.* (internal quotation marks omitted). As an example, requiring a university to reappoint a faculty member whose contract had expired constitutes a mandatory injunction. *Id.*; *see also, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) ("[T]he affirmative step of recalling [a] product" is also a mandatory injunction.). In the instant dispute, Garcia requests relief through a mandatory injunction. Rather than asking to maintain the status quo pending litigation, Garcia demands Google immediately remove a film from YouTube. Therefore, her request must be "subject to a higher degree of scrutiny because such relief is particularly disfavored under the law of this circuit."*Stanley*, 13 F.3d at 1320. This higher degree of scrutiny requires courts to be "extremely cautious" and "deny such relief unless the facts and law *clearly favor* the moving party." *Id.* at 1319–20 (internal quotation marks omitted, emphasis added). Indeed, mandatory injunctions "are not issued in doubtful cases." *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979) (internal quotation marks omitted).

This standard's importance must be appreciated in conjunction with the general standard with which this court reviews a district court's decision to deny preliminary

injunctive relief: "abuse of discretion." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As a result, the majority may only reverse if it were illogical or implausible, *United States v. Hinkson*, 585 F.3d 1247, 1263–64 (9th Cir. 2009), for the district court to conclude that the law and facts did not *clearly favor* Garcia, *Stanley*, 13 F.3d at 1320.[1]

Given this standard, the majority errs in requiring Google to pull the film from YouTube—at this stage of the litigation. The district court did not abuse its discretion in concluding that the law and facts did not clearly favor Garcia. Instead, the majority makes new law in this circuit in order to reach the result it seeks. We have never held that an actress's performance could be copyrightable. Indeed, "[t]here is little case law or statutory authority as to the position of performers as authors of an audiovisual work under U.S. law." F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. Rev. 225, 300 (2001).

## II.  Application of the *Winter* Factors

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

---

[1] As this is the relevant standard of review, the district court's application of it is hardly "equivocation." *See* maj. op. at 6 n.2. Furthermore, the amended portions of the majority opinion only confirm that the law and facts do not clearly favor Garcia: "Nothing we say today precludes the district court from concluding that Garcia doesn't have a copyrightable interest, or that Google prevails on any of its defenses." Maj. op. at 11. Where the law and facts must clearly favor Garcia in order for her to prevail, the majority's equivocation cements its error.

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## A. Garcia's Likely Success on the Merits of Her Copyright Claim

The district court concluded that it was unclear whether Garcia had a copyright interest in her acting performance. The district court's discretionary conclusion hardly appears illogical or implausible.

### 1. Copyright Interest

A protected interest under the Copyright Act must be an "original work[] of authorship fixed in any tangible medium of expression. . . ." 17 U.S.C. § 102(a). Garcia does not clearly have a copyright interest in her acting performance, because (1) her acting performance is not a work, (2) she is not an author, and (3) her acting performance is too personal to be fixed.[2]

#### a. Work

To be protected, Garcia's acting performance must be a "work." *Id*. Congress has listed examples of copyrightable works, like architectural works, motion pictures, literary works, and pictorial or sculptural works. *Id*. The nature of these works is significantly different from an actress's

---

[2] The majority relies solely on a showing of originality to conclude Garcia has a copyrightable interest in her acting performance, maj. op. at 8 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)), but the Constitution and the Copyright Act require much more.

individual performance in a film, casting doubt on the conclusion that the latter can constitute a work. *See Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1184–85 (9th Cir. 2002) ("The doctrine of *noscitur a sociis* counsels that words should be understood by the company they keep.").

Section 101 of the Act is also instructive, because it differentiates a work from the performance of it. It defines "perform a 'work'" to mean "to recite, render, play, dance or *act it*." 17 U.S.C. § 101 (emphasis added). Given this provision, it is difficult to understand how Congress intended to extend copyright protection to this acting performance. While Congress distinguishes the performance from the work itself, the majority blurs this line. Its position contemplates something very different from amalgamating independently copyrightable interests into a derivative work. *See id.* at § 103(b).

Consistent with section 101, section 102(b) outlines that which is not given copyright protection. It states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Id.* at § 102(b). An acting performance resembles the "procedure" or "process" by which "an original work" is performed. *Id.* Therefore, "[i]n no case does copyright protection" extend to an acting performance, "regardless of the form in which it is described, illustrated, or embodied in" the original work. *Id.*

In sum, a motion picture is a work. *Id.* at § 102(a). A segment independently produced and then incorporated into a motion picture is also a work. *See, e.g.*, *Effects Assocs., Inc.*

*v. Cohen*, 908 F.2d 555, 556 (9th Cir. 1990). However, the Copyright Act does not clearly place an acting performance within its sphere of copyrightable works. As a result, the law and facts do not clearly favor finding a copyrightable interest in Garcia's acting performance.

### b.  Authorship

Like the work requirement, the Copyright Act also premises copyright protection on authorship. 17 U.S.C. § 102(a). Authorship is also a constitutional copyright requirement. *See* U.S. Const. Art. I, § 8, cl. 8; *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 56 (1884). *Aalmuhammed v. Lee* is the most relevant case in this circuit on the question of authorship. 202 F.3d 1227 (9th Cir. 2000). Though the *Aalmuhammed* court discussed authorship in the context of joint authors of a film (which Garcia does not claim to be), it articulated general principles of authorship that assist in analyzing Garcia's interest in her acting performance.[3]

The *Aalmuhammed* court explained that "[t]he word [author] is traditionally used to mean the originator or the person who causes something to come into being." *Id.* at 1232. In other words, the author is the "person with creative control." *Id.* Thus, "an author 'superintends' the work by exercising control." *Id.* at 1234 (quoting *Burrow-Giles*,

---

[3] Furthermore, Garcia's interest in her acting performance may best be analyzed as a joint work with Youssef, considering she relied on Youssef's script, equipment, and direction. *See* 17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.").

111 U.S. at 61) (alteration omitted). Another framing by the court defined an author as "'he to whom anything owes its origin.'" *Id.* at 1233 (quoting *Burrow-Giles*, 111 U.S. at 58). An author might also be "'the inventive or master mind' who 'creates, or gives effect to the idea.'" *Id.* at 1234 (quoting *Burrow-Giles*, 111 U.S. at 61). Indeed, authorship "requires *more* than a minimal creative or original contribution to the work." *Id.* at 1233 (citing *Burrow-Giles*, 111 U.S. at 58) (emphasis added).[4] These principles comport with the "general rule," that "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Commty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

In concluding that Aalmuhammed was not a joint author of the film, *Malcolm X*, the court found that he (1) "did not at any time have superintendence of the work," (2) "was not the person 'who . . . actually formed the picture by putting the persons in position, and arranging the place," (3) could not "benefit" the work "in the slightest unless [the director] chose to accept [his recommendations]," and (4) made "valuable contributions to the movie," but that alone was "not enough for co-authorship of a joint work." *Aalmuhammed*, 202 F.3d at 1235.

Garcia's contribution is less significant than Aalmuhammed's. She conceded in her complaint and affidavit that she had no creative control over the script or her performance. Youssef provided the script, the equipment, and the direction. As a result, Garcia was not the originator of

---

[4] The majority opinion cannot coexist with this statement. *See* maj. op. at 8.

ideas or concepts. She simply acted out others' ideas or script. Her brief appearance in the film, even if a valuable contribution to the film, does not make her an author. Indeed, it is difficult to understand how she can be considered an "inventive or master mind" of her performance under these facts.

The majority dismisses *Aalmuhammed* as inapposite, instead bolstering its conclusion with reference to acting manuals and treatises. *See* maj. op. at 8–9. In so doing, it goes too far in attempting to distinguish *Aalmuhammed*. First, the *Aalmuhammed* court articulated general principles of authorship that it pulled from the Supreme Court case, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884). *See, e.g.*, *Aalmuhammed*, 202 F.3d at 1233 ("*Burrow-Giles* is still good law. . . ."). *Burrow-Giles* has nothing to do with joint works; instead, the Court interpreted "author" as featured in Article I, Section 8, Clause 8 of the U.S. Constitution. *See* 111 U.S. at 56. Second, the majority's one quotation from *Aalmuhammed*, maj. op. at 9, is taken out of context. The very next line in that opinion makes clear that copyright protection is premised on authorship, whether the work is joint or otherwise:

> We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution. We recognize that a contributor of an expression may be deemed to be the "author" of that expression for purposes of determining whether it is independently copyrightable.

*Aalmuhammed*, 202 F.3d at 1232. Finally, Section 102(a) of the Copyright Act and Article I, Section 8, Clause 8 of the U.S. Constitution both premise copyright protection on authorship. Therefore, not only does the majority decline to apply the most relevant precedent in this circuit on the question before it, it also reads the authorship requirement out of the Copyright Act and the Constitution.[5]

Even the commentators agree that *Aalmuhammed* not only applies to Garcia's claim, but also forecloses her realization of a copyrightable interest in her acting performance. *See, e.g.*, Dougherty, *Not a Spike Lee Joint?*, 49 UCLA L. Rev. at 306 ("Under the judicially enhanced joint work requirements," an actress's performance would be "physically inseparable from other cinematic contributions." (citing *Aalmuhammed*, 202 F.3d at 1232)); Lee, *Entertainment and Intellectual Property Law* § 12:7 (2013) ("Under [*Aalmuhammed*], . . . individual contributors will rarely qualify as joint authors").

The majority lauds an actress's creative role in a film, maj. op. at 8, but the practical impact of its decision must not be ignored. Garcia's role in the film is minimal. Yet the majority concludes that she somehow created a work Congress intended to protect under the Copyright Act. Considering the number of contributors who inject the same or a greater amount of creativity into a film, the majority's omission of any inquiry into authorship indeed creates "an

---

[5] The majority's sole reliance on *Feist Publications* to conclude that an acting performance is copyrightable, maj. op. at 8–9, gives insufficient weight to the constitutional and statutory authorship requirement. In *Feist Publications*, the specific question was not of authorship but of originality. *See* 499 U.S. at 347.

impenetrable thicket of copyright." Maj. op. at 12. Meanwhile, though *Aalmuhammed*'s interpretation of the Copyright Act has been debated in academic circles, "it adopts a standard that promotes clarity in the motion picture industry." Lee, *Entertainment and Intellectual Property Law* § 12:7.

Because Garcia does not qualify as an author under *Aalmuhammed*, the law and facts do not clearly favor protecting her acting performance under the Copyright Act.

### c.  Fixation

Lastly, the subject matter protected by the Copyright Act must also be "fixed in [a] tangible medium of expression. . . ." 17 U.S.C. § 102(a). Copyright preemption cases are instructive on the question of fixation.

For preemption purposes, the courts generally agree that "the scope of the subject matter of copyright law is broader than the protection it affords." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en banc); *see U.S. ex rel Berge v. Bd. of Trs. of Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997). In other words, the subject matter underlying a state law claim *preempted* by the Copyright Act may nevertheless not be protected by the Copyright Act. By implication, subject matter supporting a *non-preempted* state law claim is definitely not protected by the Copyright Act. A number of cases from this circuit discuss subject matter akin

30                 GARCIA V. GOOGLE, INC.

to an acting performance and prove useful on the question of fixation.[6]

In *Midler v. Ford Motor Co.*, Bette Midler sued Ford for misappropriating her voice in a commercial. 849 F.2d 460, 462 (9th Cir. 1988). Although Ford properly had a license from the song's copyright holder, it paid someone to imitate Midler in singing the song Midler made famous. *Id.* Although ultimately holding for Ford, the court rejected its argument that Midler's claim was preempted by copyright law. "A voice is not copyrightable. The sounds are not 'fixed.' What is put forward . . . here is more personal than any work of authorship." *Id.*; *see also Sinatra v. Goodyear Tire & Rubber Co.*, 435 F.2d 711 (9th Cir. 1970).

In *Laws v. Sony Music Entertainment*, we distinguished *Midler* from its facts in holding that the plaintiff's claim was preempted by the Copyright Act, because "Sony was not imitating 'Very Special' as [the plaintiff] might have sung it. Rather, it used a portion of 'Very Special' as sung by [the plaintiff]." 448 F.3d 1134, 1141 (9th Cir. 2006). Where Sony had a license to the entire song, its use of a portion of it under that license could not be attacked outside the copyright laws. *Id.*

---

[6] The majority opinion dismisses the line of copyright preemption precedent. Maj. op. at 9 ("*Midler* isn't a copyright case at all—it's a right of publicity case that happens to discuss copyright in the context of preemption."). However, these cases feature the same judges interpreting the same Copyright Act, whether the question is one of copyright infringement or copyright preemption. Thus, the majority's distinction is without difference; it fails to overcome the fact that subject matter underlying a *non-preempted* state law claim, like that in *Midler*, is *clearly* without the Copyright Act's protection. *See Montz*, 649 F.3d at 979.

*Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146 (9th Cir. 2010), is like *Laws*. Defendants in *Jules Jordan* copied (without authorization) pornographic DVDs produced and copyrighted by Jules Jordan Video, then reproduced, counterfeited, and sold their copies to third parties. *Id.* at 1153. Because Jules Jordan held a copyright in the original DVDs, this court found that the Copyright Act preempted its state law right of publicity claim against Defendants.

The subject matter in *Jules Jordan* and *Laws* concerned entire copyrighted works—video and music recordings. Differently, *Midler* involved the imitation of a singer's voice. Combined, these cases show that, just as the *singing* of a song is not copyrightable, while the entire song recording is copyrightable, the *acting* in a movie is not copyrightable, while the movie recording is copyrightable.[7]

A musical recording involves many moving parts, including the tune, lyrics, instrumental musicians, vocalists, and a production team that edits and prepares the final song. While the ultimate product is copyrightable, Ninth Circuit precedent dictates that a vocalist's singing of the song is not copyrightable. *See Midler*, 849 F.2d at 462. An acting performance depends upon similar moving parts: a script, multiple actors' and actresses' performances, guidance from directors and staff, and editing and other production preparation. The movie is ultimately copyrightable. *See*

---

[7] This is not the case where an independently authored clip is used in a film, as in *Effects Assocs.*, 908 F.2d at 557–58. Rather, this analogy assumes facts similar to the instant case: an actress acting out a script she did not write under the direction of someone else who provides all of the instruments, tools, and leadership.

17 U.S.C. § 102(a). But one actress's individual acting performance in the movie, like a vocalist singing a song, "is more personal than any work of authorship." *Midler*, 849 F.2d at 462. As a result, it is not fixed. *See id.*

Just as "an actor does far more than speak words on a page," maj. op. at 8, so too does a vocalist. Indeed, one might say that otherwise, "every schmuck" is a vocalist, "because everyone . . . knows how to read." *Id.* (quoting Sanford Meisner & Dennis Longwell, *Sanford Meisner on Acting* 178 (1987)) (quotation marks omitted). An actress like Garcia makes a creative contribution to a film much like a vocalist's addition to a musical recording. Garcia did not write the script; she followed it. Garcia did not add words or thoughts to the film. She lent her voice to the words and her body to the scene. Her creativity came in the form of facial expression, body movement, and voice. Similarly, a singer's voice is her personal mobilization of words and musical notes to a fluid sound. Inflection, intonation, pronunciation, and pitch are the vocalist's creative contributions. Yet, this circuit has determined that such, though perhaps creative, is too personal to be fixed. *See Midler*, 849 F.2d at 462.

Under this line of cases, an actress's performance in a film is more like the personal act of singing a song than the complete copyrighted works in *Laws* and *Jules Jordan*. As a result, it does not seem copyrightable. Thus, the law and facts do not clearly support Garcia's claim that her acting performance is protected under the Copyright Act.

Considering work, authorship, and fixation, Garcia has not demonstrated how the facts and law clearly favor her claim of a copyrightable interest in her acting performance.[8]

## 2.  Work for Hire Doctrine

Even if the majority were correct in finding a copyrightable interest in Garcia's acting performance, preliminary injunctive relief would be unwarranted. The district court did not address the application of the work for hire doctrine. Yet, the law and facts do not clearly show that Garcia was not working for hire.

"In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title. . . ." 17 U.S.C. § 201(b). "A 'work made for hire' is a work prepared by an employee within the scope of his or her employment. . . ." *Id.* at § 101. Therefore, "[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751.

---

[8] The majority's amended opinion also attempts to hedge its conclusion that Garcia has a copyright interest in her acting performance by avoiding counter arguments it failed to address, because they were not raised by the parties. Maj. op. at 11, 19. Yet, the majority could consider these arguments *sua sponte* "under exceptional circumstances, where substantial public interests are involved, or where to not do so would be unduly harsh to one or both of the parties." *United States v. Hoyt*, 888 F.2d 1257, 1258 (9th Cir. 1989). The majority's failure to even engage this inquiry, instead quickly dismissing arguments against its view, confirms its error.

> Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52 (internal citations omitted). Though "[n]o one of these factors is determinative," *id.* at 752, the hiring party's control "is the central inquiry here." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125 (9th Cir. 2010).

The work for hire doctrine "is important in the analysis of motion picture authorship because in the United States most contributions to a motion picture are created as works made for hire." Dougherty, *Not a Spike Lee Joint?*, 49 UCLA L. Rev. at 238. Here, Garcia conceded in her complaint and affidavit that Youssef "managed all aspects of production," controlling both the manner and means of making the film, including the scenes featuring Garcia. Further, this "central" factor is not the only one supporting a work for hire finding here. The bulk of the other factors also suggest that Garcia is an employee. Youssef provided the instrumentalities and tools, dictated the filming location, decided when and how long Garcia worked, and was engaged in the business of film making at the time. Additionally, Garcia did not hire or pay

assistants. Contrary to the majority's conclusion, maj. op. at 12–14, the facts and law do not clearly favor finding that Garcia was not working for hire.[9]

In *Reid*, the Court decided a sculptor was not an employee, even though Community for Creative Non-Violence "directed enough of Reid's work to ensure that he produced a sculpture that met their specifications." *Reid*, 490 U.S. at 752. However, "all the other circumstances weigh[ed] heavily against finding an employment relationship." *Id.* This case differs considerably from *Reid*. The central factor of control and many other factors "weigh heavily" *for* finding an employment relationship.

In sum, the majority gives zero deference to the district court's position on the likelihood for success factor. To justify its opinion, the majority must show the district court abused its discretion in determining the law and facts did not clearly show Garcia was likely to succeed on the merits. This, the majority has failed to do.

## B. Irreparable Harm

The district court decided that because "[t]he Film was posted for public viewing on YouTube" five months prior to Garcia bringing suit, she "has not demonstrated that the requested preliminary relief would prevent any alleged harm." The majority has failed to demonstrate how the district court abused its discretion in so holding.

---

[9] While the majority may dispute which person was actually directing the film, it cannot overcome Garcia's own admissions in her complaint that substantiate these facts; she was not in control.

Indeed, the district court's application of the law to the facts of this case here was not an abuse of discretion. A "[p]laintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). The district court gave significant weight to Garcia's delay in filing suit, even given Garcia's explanation for her delay. *See* maj. op. at 16–17. This is not illogical or implausible. Were Garcia really trying to protect her purported copyright interest in her acting performance, one would expect her to have brought this action immediately after learning of the alleged infringing behavior. Considering "[t]he relevant harm is the harm that . . . occurs to the parties' legal interests," Garcia has failed to explain her delay in terms of harm to her alleged copyright interest. *See Salinger v. Colting*, 607 F.3d 68, 81 & n.9 (2d Cir. 2010) ("[T]he justification of the copyright law is the protection of the *commercial* interest of the artist/author. It is not to coddle artistic vanity or to protect secrecy, but to stimulate creation by protecting its rewards." (internal quotation marks omitted)).

Further, by Garcia's own admission, the film has been widely discussed and disseminated; Garcia admits in her affidavit that she "went public and advised the world through media that [she] did not condone the film." Thus, while Garcia has provided undisputed evidence of past threats and injuries, she has failed to link her allegations of future harm to potential future viewings of the film on YouTube. *See Perfect 10 v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1173 (9th Cir. 2011).

Therefore, it is not illogical or implausible to conclude that the law and facts do not clearly demonstrate how Garcia will suffer continued irreparable harm caused by the presence of the film on YouTube. *See Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n Local 200*, 611 F.3d 483, 494 (9th Cir. 2010).

Rather than focusing on the logic or plausibility of the district court's decision, the majority substitutes its own explanation of why Garcia's delay should not be held against her. Maj. op. at 16–18. However, the weight attached by the district court to certain facts when measuring irreparable harm is not for this court to second guess. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

## C.  Balancing the Equities

When considering the propriety of preliminary injunction relief, "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 632 F.3d at 1131. The district court applied this concept in concluding preliminary injunctive relief was unwarranted without considering the balance of the equities or the public interest.

However, the balance of the equities does not clearly favor Garcia. A court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

Google argues that the balance of the equities does not clearly favor Garcia, because "[a] court order requiring removal from YouTube of the Film or any portion thereof would impose a substantial burden on free expression,

without preventing any future harm to Appellant." Garcia is only faced with *potential* infringement of her *potential* copyright interest *pending* a final disposition of this lawsuit. Further, she is not completely without fault in these circumstances. If she valued her acting performance to the extent she now claims, why didn't she protect her performance by contract? The facts evidence that she acted for three days and was paid $500 dollars. Balancing the harm faced by both Garcia and Google, the law and facts do not clearly favor Garcia.

In its basis concerning the balance of the equities, the majority discusses Youssef's reproachable conduct. Maj. op. at 18–19. However, Youssef is not a party to this appeal, and Google was not a party to any of Youssef's actions.

Therefore, the balance of the equities does not clearly favor Garcia.

**D.  Public Interest**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the *extraordinary* remedy of injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24(2008)) (emphasis added). In fact, "'the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" *Stormans*, 586 F.3d at 1139 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–313 (1982)).

GARCIA V. GOOGLE, INC.                    39

The public's interest in a robust First Amendment cannot be questioned. *See Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Opposite this vital public interest is Garcia's allegation of copyright infringement. Properly enforcing the Copyright Act is also an important public interest. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011). Indeed, if Google were actually infringing Garcia's copyright, the First Amendment could not shelter it. *See Eldred v. Ashcroft*, 537 U.S. 186, 219–20 (2003).

But the case at bar does not present copyright infringement per se. Instead (in an unprecedented opinion), the majority concludes that Garcia *may* have a copyright interest in her acting performance. Maj. op. at 10. As a result, Google's contention, that issuing a preliminary injunction on these facts may constitute a prior restraint of speech under the First Amendment, identifies an important public interest.

Thus, the law and facts do not clearly demonstrate how granting a preliminary injunction in Garcia's favor would serve the public interest.

## III.   Conclusion

The *Stanley* standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint. Instead, the majority abandons restraint to procure an end (ordering the film be taken down) by unsuitable means (the Copyright Act).