M. Cris Armenta (SBN 177403)
THE ARMENTA LAW FIRM APC
11900 W. Olympic Boulevard, Suite 730
Los Angeles, CA 90064
Tel: (310) 826-2826 x 108
Facsimile: (310) 826-5456
Email: cris@crisarmenta.com

Credence E. Sol (SBN 219784)
c/o THE ARMENTA LAW FIRM APC
11900 W. Olympic Boulevard, Suite 730
Los Angeles, CA 90064
Telephone: 06 74 90 22 08
credence.sol@orange.fr
Attorneys for Plaintiff
Cindy Lee Garcia

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY LEE GARCIA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NAKOULA BASSELEY NAKOULA, an individual also known as SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, and/or MALID AHLAWI; GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, and ALAN ROBERTS, an individual also known as ROBERT BROWNELL, DOES 2 through 10, inclusive.<br><br>Defendants. | Case No. CV12-8315-MWF(VBKx)<br><br>**OPPOSITION TO EX PARTE APPLICATIONS OF MARK BASSELEY YOUSSEF TO SET ASIDE SUBPOENAS TO THORIYA NAKOULA AND MINA IMIEL, OR IN THE ALTERNATIVE FOR SHORTEING OF TIME; DECLARATION OF M. CRIS ARMENTA PROOF OF SERVICE OF SUBPOENA TO PRODUCE DOCUMENTS TO UNION BANK** |

Plaintiff Cindy Lee Garcia hereby opposes the applications of Defendant Mark Basseley Youssef to the subpoenas directed to banking information of Thoriya Nakoula and Mina Imiel as follows:

## I.      Introduction

As a preliminary matter, Defendant Mark Basseley Youssef ("Defendant Youssef") is a party and as such, has no standing to quash a subpoena served on a non-party.  On those grounds alone, the Ex Parte Applications should be denied.  Further, the information sought by the subpoenas is relevant to the purpose of discovering who were the parties who actually funded the film property "Innocence of Muslims" which is the subject of the claims against Defendant Youssef.  Plaintiff has been attempting to discover the true and actual identities of the producers and those who funded the film, in order to identify the proper defendants as DOES in this action.   In informal and formal discovery already provided to the Plaintiff, it has been established that Thoriya Nakoula and Mina Imiel at least partially funded the production.  Thoriya Nakoula wrote a check to Plaintiff Cindy Lee Garcia, which is attached to the Declaration of M. Cris Armenta.  And, Mina Imiel, paid for the location fee for the film to be shot at Blue Cloud Ranch.  It is interesting that Youssef objects on the grounds that these witnesses are not identified in the draft Rule 26 document, because that document was sent to Defendant Youseff on May 23, 2014, but Youseff has not responded to the request to participate in this collaborative process.   Plaintiff has since gathered more information, discovery and documetns, and has even take two depositions in this action – of this newly discovery information will be in the amended draft  Rule 26 disclosure documents, but, of course, it is difficult to collaborate on such a venture when Defendant Youseff has been completely unresponsive.

## II.     Standard

Although the Ninth Circuit has not explicitly addressed the question of whether a party can move to quash a subpoena served upon a nonparty, the "general

1    rule . . . is that a party has no standing to quash a subpoena served upon a third

2    party, except as to claims of privilege relating to the documents being sought." Cal.

3    Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc., —— F.R.D. ——, ——, Civ.

4    No. 2:10–1207 GEB AC, 2014 WL 641139, at *5 (E.D.Cal. Feb.18, 2014); see also

5    Crispin v. Christian Audigier, Inc., 717 F.Supp.2d 965, 973–74 (C.D.Cal.2010)

6    (citing cases); 9A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE &

7    PROCEDURE § 2459 (3d ed. 2008) ("Ordinarily a party has no standing to seek to

8    quash a subpoena issued to someone who is not a party to the action, unless the

9    objecting party claims some personal right or privilege with respect to the

10   documents sought.").

11          Defendants seek to quash these subpoenas on the ground that they seek

12   Defendants' bank and financial institution records. Defendants discuss the threshold

13   issue as to whether Defendants have standing to move to quash subpoenas issued to

14   third-party banks, but cite no Ninth Circuit authority in support of Defendants'

15   contention that they possess such standing. As a general rule, a party has no standing

16   to seek to quash a subpoena issued to a non-party to the action. See, e.g., Sneirson,

17   108 F.R.D. at 160 n. 2. Nonetheless, some courts have found that a party has

18   standing to move to quash subpoenas where the party has "some personal right or

19   privilege" in the documents sought.   See, e.g., Crispin v. Christian Audigier, Inc.,

20   717 F.Supp.2d 965, 973 (C.D.Cal.2010); but see In re: Rhodes Cos., 475 B.R. 733,

21   740–41 (D.Nev.2012) (Pro, J.) (declining to adopt a "personal right or privilege"

22   standing rule and holding that "only the party subject to the subpoena may bring a

23   motion to quash under Rule 45(c)(3)(A)") and Salem Vegas, L.P. v. Guanci, 2013

24   WL 5493126, *2–3 (D.Nev. Sept. 30, 2013) (following Rhodes). A party does not

25   have standing, or a personal right of privilege, even in their own bank records. See,

26   e.g., United States v. Gordon, 247 F.R.D. 509, 510 (E.D.N.C.2007) ( "Typically, a

27   party has no standing to challenge a subpoena issued to his or her bank seeking

28   discovery of financial records because bank records are the business records of the

1   bank, in which the party has no personal right"); see also Painters Joint Comm. v.

2   Emp. Painters Trust Health & Welfare Fund, 2011 WL 4573349, *4 (D.Nev. Sept.

3   29, 2011), amended on other grounds, 2011 WL 5854714 (D.Nev. Nov. 21, 2011).

4   **III.   Argument**

5        The subpoenas are directed to financial institutions which hold the banking

6   records of two individuals who paid monies in connection with the production of

7   "Innocence of Muslims."  (See Declaration of M. Cris Armenta ("Armenta Decl.")

8   Exs. A and B.)  The purpose of the discovery is to learn who truly produced and

9   funded the film. (Armenta Decl. para. 2.) At the time the film was produced, Mark

10   Yousseff had just been released from federal prison.  (Armenta Decl. Ex. C.).  He

11   owed the federal government nearly $800,000.  (Arment Decl. Ex. D.)  According to

12   recent testimony given to the United States Attorney, Mr. Youseef claims, had no

13   employment or income, according to his own testimony before the United States

14   Attorney and owed the federal government nearly $800,000.  Mr. Youseff has

15   produced mixed messages about the identity of the producers of the movie:

16        1.   In his Answer, Defendant Youssef claimed that he was the writer and

17   that Plaintiff signed all her rights away to the producer.  Answer p. 3, l. 15, 23.  He

18   also claims the action is an attack on his First Amendment rights, presumably, as the

19   producer.  Id. at 5, l. 6-7.

20        2.   In his testimony before the United States Attorney in United States of

21   America v. Nakoula, United States District Court No. Cv-13-08734-CAS-Cwx,

22   Youssef testified in response to the question: "Who was the producer?" "I have no

23   ideas."  Armenta Decl. Ex. E. at 28.  He also testified "I'm not the producer."

24        3.   He also claims that he did not raise any money for the movie and does

25   not know who did.  Armenta Decl. Ex. D at 36-42.

26        However, in documents the Plaintiffs have obtained, it has been discovered

27   that:

28

1.    Thoriya Nakoula wrote a check to Plaintiff Cindy Lee Garcia for her participation in the film as an actress. (Armenta Decl. Ex. A.)  Thoriya Nakoula is Youseff's daughter. (Armenta Decl. Ex. A._

2.    Abanob Nakoula wrote a check to Blue Cloud Studios for use of that film location to shoot the film. (Armenta Decl. Ex. G.)

3.    Mina Imiel wrote a check to Cindy Lee Garcia.

A review of the bank records so far obtained shows transfers of large amounts of monies between Abanob, Thoriya, and Mina Imiel, and many of the transactions related directly to the funding of the production.  Yet, as recently as February 18, 2014, when Youseff was questioned under oath to the United States Attorney, he denied raising money for the movie, producing the movie, having any knowledge of who the movie was produced by, or having any involvement other than being the script writer.   Yet, at the same time in his answer, he claims that Plaintiff "refused to listen" to the true nature of the movie, and "asked for her check."
It is worth noting that Mr. Youseff's prior criminal conviction in this court is for fraud and that his probation was revoked by the Honorable Christina A. Snyder after it was discovered that Mr. Youseff violated the terms of his probation, and lied to the Court about even his true name. (See Ex. F.)  Accordingly, because there are so m any conflicting versions of what is known about the identities of producers of this film, it is imperative that Plaintiff follow the documents, paper trail and bank records to determine who, if anyone, is responsible for the production and the fraud occasioned on her. In order to identify the proper parties, funders and producers, Plaintiff needs to see the bank records that are within the subpoenas provided to this Court and the subject of the Ex Parte Application.

/
/
/
/

## IV.   Conclusion

Based on the foregoing, the Plaintiff requests that the Court deny the Ex Parte Application.

Dated: July 16, 2014                    THE ARMENTA LAW FIRM, A.P.C.


By: _____
                    M. Cris Armenta
                 Attorneys for Plaintiff
                  Cindy Lee Garcia

**Declaration of M. Cris Armenta**

I, M. Cris Armenta, declare:

1.     I am an attorney admitted to practice before this Court and in good standing with the State Bar of California.  I am the principal of the Armenta Law Firm APC, counsel of record for Plaintiff Cindy Lee Garcia.  I make this declaration based on my own personal knowledge. If called as witness, I could and would testify completely as follows:

2.     On May 23, 2014 Plaintiff served a subpoena on Bank of America for the records pertaining to Thoriya Nakoula.  A true and correct copy of the subpoena and the proof of service is attached hereto as Exhibit A.

3.     On June 23, 2014 Plaintiff served as subpoena on Bank of America for the records pertaining to Mina Imiel.  A true and correct copy of the subpoena and the proof of service is attached hereto as Exhibit B.

4.     True and correct copies of the Order of Detention and the Judgment of Commitment regarding Nakoula Basseley Nakoula aka Mark Youseff in <u>United States of America vs. Nakoula Basseley Nakoula</u> are attached hereto as Exhibit C.

5.     Mr. Youseff recently appeared for his Judgment Debtor Examination and was sworn to testify before the United States Attorney. A true and correct copy of redacted portions of that transcript is attached hereto as Exhibit D.

6.     Previous to issuance of the subpoenas attached as Exhibit A, Plaintiff's counsel discovered that Plaintiff had been paid partially for her participation in the film "Desert Warrior" (which later became "Innocence of Bin Laden," "Innocence of Muslims" and "Life of Muhammad") on the account of Thoriya Nakoula. Attached as Exhibit E is a correct and redacted copy of a check issued on that account.

7.     Previous to the issuance of the subpoenas attached as B, Plaintiff's counsel discovered that Abanob Nakoula, both Youseff's son and one of Youseff's aliases, paid for the production fee at Blue Cloud Ranch for "Desert Warrior."

Attached as Exhibit F is a true and correct copy of the check.   Review of the bank documents for Abanob Nakoula shows an influx of monies to his account from a person identified as "Mina Imiel."   It appears that Mina Imiel may have partially funded the film, however, without analysis of Mina Imiel's banking documents, it is impossible to determine the precise nature and extent of his or her involvement.

8.   On May 23, 2014 I transmitted an early draft of a Rule 26 collaborative document to Defendant Yousseff.  Mr. Youseff has not responded to that transmission or participated in any meaningful way to the Rule 26 process. Plaintiff's counsel has since learned of the existence of other witnesses and intends to add those to the amended or initial Rule 26 report once Plaintiff's counsel can obtain Defendant Youseff's participation or collaboration.  The current plan is to send Mr. YOuseff the amended draft Rule 26 report along with a transmission of all the documents that Plaintiff's counsel has obtained to date, and to provide a copy of all of those to counsel for Google, Inc. and YouTube LLC.   Plaintiff's counsel already informed counsel for Google and YouTube of this plan last week.   The documents are in the process of being gathered and numbered so that the transmission can be as full and complete as within the Plaintiff's possession to date.   Plaintiff's counsel has also taken 2 depositions in an effort to identify the proper producers or responsible parties and has been unable to serve Defendant Robert Brownell aka Alan Roberts, the director; because he has indicated that he does not intend to be found.  Plaintiff continues to make efforts in that regard and will keep the Court and the other parties apprised of the outcome.

9.   Attached as Exhibit G are true and correct copies of redacted documents that Plaintiff's counsel obtained from Blue Cloud Ranch, including a check showing the payment for the location fee for "Desert Warrior" drawn on the account of Abanob Nakoula.

10.   Attached as Exhibit H are true and correct copies of redacted documents from Abanob Nakoula's bank records showing deposits from the account

1 | of Mina Imiel into Nakoula's bank accounts during the time period the film was

2 | produced to the best of our information.

3 |      I declare under the penalty pf perjury that the foregoing is true and correct

4 | under the penalty of perjury under the laws of the United States of America and that

5 | I executed this Declaration of July 15, 2014 in Los Angeles, California.

6

7

8                                   M. Cris Armenta

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

AO 88B  (Rev  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| Cindy Lee Garcia | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  CV12-8315-MWF-(VBKx) |
| Nakoula Bassely Nakoula, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Bank of America, Artesia & Norwalk, 12221 Artesia Blvd, Cerritos, CA 562-868-1448, c/o C T CORPORATION
      SYSTEM, 818 WEST SEVENTH ST 2ND FL, LOS ANGELES CA 90017

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Please see attached

| Place: Danny Duarte, Keystone Document Discovery 1940 Century Park East, Suite B-100, Los Angeles, CA 90067 | Date and Time: 06/06/2014 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   05/23/2014

| *CLERK OF COURT* | OR | *Attorney's signature* |
|---|---|---|
| *Signature of Clerk or Deputy Clerk* | | |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Cindy Lee Garcia
_____ , who issues or requests this subpoena, are:

Attorney M. Cris Armenta, 11900 W. Olympic Blvd, Suite 730, LA, CA 90064, 310-826-2826 x108

#### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

| Attorney or Party without Attorney:<br>M. CRIS ARMENTA, ESQ., Bar #177403<br>THE ARMENTA LAW FIRM, A.P.C.<br>11900 OLYMPIC BOULEVARD<br>SUITE 730<br>LOS ANGELES, CA  90064<br>Telephone No: 310-826-2826        FAX No: 310-826-5456 | | For Court Use Only |
|---|---|---|
| Attorney for: Plaintiff | Ref. No. or File No.: | |
| Insert name of Court, and Judicial District and Branch Court:<br>United States District Court For The Central District Of California | | |
| Plaintiff: CINDY LEE GARCIA | | |
| Defendant: NAKOULA BASSELY NAKOULA, ET AL. | | |

| **PROOF OF SERVICE** | Hearing Date:<br>Fri, Jun. 06, 2014 | Time:<br>10:00AM | Dept/Div: | Case Number:<br>CV12-8315-MWF-(VBKX) |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION.

3. a. *Party served:*          BANK OF AMERICA
   b. *Person served:*         VIVIAN IMPERIAL, PROCESS SPECIALIST, CT CORPORATION SYSTEM, REGISTERED AGENT.

4. *Address where the party was served:*    818 WEST 7TH STREET
                                            LOS ANGELES, CA  90017

5. *I served the party:*
   a. **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Fri., May. 23, 2014 (2) at: 1:45PM

7. ***Person Who Served Papers:***                          Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. DOUG FORREST                                           d.  ***The Fee for Service was:***

   **First Legal**
   1511 West Beverly Blvd.          e.  I am: (3)  registered California process server
   Los Angeles, CA 90026                 *(i)*  Independent Contractor
   Telephone    (213) 250−9111           *(ii)*  *Registration No.:*    5141
   Fax          (213) 250−1197           *(iii)*  *County:*             Los Angeles
   www.firstlegalnetwork.com

8.  *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States Of America that the foregoing is true and correct.*
    Date: Wed, May. 28, 2014

AO 88B  (Rev  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Cindy Lee Garcia
VS.
Nakoula Basseley Nakoula, et al

## ATTACHMENT A DOCUMENT REQUEST

All bank records, including but not limited to signature cards, account opening paperwork, and for the period January 1, 2011 through the present, all records of transactions, including but not limited to account statements, checks (fronts and backs), records of deposits or wire transfers for the account reflected on the check attached hereto as Exhibit A.

**EXHIBIT A**



## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

On May 30, 2014 I served the following document(s) described as:

**PROOF OF SERVICE OF SUBPOENA TO PRODUCE DOCUMENTS TO BANK OF AMERICA (2)**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

**Timothy L. Alger**
**Perkins Coie LLP**
**3150 Porter Drive**
**Palo Alto, CA 94304-1212**

**Nakoula Basseley Nakoula**
**a/k/a Mark Youssef**
**a/k/a Sam Bacile**
**First Southern Baptist Church**
**c/o Pastor Wiley Drake**
**Attn: Mark Youssef**
**6801 Western Ave**
**Buena Park, CA 90621**

*BY MAIL:*  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.  (C.C.P. § 1013 (a) and 1013a(3))

Executed on May 30, 2014 in Los Angeles, California.

Heather Rowland

1
PROOF OF SERVICE

1    M. Cris Armenta (SBN 177403)
     THE ARMENTA LAW FIRM APC
2    11900 W. Olympic Boulevard, Suite 730
     Los Angeles, CA 90064
3    Tel: (310) 826-2826 x 108
     Facsimile: (310) 826-5456
4    Email: cris@crisarmenta.com

5    Credence E. Sol (SBN 219784)
     La Garenne
6    86300 Chauvigny
     France
7    Tel: 06 74 90 22 08
     Email: credence.sol@orange.fr

8

     Attorneys for Plaintiff
9    Cindy Lee Garcia

10            **UNITED STATES DISTRICT COURT**

11        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12    CINDY LEE GARCIA, an      Case No. CV12-8315-MWF(VBKx)
     individual,
13                        **PROOF OF SERVICE OF**
             Plaintiff,      **SUBPOENA TO PRODUCE**
14                        **DOCUMENTS TO BANK OF**
     vs.                     **AMERICA**
15
     NAKOULA BASSELEY
16    NAKOULA, an individual also
     known as SAM BACILE, MARK
17    BASSELEY YOUSSEF,
     ABANOB BASSELEY
18    NAKOULA, MATTHEW
     NEKOLA, AHMED HAMDY,
19    AMAL NADA, DANIEL K.
     CARESMAN, KRITBAG
20    DIFRAT, SOBHI BUSHRA,
     ROBERT BACILY, NICOLA
21    BACILY, THOMAS J. TANAS,
     ERWIN SALAMEH, YOUSSEFF
22    M. BASSELEY, and/or MALID
     AHLAWI; GOOGLE, INC., a
23    Delaware Corporation;
     YOUTUBE, LLC, a California
24    limited liability company, and
     DOES 1 through 10, inclusive.
25

26                   Defendants.

27

28

| *Attorney or Party without Attorney:*<br>M. CRIS ARMENTA, ESQ., Bar #177403<br>THE ARMENTA LAW FIRM, A.P.C.<br>11900 OLYMPIC BOULEVARD<br>SUITE 730<br>LOS ANGELES, CA  90064<br>*Telephone No:* 310-826-2826      *FAX No:* 310-826-5456 | *For Court Use Only* |
|---|---|

*Ref. No. or File No.:*

*Attorney for:* Plaintiff

*Insert name of Court, and Judicial District and Branch Court:*
 United States District Court For The Central District Of California

*Plaintiff:* CINDY LEE GARCIA
*Defendant:* NAKOULA BASSELY NAKOULA, ET AL.

| **PROOF OF SERVICE** | *Hearing Date:*<br>Fri, Jun. 06, 2014 | *Time:*<br>10:00AM | *Dept/Div:* | *Case Number:*<br>CV12-8315-MWF-(VBKX) |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2.   I served copies of the SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION.

*3.   a. Party served:*          BANK OF AMERICA
     *b. Person served:*        VIVIAN IMPERIAL, PROCESS SPECIALIST, CT CORPORATION SYSTEM,
                                REGISTERED AGENT.

*4. Address where the party was served:*        818 WEST 7TH STREET
                                                LOS ANGELES, CA  90017

*5.  I served the party:*
    a. **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive
       process for the party (1) on: Fri., May. 23, 2014 (2) at: 1:45PM

*7.  Person Who Served Papers:*                                    Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. DOUG  FORREST                               d.   *The Fee for Service was:*

**First Legal**
1511 West Beverly Blvd.
Los Angeles, CA 90026
Telephone   (213) 250-9111
Fax         (213) 250-1197
www.firstlegalnetwork.com

e.   I am: (3)  registered California process server
     *(i)*    Independent Contractor
     *(ii)   Registration No.:*     5141
     *(iii)  County:*               Los Angeles

*8.   I declare under penalty of perjury under the laws of the State of California and under the laws of the United States Of
     America that the foregoing is true and correct.*
     Date: Wed, May. 28, 2014

| Judicial Council Form<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE** | (DOUG  FORREST)<br>3868498  .criar.618602 |
|---|---|---|

**EXHIBIT B**

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | | |
|---|---|---|
| Cindy Lee Garcia | ) | |
| *Plaintiff* | ) | Civil Action No.   CV12-8315-MWF-(VBKx) |
| v. | ) | |
| Nakoula Bassely Nakoula, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:             Bank of America, Legal Order Processing, 800 Samocet Drive, Newark, DE 19713

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **Account #** ▮▮▮▮▮▮ in the name of Mina S. Imiel - Please see attached

| Place: Danny Duarte, Keystone Document Discovery | Date and Time: |
|---|---|
| 1940 Century Park East, Suite B-100, Los Angeles, CA 90067 | 07/14/2014 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      06/23/2014

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Cindy Lee Garcia
_____ , who issues or requests this subpoena, are:

Attorney M. Cris Armenta, 11900 W. Olympic Blvd, Suite 730, LA, CA 90064, 310-826-2826 x108

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   CV12-8315-MWF-(VBKx)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   B of A

on *(date)*   6/23/14       .

☑ I served the subpoena by delivering a copy to the named person as follows:

B of A   via Certified mail

_____   on *(date)* _____  ; or

☐  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____   for travel and $ _____   for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   6/23/14

_____
*Server's signature*

Heather Rowland
*Printed name and title*

11900 W. Olympic Blvd #730, 91064
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
 (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify a subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or

  (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Cindy Lee Garcia
VS.
Nakoula Basseley Nakoula, et al

## ATTACHMENT A DOCUMENT REQUEST

All bank records, including but not limited to signature cards, account opening paperwork, and for the period January 1, 2011 through the present, all records of transactions, including but not limited to account statements, checks (fronts and backs), records of deposits or wire transfers for the account reflected on the check attached hereto as Exhibit A.

**EXHIBIT A**



Capture Date: 03/14/2012 Sequence

**MINA S. IMIEL**
12808 PARK ST
CERRITOS, CA 90703-1142

787

t8-66/1220
1051

3-3-12
Date

Pay to the Order of   AbANOb NAKoulA   | $ 100

One hundred el Gef   Dollars

**Bank of America**
Cerritos Financial
18641 S Gridley Rd
Cerritos CA
562.868.1448

Customer Since 2005

For

No Electronic Endorsements Found
No Payee Endorsements Found

**EXHIBIT C**



CLERK, U.S DISTRICT COURT

**SEP 2 7 2012**

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

1
2
3
4
5
6
7
8
9
10
11
12
13
14

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

15  UNITED STATES OF AMERICA,        )        CR09-617-CAS

16          Plaintiff,               )  ORDER OF DETENTION AFTER
                                     )  HEARING ( Fed.R.Crim.P. 32.1(a)(6)
17      v.                           )  Allegations of Violations of Probation
                                     )  Supervised Release)
18                                   )  Conditions of Release)
    NAKOULA BASSELEY NAKOULA )
19                                   )
          Defendant.                 )
20
21      On arrest warrant issued by a United States District Court involving

22  alleged violations of conditions of probation or Supervised Release,

23      The court finds no condition or combination of conditions that will

24  reasonably assure:

25      (A)  ☒  the appearance of defendant as required; and/or

26      (B)  ☒  the safety of any person or the community.

27  //

28  //

1       The court concludes:

2   A.      (X)     Defendant poses a risk to the safety of other persons or the

3               community because defendant has not demonstrated by clear and

4               convincing evidence that:

5       he will abide by conditions of supervised

6       release. Despite his underlying conviction

7       for fraud and the condition that he not use any

8   name other than his true name, it is alleged he

9   failed to use his true name. He may have committed

10   new crimes while on release. Thus, Defendant poses a danger

10  (B)      (x)     Defendant is a flight risk because defendant has not shown by clear   to the

community.

11              and convincing evidence that:

12       he will abide by conditions of release. He appears

13   to have engaged in a pattern of deception. He lacks

14   stable employment or residence. He does not have

15   an adequate surety or bail resources. He has some

16   ties to foreign countries. He has used aliases. Thus,

    defendant poses a risk of flight.

17       IT IS ORDERED that defendant be detained.

18

19  DATED: 9/27/12

20

21

22

23                        SUZANNE H. SEGAL
                     UNITED STATES  MAGISTRATE  JUDGE
24

25

26

27

28

                            2

**EXHIBIT D**

**United States District Court**
**Central District of California**

| UNITED STATES OF AMERICA vs. | Docket No. | CR09-617-CAS | ENTER |
|---|---|---|---|

Defendant    NAKOULA BASSELEY NAKOULA

Mark Basseley Youssef; Yousseff M. Basseley;
akas:  Nicola Bacily; Malid Ahlawi

Social Security No.  0   7   7   4

(Last 4 digits)

| JUDGMENT AND PROBATION/COMMITMENT ORDER |
|---|

In the presence of the attorney for the government, the defendant appeared in person on this date.

| MONTH | DAY | YEAR |
|---|---|---|
| 06 | 24 | 2010 |

| COUNSEL | [X] **WITH COUNSEL** | James Henderson, Sr., Retained |
|---|---|---|

(Name of Counsel)

| PLEA | [ ] **GUILTY,** and the court being satisfied that there is a factual basis for the plea. | [ ] **NOLO CONTENDERE** | [ ] **NOT GUILTY** |
|---|---|---|---|

**FINDING**    There being a finding/verdict of **GUILTY,** defendant has been convicted as charged of the offense(s) of:
Bank Fraud, Causing an Act to be Done in violation of 18 USC 1344,2(b), as charged in Count 1 of the Indictment.

**JUDGMENT AND PROB/ COMM ORDER**    The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed on count 1 of the Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of: **TWENTY-ONE (21) MONTHS.**

It is ordered that the defendant shall pay to the United States a special assessment of $100.00, which is due immediately.

It is ordered that the defendant shall pay restitution in the total amount of $794,700.57, pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid to the victim as set forth in a separate victim list prepared by the probation office which this Court adopts and which reflects the Court's determination of the amount of restitution due to each victim. The victim list, which shall be forwarded to the fiscal section of the clerk's office, shall remain confidential to protect the privacy interests of the victim.

If the defendant makes a partial payment, each payee shall receive approximately proportional payment unless another priority order or percentage payment is specified in this judgment.

Restitution shall be due during the period of imprisonment, at the rate of not less than $25.00 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of restitution remains unpaid after release from custody, monthly installments of at least 10% of gross monthly income, but not less than $100.00 shall be made, whichever is greater, during the period of supervised release and shall begin thirty (30) days after the commencement of supervision. Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest. Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

All fines are waived as it is found that the defendant does not have the ability to pay a fine in addition to restitution.

The defendant shall comply with General Order No. 01-05.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of five (5) years, under the following terms and conditions:

USA vs.   NAKOULA BASSELEY NAKOULA          Docket No.:   CR09-617-CAS

1. The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

2. The defendant shall reside for a period of six (6) months in a community corrections center (community corrections component), as directed by the Probation Officer, and shall observe the rules of that facility;

3. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one (1) drug test within fifteen (15) days of release from imprisonment and at least two (2) periodic drug tests thereafter, not to exceed eight (8) tests per month, as directed by the Probation Officer;

4. During the period of community supervision, the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment;

5. The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name; nor shall the defendant use, for any purpose or in any manner, any name other than his/her true legal name or names without the prior written approval of the Probation Officer;

6. The defendant shall cooperate in the collection of a DNA sample from the defendant;

7. Defendant shall not possess or use a device with access to any online service at any location without the prior approval of the Probation Officer. This includes access through any Internet Service Provider ("ISP"), bulletin board system, or any public or private computer network system. Further, defendant shall not have another individual access the Internet on defendant's behalf to obtain files or information that defendant is restricted from accessing personally, or accept restricted files or information from another person;

8. Defendant shall use only those computers, computer related devices, screen/user names, passwords, e-mail accounts, and ISPs approved by the Probation Officer. Computer and computer-related devices include, but are not limited to, personal computers, personal data assistants (PDAs), Internet appliances, electronic games, and cellular telephones, as well as peripheral equipment, that can access, or can be modified to access, the Internet, electronic bulletin boards, other computers, or similar media. Defendant shall use any approved computers only within the scope of his employment. Defendant shall not access a computer for any other purpose. Defendant shall immediately report to the Probation Officer any changes in defendant's employment affecting defendant's access and/or use of computers or the Internet, including e-mail;

9. All computers, computer-related devices, computer storage media, and peripheral equipment used by defendant shall be subject to search and seizure, and subject to the installation of search and/or monitoring software and/or hardware, including unannounced seizure for the purpose of search. Defendant shall not add, remove, upgrade, update, reinstall, repair, or otherwise modify the hardware or software on any computers, computer related devices, or peripheral equipment without the prior approval of the Probation Officer, nor shall defendant hide or encrypt files or data. Further, defendant shall, as requested by the Probation Officer, provide all billing records,

USA vs.   NAKOULA BASSELEY NAKOULA                    Docket No.:   CR09-617-CAS

including telephone, cable, Internet, satellite, and similar records; and

10.    The defendant shall apply all monies received from income tax refunds to the outstanding court-ordered financial obligation.  In addition, the defendant shall apply all monies received from lottery winnings, inheritance, judgements and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation.

Defendant is informed of his right to appeal.

The Court grants the Government's request to dismiss the remaining counts of the Indictment.

The Court hereby recommends that defendant be designated to Lompoc, or as close thereto as possible.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed.  The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

June 24, 2010                                              _Christine a. Snyder_
Date                                                        U. S. District Judge/Magistrate Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

June 24, 2010                              By        /S/
Filed Date                                           Catherine M. Jeang, Deputy Clerk

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

CR-104 (04/10)                    **JUDGMENT & PROBATION/COMMITMENT ORDER**                    Page 3 of 4

USA vs.   NAKOULA BASSELEY NAKOULA                          Docket No.:   CR09-617-CAS

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;

10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

☐   The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
   Private victims (individual and corporate),
   Providers of compensation to private victims,
   The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

USA vs.   NAKOULA BASSELEY NAKOULA                    Docket No.:   CR09-617-CAS

### SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

---

### RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____        By _____
Date                                Deputy Marshal

### CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

_____        By _____
Filed Date                           Deputy Clerk

---

USA vs.   NAKOULA BASSELEY NAKOULA _____   Docket No.:   CR09-617-CAS _____

=======================================================================

### FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____     _____
             Defendant                                                                  Date

_____     _____
U. S. Probation Officer/Designated Witness                      Date

**EXHIBIT E**

Youseff, Mark Basseley - Vol. I

1

```
 1            UNITED STATES DISTRICT COURT

 2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4    UNITED STATES OF AMERICA,   )
                                  )
 5                  Plaintiff,    )
                                  )
 6    vs.                         )No. CV 13-08734 CAS-CWx
                                  )
 7    NAKOULA BASSELEY NAKOULA,   )    (CR 09-0617-CAS)
                                  )
 8                  Defendant.    )
      _____)
 9

10

11            JUDGEMENT DEBTOR EXAMINATION OF MARK

12            BASSELEY YOUSEFF, taken on behalf of

13            Plaintiff at 300 North Los Angeles Street,

14            Los Angeles, California, on Tuesday,

15            February 18th, 2014, commencing at

16            10:57 A.M., before Marie Wilson,

17            CSR No. 13480.

18

19

20

21

22

23

24

25    Pages 1 - 57
```

2

```
 1    APPEARANCES BY:
```

Youseff, Mark Basseley - Vol. I

2

3      For the Plaintiff:

4           U.S. DEPARTMENT OF JUSTICE
            U.S ATTORNEY'S OFFICE
5           BY:  ZORAN SEGINA, AUSA
            300 North Los Angeles Street
6           Room 7516
            Los Angeles, California 90012
7           (213) 894-2879

8

9      For the Defendant:

10          MARK BASSELEY YOUSEFF,
            previously known as
            Nakoula Basseley Nakoula,
11          IN PRO PERSONA
            6801 Western Ave
12          Buena Park, California 90621
            (712) 432-1690
13

14     Also present:

15          Dr. Wiley s. Drake, Sr.,
            Chairman of Congressional Prayer
16          Conference of Washington D.C.
            for the Defendant
17

18

19                    ---oOo---

20

21

22

23

24

25

⚲

3

1           LOS ANGELES, CALIFORNIA;

2       TUESDAY, FEBRUARY 18TH, 2014

3                10:57 A.M.

4                 ---oOo---

Page 2

Youseff, Mark Basseley - Vol. I

5      MR. SEGINA:  This is a judgment debtor

6   examination of Nakoula Basseley Nakoula, and also

7   present in the examination room is Mr. -- Dr. Wiley

8   S. Drake, Senior, who has represented that he is a

9   spiritual advisor to Mr. Nakoula.

10      Before the examination, Mr. Nakoula

11   indicated that he has legally changed his name from

12   "Nakoula Basseley Nakoula" --

13      Mr. Nakoula, can I see your driver's

14   license for a second.  Thank you.

15      And he changed the name to "Mark Basseley

16   Youseff."

17   Q.  Mr. Nakoula, to start with that, when did

18   you legally change your name?

19   A.  I legally changed my name to "Mark" in

20   2002.

21   Q.  Now, Mr. -- would you prefer me to call you

22   Mr. Youseff or Mr. Nakoula?

23   A.  Yes, it's okay, it's fine.

24   Q.  Well, you have to tell me, sir.

25   A.  Yeah, Youseff.


4

1   Q.  Youseff, Mr. Youseff, have you ever had

2   your judgment debtor examination taken before, sir?

3   A.  No.

4   Q.  Okay.  Let me explain to you briefly what

5   is going to happen.  As a matter of fact, you've

6   committed the first mistake of a judgment debtor

7   examination as I will explain to you.

Page 3

Youseff, Mark Basseley - Vol. I

8      About a half an hour ago, you were sworn in

9   by Magistrate Honorable Judge Carl Worly, you

10   remember that?

11      A.  Yes.

12      Q.  And you were sworn in to tell the truth

13   during the examination.  Do you remember that?

14      A.  Yes.

15      Q.  Okay.  Now, even though we're in the

16   informal setting of my office, the testimony that

17   you are giving and that you are still under oath,

18   you are under oath as though you were in the court

19   of law.

20      Anything that you and I say is going to be

21   taken word for word, the technical term is

22   verbatim, but the madam reporter is who is sitting

23   to your left, and all of our words will then be

24   placed in a booklet which you will then be able to

25   review.

5

1      For that reason, Mr. Youseff, I have

2   several requests; No. 1 is that you answer audibly

3   and loudly, meaning speak up, sir, because madam

4   reporter needs to hear you.

5      Do you understand that?

6      A.  Yes.

7      Q.  Could you speak a little louder, please.

8      A.  Yes, I do.

9      Q.  Also, our reporter cannot take more than

10   one person talking at the same time, because this

Page 4

Youseff, Mark Basseley - Vol. I

11  is not a movie, this is a transcript of the

12  proceeding, so for that reason, I will ask you

13  to -- ask to wait until I finish asking my question

14  before you proceed with an answer.

15      Can you do that, sir?

16  A.  Yes, I do.

17  Q.  And, also, this is only a written form, so

18  as a result of it, I will also ask you,

19  Mr. Youseff, that you answer with yes or no or

20  audibly as opposed to shaking your hands, nodding

21  saying "Uh-huh" or "Uh-uh," because it's very hard

22  to then determine in the transcript what you

23  meant.

24      Do you understand that?

25  A.  Yes.  Can I say something?

♀

6

1   Q.  Yes, you can say something.

2   A.  Okay.  I changed my name from "Nakoula

3   Basseley Nakoula" to "Mark Basseley Youseff" in

4   2002, and everything going smooth, everything is

5   going okay, and all of a sudden when they -- I get

6   arrested in 2009, the judgment they judged me for

7   "Nakoula Basseley Nakoula," that's why I went to

8   "Nakoula Basseley Nakoula."  And last year we

9   discovered I was obliged to changing my name again

10  to Ibrahim (unintelligible) Youseff --

11      THE REPORTER:  Say the names slowly --

12  BY MR. SEGINA:

13  Q.  Let me give you one more -- it's called an

Page 5

Youseff, Mark Basseley - Vol. I

14    admonition, Mr. Youseff.  Please speak slowly and

15    audibly.  Our reporter is very good --

16        A.  Sure.

17        Q.  -- but we don't want to have her fingers

18    tired, do we, Mr. Youseff?

19        A.  Of course, okay.

20        Q.  So go ahead, please continue, continue

21    explaining yourself.

22        A.  Okay.  I discovered -- one of my lawyer

23    discovered I applied to changing my name again from

24    "Mark Basseley Youseff" to "Ibrahim Basseley

25    Youseff," and I didn't know that until -- because I

7

1    was in jail, and that time I didn't know it's going

2    through, but the lawyer gets the approval

3    without -- he looking for me but he didn't find

4    me.

5           And when I get out, I talked to the

6    probation officer.  I told him I didn't know my

7    name is still "Ibrahim Basseley Youseff."  He said,

8    okay, you can go back again to the court and return

9    it to "Mark Basseley Youseff," this is what

10    happened.  They returned my name again from

11    "Ibrahim Basseley Youseff," which I didn't know

12    that before, to "Mark Basseley Youseff."

13        Q.  So besides being known as "Nakoula Basseley

14    Nakoula" and "Mark Basseley Youseff" and then the

15    third name that you mentioned once again was?

16        A.  "Nicola Ibrahim Youseff," it was legal

Youseff, Mark Basseley - Vol. I

17    name, but one of them I didn't know until they

18    discovered that and the judge give it to me back

19    again "Mark Basseley Youseff" now, he have again,

20    and that means go back again to the original name,

21    "Mark Basseley Youseff."

22        Q.  How about "Nicola Bacily" with a

23    B-a-c-i-l-y?

24        A.  No, this is not my name.

25        Q.  Mr. Youseff, have you been known ever as

8

1    "Nicola Bacily"?

2        A.  This is in my Egyptian passport, but I

3    didn't use it before.  My Egyptian passport

4    spelling is wrong, "Nakoula Basseley Nakoula."

5        Q.  What I'm asking here, the name that was

6    listed as one of your alias --

7        A.  Yeah.

8        Q.  -- in the pre-sentence report --

9        A.  Yes.

10       Q.  Would you wait until I finish my question,

11    please, before you answer.  Remember, that is one

12    of my --

13       A.  I'm sorry.

14       Q.  Thank you.

15           One of the names that was listed in the

16    pre-sentence report, Mr. Youseff, was Nicola,

17    N-i-c-o-l-a, Bacily, B-a-c-i-l-y.

18       A.  But I didn't use that name at all.  This is

19    not my name.

Page 7

Youseff, Mark Basseley - Vol. I

13    A.   It's Thoriya, T-h-o-r-i-y-a.

14    Q.   Your daughter?

15    A.   Yes.

16    Q.   How old is she?

17    A.   She's 20.

18    Q.   Where does she live?

19    A.   She lives with her mother.

20    Q.   Any other kids?

21    A.   Yeah, A-b-a-n-o-b, 22 years old.

22    Q.   And what does -- Abanob is your son?

23    A.   Yeah, he's my son.  He is in UC Riverside,

24    and, you know, he is -- I don't know where exactly,

25    you know.

17

1    Q.   Any other children?

2    A.   Yeah, Matthew, M-a-t-t-h-e-w, he's 14 years

3    old.

4    Q.   Okay.  Any other children?

5    A.   No.

6    Q.   Before you were married to Ms. Ibrahim, you

7    were married to Ms. Rodriguez --

8    A.   Yes.

9    Q.   -- were you not?

10    A.   Yes.

11    Q.   What is your father's name?

12    A.   Her father name?

13    Q.   No, your father's.

14    A.   Yeah, Baseley, B-a-s-e-l-e-y, Nada,

15    N-a-d-a.

Page 15

Youseff, Mark Basseley - Vol. I

22

1     A.  Yes.

2     Q.  But we're in February of 2014.

3     A.  Yes, they put it for me December 13th.

4     Q.  December 13th?

5     A.  December 15th, 2013 --

6     Q.  And you should have an ankle bracelet

7  until?

8     A.  May 14, 2014.  I'm sorry, I have a big

9  accent, you know.

10     Q.  Mr. Youseff, you do not have a problem

11  understanding my English, do you, sir?

12     A.  Yes, I do -- no, no, no problems.  I

13  understand you very well, but my accent is bad.

14     Q.  You're talking to a kindred spirit, sir.

15  Based upon my name, you'll find out that I also

16  have an accent.

17         Anyway, to go back to good English, so when

18  were you released from custody, Mr. Youseff?

19     A.  In -- I left in -- from Daytona, Texas, in

20  May 26, 2013, to the halfway house in Brawley, and

21  I lived at Brawley in September -- the 26th of

22  September, 2013, to here to Mr. Drake.

23     Q.  So the tobacco shop, the tobacco shop was

24  after your incarceration, sir?

25     A.  No.  Okay, they jailed me twice, from 2009

23

1  until 2010, and then after I left from 2010, I went

Page 20

Youseff, Mark Basseley - Vol. I

2   to the halfway house and I worked normally and

3   everything.  When the problem of the movie came and

4   they catch me, they caught me, and they put me

5   again to jail for one year, the judge sentenced me

6   one year from -- I did a mistake.

7       Q.   In other words at one point, correct me if

8   I'm wrong, Mr. Youseff --

9       A.   Sure.

10      Q.   -- at one point after your first

11  incarceration, you were on supervised release, were

12  you not?

13      A.   Yes, yes, yes.

14      Q.   And you did something to violate the terms

15  of your release, correct --

16      A.   This is what --

17      Q.   Allow me to finish my question.

18      A.   Sure.

19      Q.   You violated the terms of your supervised

20  release according to the Office of the United

21  States Attorney, did you not?

22      A.   Yes.

23      Q.   And the judge found that the violation

24  existed and basically revoked your supervised

25  release and resent you back to custody; correct?

24

1       A.   Yes.

2       Q.   So your swap meet and tobacco house

3   employment was while you were still on supervised

4   release before the second incarceration; correct?

Page 21

Youseff, Mark Basseley - Vol. I

5      A.  Yes.

6      Q.  What happened?

7      A.  When?

8      Q.  Why did you go back to the incarceration

9  the second time?  What happened?

10     A.  Nobody believed me.  Nobody believed me.

11     Q.  Obviously, because if they did,

12  Mr. Youseff, you would not have been incarcerated,

13  but go ahead, sir.

14     A.  Can I take this off, please?

15     Q.  Yes, we can take it off.

16        (Off the record.)

17  BY MR. SEGINA:

18     Q.  Do you receive -- at this time do you

19  expect to receive any pension or disability

20  compensation?

21     A.  No.

22     Q.  Any retirement pay, sir?

23     A.  No.

24     Q.  Civil service retirement, any benefits from

25  the United States?

♀

25

1      A.  No.

2      Q.  Are you entitled to social security?

3      A.  No.

4      Q.  Why?

5      A.  I'm 56 years old.  Still too young.

6      Q.  But after you reach the appropriate age,

7  you would be entitled to social security, would you

Page 22

Youseff, Mark Basseley - Vol. I

14    A.  Yes.  How many minutes?  Because some
15  people add 13 minutes to something and they use my
16  name for it.
17        DR. DRAKE:  Piggyback.
18  BY MR. SEGINA:
19    Q.  How long was the movie?
20    A.  13 minutes.
21    Q.  13 minutes?
22    A.  Yeah.
23    Q.  Why so short?
24    A.  This is just only a trailer.  The original
25  movie is two hours.

                                                    28

1    Q.  And who -- how was it shot?
2    A.  What's that?
3    Q.  How was -- in what method was it shot?  Was
4  it -- is it on a 35-millimeter stock, or is it on
5  the magnetic?
6    A.  I have no idea.  I don't have any
7  experience about that.  I don't know.  This is only
8  a trailer.  The 13 minutes is just only a trailer.
9    Q.  And why would you shoot only a trailer?
10    A.  What's that?
11    Q.  You said that there was a movie that lasts
12  two hours?
13    A.  Yes, the movie is two hours.  Whatever I
14  wrote is two hours movie, but they put on the
15  Internet only the trailer, the 13 minutes.
16    Q.  Did anybody shoot the movie in its

Page 25

Youseff, Mark Basseley - Vol. I

17    entirety?

18        A.  No, I have no idea.  What does that mean?

19        Q.  Have you been lately to the movie houses,

20    sir?  What was the last movie you saw besides

21    yours?

22        A.  I cannot go to the Internet.  I don't know

23    how, but people told me it's --

24        Q.  Are you watching television, sir?

25        A.  Yes.

29

1        Q.  Have you seen any movie on television?

2        A.  Yeah, sometimes.

3        Q.  Tell me the name of the last movie you saw

4    on television, any movie.

5        A.  I don't watch American movies.  I just saw

6    only Arabian movies.

7        Q.  Fine.  And the last movie that you saw, how

8    long was it?

9        A.  It's --

10        Q.  They normally come at about two hours,

11    don't they?

12        A.  Two years ago.

13        Q.  Fine.  And how long were they?

14        A.  It's almost one and half hour.

15        Q.  One and a half hour.  When you wrote your

16    screenplay from the Innocence of Muslims, if the

17    movie was shot according to your screenplay, how

18    long would the movie be?

19        A.  It's supposed to be more than two hours.

Page 26

Youseff, Mark Basseley - Vol. I

20   Q.   More than two hours?

21   A.   Yes, supposed to more than that.

22   Q.   You're learning from Martin Scorsese, don't

23   you?  So the question that I have, Mr. Youseff,

24   when they shot the movie, did they shoot the entire

25   length of your script in the entire length of the

⚲

30

1   movie or not?

2   A.   They are supposed to, yes.

3   Q.   But did they?

4   A.   I think so, yeah, I believe so, yes.

5   Q.   So there was the full two-hour length

6   movie; correct?

7   A.   Yes.

8   Q.   What do you know about the movie called

9   "Desert Warrior"?

10   A.   It's the same thing.

11   Q.   Who is Allen Roberts?

12   A.   This is the director.

13   Q.   Who are the actors?

14   A.   It's all actors.  It was more than 79

15   actors.

16   Q.   You were arrested regarding this movie on

17   September 27th, 2012; is that correct?

18   A.   Yes, yes.

19   Q.   And then you were sentenced on November 7,

20   2012 --

21   A.   Yes.

22   Q.   -- to when you were in prison?

Page 27

Youseff, Mark Basseley - Vol. I

23    A.   Yes.

24    Q.   Did you ever use the alias "Sam Batulley"?

25    A.   Never.

31

1     Q.   Who financed the shooting of the movie,

2  sir?

3     A.   Who what?

4     Q.   Who financed the shooting -- movies are

5  expensive, Mr. Nakoula.

6     A.   No, it's not a regular movie.  This is --

7  they call it green-screen movie, green screen, they

8  are in the room and they shoot it, and that's --

9  it's not a movie going to the desert and all of

10  that, that is why it's nothing.  It doesn't --

11    Q.   You still have to pay a cameraman, do you

12  not?

13    A.   I have no idea.  They didn't pay anyone, I

14  didn't do anything for that.

15    Q.   You have to pay the director; correct?

16    A.   Yeah, but I didn't.  I just only wrote the

17  movie.

18    Q.   Who was the producer?

19    A.   I have no idea.

20    Q.   Did anybody block the movie from being

21  shown?

22    A.   What does that mean?

23    Q.   The movie you said -- you testified earlier

24  the movie was on YouTube, was it not?

25    A.   No, no, no, I never use the Internet.

Youseff, Mark Basseley - Vol. I

1      Q.  Not you.

2      A.  No.

3      Q.  But the movie that you wrote --

4      A.  Yeah.

5      Q.  -- ended up on YouTube, did it not?

6      A.  I didn't.

7      Q.  Not you, sir.  You did not end up on

8  YouTube.

9      A.  No, no, no.  I. --

10     Q.  The movie that you wrote, did it?

11     A.  This is what was told to me, I cannot go to

12  the Internet.  I never see anything on the

13  Internet.  I don't have a computer.  I would be

14  able to use the name.  They did a lot of things.

15     Q.  Do you know how long you're going to be at

16  the 6801 Western Avenue?

17     A.  Forever, until I find a job, until I -- you

18  know, maybe I can find a wife to live with, I can

19  get married or something.

20     Q.  At this point any plans of getting married

21  in the future?

22     A.  Yes.

23     Q.  Do you own any stocks or bonds or any other

24  securities?

25     A.  No.

Page 29

Youseff, Mark Basseley - Vol. I

16     A.   Yeah, yeah.

17     Q.   So let's see if we have this straight, the

18   Desert Warrior, the Innocence of Muslims and the

19   Innocence of Bin Laden refers to the same --

20     A.   Root of Terrorism.

21     Q.   But it refers to the same work called --

22   which is a screen play from -- for a full-length

23   feature movie; correct?

24     A.   Yes.

25     Q.   Please answer with yes or no.

39

1      A.   Yes.

2      Q.   When the movie was shot, you said at one

3    point there was a full-length feature movie

4    somewhere.   Is it?

5      A.   What is that?

6      Q.   At this point we established that there is

7    a 14-minute trailer, but usually 14-minute trailers

8    are cut out from a longer full-length feature, are

9    they not?

10     A.   Yes, yes.

11     Q.   And in this particular case, does this

12   full-length feature exist?

13     A.   I have no idea, because I don't have it --

14   even I didn't see it.   I didn't see the complete

15   movie yet.

16     Q.   As a playwright, you did not see the

17   complete movie?

18     A.   I didn't see it.   They put it in the
                         Page 35

Youseff, Mark Basseley - Vol. I

19    theater, and I didn't -- the Vine Theater,

20    something in Hollywood.

21        Q.  Yes.

22        A.  Okay.  But I didn't go.  I, you know -- I

23    afraid to go.  They put it for one day, but I

24    didn't go.

25        Q.  Have you spoken to the director of the

40

1    movie?

2        A.  Not after this, because this happened I

3    could not -- I didn't talk to him, and he changing

4    his phone numbers and everything.

5        Q.  Are you listed as a producer of the movie,

6    Mr. Nakoula?

7        A.  No.

8        Q.  Who is?

9        A.  I don't know really.  It's (unintelligible)

10    I don't know --

11            THE REPORTER:  Say that again.

12    BY MR. SEGINA:

13        Q.  Do you know anybody else who is the

14    producer on that movie?

15        A.  It's -- they used to send money for my son

16    to give it or something like that, but I didn't do

17    exactly that --

18        Q.  Let me explain something to you,

19    Mr. Nakoula, as a debt collector, I'm not

20    interested in political messages, I'm not

21    interested in anything except if you or somebody on

Page 36

Youseff, Mark Basseley - Vol. I

22  your behalf can get some money on the work you

23  made, that's the only thing I'm interested in, so

24  when I'm asking you these questions, I'm trying to

25  find out if you were the producer -- if you

41

1  were not the producer, you should be paid for the

2  movie as a writer.

3      A.  No, no.

4      Q.  You realize that the writers do get paid?

5      A.  But I didn't get any money.  I'm not the

6  producer.  I didn't get money.

7      Q.  Did you raise any money for the movie?

8      A.  No.

9      Q.  Who did?

10      A.  What's raise money?  Give money you mean?

11      Q.  No.  When you shoot a movie, you have to

12  pay a cameraman; correct?

13      A.  Okay.

14      Q.  You have to pay an actor, yes?

15      A.  Yes.

16      Q.  You have to pay a guy who is carrying the

17  light; correct?

18      A.  When I go to the movie with -- when I used

19  to go over there as a writer to advise them to do

20  that, to do that and I leave, that's all.  I don't

21  know nothing about that.  I didn't pay money.  I

22  didn't get money.

23      Q.  Mr. Nakoula, my question is somebody did,

24  because the movie could have not been made if

Page 37

Youseff, Mark Basseley - Vol. I

25    somebody did not finance the movie; correct?

42

1       A.  I don't know who this is.  I don't know the
2    people that did that, because now I tried to know
3    that, and everybody hiding, everybody said I don't
4    know nothing about that, everybody afraid,
5    everybody put me in the face and left.
6       Q.  Except for that 14-minute trailer.
7       A.  Just only they throw it in the Internet 14
8    minutes, that's it.  Even I didn't see them,
9    because I could not go to the Internet.  Because
10   this problem, everybody hiding, everybody cannot
11   say, no, I am -- even Allen, the director, he
12   hides.  Everybody hiding.
13      Q.  Do you own any part of any business?
14      A.  No.
15         MR. SEGINA:  Let's get off the record.
16         (Off the record.)
17         MR. SEGINA:  I will ask the reporter to
18   mark as Exhibit 1 an order for appearance of
19   judgement debtor.
20         (Whereupon, Notice for Judgement Debtor
21   Examination was marked Exhibit 1 for
22   identification.)
23   BY MR. SEGINA:
24      Q.  Mr. Nakoula, this is a document that asks
25   you to show up today for the examination.  You saw

Youseff, Mark Basseley - Vol. I

2      Q.  You don't have any documents responsive to

3  any of these requests?

4      A.  Yes.

5      Q.  Do you have any bank statements for the

6  past 24 months, sir?

7      A.  No.

8      Q.  Have you had a bank accounts in the past 24

9  months?

10      A.  No.

11      Q.  When did you start living at the 6801

12  Western Avenue?

13      A.  In September 26, 2013.

14      Q.  Before that where did you live?  You were

15  incarcerated?

16      A.  Yeah.

17      Q.  And even before that where did you live?

18      A.  I was jumping from place to place, but I

19  went to -- 12608 Park Street with my ex-wife and my

20  kids over there, but not all of the time.  You

21  know, I was jumping from place to place with

22  friends.

23      Q.  Before you started living at 6801 Western

24  Avenue, did you have any living expenses?

25      A.  No.

45

1      Q.  How did you buy food?

2      A.  I used to work.  Remember when I used to

3  work in the swap meet?

4      Q.  Yes.

Page 40

Youseff, Mark Basseley - Vol. I

5        A.   And I get money --

6        Q.   Okay.

7        A.   -- you know.

8        Q.   And when you received money, in what form

9   would that be?

10       A.   I was working the swap meet.

11       Q.   I understand.  Were you paid by checks?

12       A.   Yes.

13       Q.   So what did you do with the check?

14       A.   What?

15       Q.   What did you do with the check that you

16   would receive?

17       A.   Okay.  I sign it in the back and the owner

18   give me the cash.

19       Q.   Okay.

20       A.   And -- because I have two copies of the

21   check and, you know --

22       Q.   Did you have --

23       A.   -- until now, even this month when a doctor

24   gave me $700 --

25       Q.   Yes.

1        A.   -- I signed it for him in the back and they

2   give it back to him, he give me cash.

3        Q.   So you convert all of your checks into

4   cash?

5        A.   Yes.

6        Q.   Did you at any time have a checking

7   account?

Youseff, Mark Basseley - Vol. I

8    A.  No.  Long time.

9    Q.  Did you apply for a loan in the last five

10  years?

11   A.  No.

12   Q.  Did you raise any money for your movie?

13   A.  No.

14   Q.  Do you know who did?

15   A.  No.

16   Q.  For that screening of the movie on the

17  Internet, did anybody ever get paid?

18   A.  No, I don't think so.

19   Q.  The director?

20   A.  I don't think so, which I know because

21  everybody hiding, everybody hides.

22   Q.  You submitted a tax return in 2011, did you

23  not?

24   A.  Yes, I did.

25   Q.  Do you have a copy of that?

47

1    A.  No.  Because when I -- when they took me, I

2  don't have any document, any paper, anything.  I

3  went to the church, came from the halfway house

4  going to the church, they give me uniform, pants

5  and shirts, all of that.

6    Q.  But you filed your tax return?

7    A.  Yeah, I filed -- yeah, I filed, I filed.

8    Q.  Will you give me permission to actually

9  obtain it from the IRS?

10   A.  Absolutely.

Page 42

Youseff, Mark Basseley - Vol. I

14   A.   Terry Jones?

15   Q.   Have you heard of this name?

16   A.   I think so.  It's -- yeah, one of the
17   people they support me, but I don't think he is in
18   California, he is outside of California.  He used
19   to call if I need any help or any lawyers or
20   something.

21   Q.   Did you know that your movie would cause
22   such a reaction?

23   A.   Yeah, I know that.

24   Q.   In other words, at the time when you wrote
25   it and the movie was shot, did you know that it

49

1   would cause a reaction?

2   A.   No, no, no.

3   Q.   Ever since the movie -- the trailer was put
4   together, have you had any connection -- strike
5   that.

6         Have you had any contact from anybody who
7   was making this movie?

8   A.   No.

9   Q.   Were you ever contacted by people who were
10   trying to -- who were making this movie?

11   A.   No.

12   Q.   When was the last time you talked to -- you
13   said his name was Allen.  When was the last time
14   you talked to Allen?

15   A.   Before maybe July or August, in August.

16   Q.   Of 2013?

Page 44

Youseff, Mark Basseley - Vol. I

17   A.  '12.

18   Q.  2012.  And after September 2012, did

19   anything else happen?

20   A.  No.

21   Q.  Do you know what fatwa is?  Do you know

22   what fatwa is?

23   A.  Yeah, I know what fatwa is, of course I

24   know what fatwa is.

25   Q.  Is there currently that you know of a fatwa

50

1   against you for writing the movie?

2   A.  Yeah, they are people they need to collect

3   money from the people and they don't do nothing.

4   The people they issue the fatwa they don't have

5   money.  They send fatwa to collect the money from

6   the people over there and that's it.  People are

7   making money on my behalf.

8   Q.  Mr. Youseff, fatwa is -- isn't a fatwa

9   edict authorizing somebody to actually harm you or

10   kill you?

11   A.  Yes, that's right, but this is for money.

12   If somebody is doing this, we give him $100,000,

13   $1,000,000, but we have to collect first the

14   million dollars, and then to give it to the guy, he

15   go over there to kill Nakoula or whatever.

16   Q.  So the question that I have, have you been

17   aware --

18   A.  Yeah, I know.

19   Q.  -- of anybody in the Muslim world issuing

Page 45

Youseff, Mark Basseley - Vol. I

20  fatwa against you, sir?

21      A.  I heard this when I was in jail, I heard

22  about this, but I wasn't sure if this was right or

23  not, because this was the reason for me to put me

24  in the special housing unit because this fatwa, we

25  put you in special housing unit for your

51

1   protection.

2       Q.  Because the Bureau of Prison was afraid of

3   somebody actually maybe killing you in the prison?

4       A.  This is what they said.

5       Q.  Do you know whether anybody else connected

6   with the movie was subject to religious fatwa?

7       A.  No.

8           MR. SEGINA:  Fatwa is spelled f-a-t-w-a.

9       Q.  Have you signed any promissory notes,

10  Mr. Youseff --

11      A.  No.

12      Q.  -- that you would owe money to somebody on

13  behalf of IOU notes?

14      A.  No.

15      Q.  Nothing like that?

16      A.  No.

17      Q.  At this point, Mr. Youseff, I don't have

18  anything further.  The only thing I wanted to ask

19  you before we finish, do you -- can you provide me

20  with the name of the law firm who is representing

21  you in this personal injury lawsuit, do you have

22  their name?

Page 46

**EXHIBIT F**

1

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE CHRISTINA A. SNYDER, JUDGE PRESIDING

4  UNITED STATES OF AMERICA,     )
                             )
5                          )
                             )
6                  Plaintiff,   )
                           )
7                          )
                           )
8        Vs.              )  No. CR 09-617 CAS
                           )
9                          )
                           )
10 MARK BASSELEY YOUSSEF,      )
                           )
11                          )
                           )
12                Defendant.   )
                           )
13 _____)

14

15

16             REPORTER'S TRANSCRIPT OF

17     FINAL REVOCATION OF SUPERVISED RELEASE

18          LOS ANGELES, CALIFORNIA

19     WEDNESDAY, NOVEMBER 7, 2012; 1:32 P.M.

20

21

22        LEANDRA AMBER, CSR 12070, RPR
      OFFICIAL U.S. DISTRICT COURT REPORTER
23      312 NORTH SPRING STREET, # 408
       LOS ANGELES, CALIFORNIA 90012
24         www.leandraamber.com
           (213) 894-6603
25

1                          A P P E A R A N C E S

2

3       IN BEHALF OF THE PLAINTIFF,
        UNITED STATES OF AMERICA:
4                                        U.S. DEPARTMENT OF JUSTICE
                                         U.S. ATTORNEY'S OFFICE
5                                        BY:  ROBERT DUGDALE, AUSA
                                         312 NORTH SPRING STREET
6                                        12TH FLOOR
                                         LOS ANGELES, CA 90012
7                                        (213) 894-4685
                                         robert.dugdale@usdoj.gov
8

9

10

11

12      IN BEHALF OF THE DEFENDANT,
        MARK BASSELEY YOUSSEF:           LAW OFFICE OF STEVEN A. SEIDEN
13                                       BY:   STEVEN A. SEIDEN, ESQ.
                                         3800 EL SEGUNDO BOULEVARD
14                                       SUITE 201
                                         HAWTHORNE, CA 90250
15                                       (310) 644-5003

16

17

18

        ALSO APPEARING:
19           HISHAM A. MALEK, ARABIC INTERPRETER
             CURTIS SAMSON, U.S.P.O.
20           GRACIELA GUDINO, U.S.P.O.

21

22

23

24

25

                     UNITED STATES DISTRICT COURT

3



**I N D E X**

**PAGE**

**HEARING:**   FINAL REVOCATION OF SUPERVISED RELEASE

UNITED STATES DISTRICT COURT

4

```
 1           LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 7, 2012

 2                          1:32 P.M.

 3                          -o0o-

 4

 5

 6           THE CLERK:  Calling calendar item two, case number

 7   CR 09-617, United States of America versus Mark Basseley

 8   Youssef.

 9           Counsel, please state your appearances.

10           MR. DUGDALE:  Good afternoon, your Honor.

11           Robert Dugdale on behalf of the United States of

12   America, and I'm present at counsel table with Graciela

13   Gudino and Curtis Samson of the United States Probation

14   Office.

15           THE COURT:  Good afternoon.

16           MR. SEIDEN:  Good afternoon, your Honor.

17           Steven Seiden on behalf of Mr. Youssef.  He is

18   present with counsel.

19           THE COURT:  All right.  Good afternoon.

20           MR. SEIDEN:  Thank you.

21           THE COURT:  Okay.  A few preliminary matters --

22           Mr. Youssef, first of all, we have a stand by

23   Arabic interpreter.  Do you wish to proceed with the

24   assistance of the interpreter?

25           THE DEFENDANT:  Yes.
```

5

```
 1              THE COURT:  Okay.

 2              THE DEFENDANT:  Thank you.

 3              THE COURT:  Secondly, as a housekeeping matter,

 4    before we proceed, Mr. Youssef, you submitted to me a letter

 5    in Arabic, and I have not had an opportunity to read your

 6    letter because we have been attempting to find the

 7    appropriate procedure to fund, and now we have found the

 8    procedure to fund a -- an interpreter translating it to me.

 9              I don't know that your counsel has necessarily had

10    an opportunity to go over it, and my question to you is,

11    before we proceed today, do you want us either at sidebar or

12    in camera to read -- have that translated?

13              THE DEFENDANT:  No.

14              THE COURT:  Okay.  Do you wish to tell us in

15    summary form anything that was contained in that

16    communication?

17              THE DEFENDANT:  No.

18              THE COURT:  All right.  Then why don't we place

19    Mr. Youssef under oath, and I will proceed to ask him

20    regarding certain allegations.

21              THE CLERK:  Please raise your right hand to the

22    best that you can.

23              Do you solemnly swear that you will answer

24    truthfully the questions that the Court will ask you so help

25    you God?
```

UNITED STATES DISTRICT COURT

6

```
 1              THE DEFENDANT:  Yes.
 2              THE CLERK:  Thank you.
 3              THE COURT:  All right.  Mr. Youssef, I'm going to
 4    be asking you about allegations and again whether you admit
 5    or deny those allegations.
 6              First of all, having been ordered by the Court not
 7    to use for any purpose or in any manner any name other than
 8    his true legal name or names without the prior written
 9    approval of the Probation Officer, from December 26, 2010, to
10    the present, Nakoula Basseley Nakoula, you used the name
11    Nakoula Basseley Nakoula on all documentation provided to the
12    Court and the Probation Officer.  Whereas on or about
13    October 1, 2002, in the Superior Court of California, County
14    of Orange, decree changing name, case number A 21-5011, upon
15    his own motion, the Superior Court ordered his name changed
16    from Nakoula Basseley Nakoula to Mark Basseley Youssef.
17              Do you admit or deny that?
18              THE DEFENDANT:  (Through interpreter) admit.
19              (In English) admit.
20              THE COURT:  Second, having been ordered by the
21    Court not to use for any purpose or in any manner any name
22    other than his true local name or names without the prior
23    written approval of the Probation Officer, from December 26,
24    2010, to the present, Nakoula Basseley Nakoula has possessed
25    a California driver's license under the name Nakoula Basseley
```

UNITED STATES DISTRICT COURT

1    Nakoula without prior written approval of the Probation

2    Officer.

3              Do you admit or deny that?

4              THE DEFENDANT:  Admit.

5              THE COURT:  Okay.  Third, having been ordered by

6    the Court pursuant to general order 318 to not commit another

7    federal, state, or local crime, from December 26, 2010, to

8    the present, Nakoula Basseley Nakoula possessed a

9    fraudulently obtained California driver's license in

10   violation of California Vehicle Code section 14610.

11             Do you admit or deny that?

12             THE DEFENDANT:  Admit.

13             THE COURT:  Okay.  And then my understanding is

14   that I am to go to allegation number five.

15             Having been ordered by the Court pursuant to

16   General Order 318 to answer truthfully all inquiries by the

17   Probation Officer on September 15, 2012, Nakoula Basseley

18   Nakoula falsely stated to the Probation Officer that he had

19   not used the name Sam Bassil and/or the variations of Sam

20   Bassiel and Sam Bacile.

21             Do you admit or deny that, sir?

22             THE DEFENDANT:  Admit.

23             THE COURT:  All right.  It's my understanding that

24   pursuant to the agreement between Government and the defense,

25   those are the only allegations that remain active; is that

8

1    correct, Mr. Dugdale?

2            MR. DUGDALE:  Yes, your Honor.

3            Basically as a result of the defendant's admissions

4    to Allegations One, Two, Three, and Five, the Government will

5    agree to dismiss Allegations Four, Six, Seven, and Eight.

6            THE COURT:  All right.

7            MR. DUGDALE:  And in addition there are several

8    other provisions that we have agreed to or agreements that

9    we've reached as a result of this disposition.

10           The Government has agreed not to charge the

11   defendant with a violation of Title 18 United States Code

12   Section 1001, which is false statements based upon the

13   Allegations Seven and Eight.

14           The parties have agreed to stipulate that the

15   appropriate sentence in this case following the necessary

16   revocation of the defendant's supervised release is 12 months

17   imprisonment to be followed by an additional four-year period

18   of supervised release.

19           And also the parties have agreed that the defendant

20   will participate in a proffer with the United States

21   Probation Office and the United States Attorney's Office

22   pursuant to the terms of the Government's standard proffer

23   agreement to truthfully answer all questions concerning his

24   finances, his assets, his employment, and his income.

25           And provided he truthfully answers questions along

UNITED STATES DISTRICT COURT

9

```
1     those subject lines, the Government has agreed it won't

2     pursue further violations of the conditions of the

3     defendant's supervised release based upon those subjects and

4     those answers.

5              THE COURT:  Thank you.

6              Mr. Seiden, do you agree?

7              MR. SEIDEN:  We do agree, your Honor.  We're going

8     to be requesting of the Court to at sentencing for home

9     confinement per the judge -- the Court's consideration.

10             Also, if the Court does not agree to that, we're

11    asking that you make a recommendation that he be housed in

12    the Southern California area.

13             THE COURT:  All right.

14             MR. SEIDEN:  Thank you.

15             THE COURT:  First of all, let me state that given

16    the fact that Mr. Youssef has admitted Allegations One, Two,

17    Three, and Five, the Court finds him to be in violation of

18    the terms and conditions of his supervised release.

19             Let me hear from Mr. Dugdale regarding the request

20    for home confinement.

21             MR. DUGDALE:  Yes, your Honor.

22             That wasn't exactly our agreement, but the

23    Government stands here relatively confident that the

24    appropriate sentence is one of imprisonment regardless of

25    what that request would be.
```

UNITED STATES DISTRICT COURT

1            So I would briefly talk about the four things that

2     illustrate that this was a serious breach of the Court's

3     trust through these violations that's deserving of the

4     one-year sentence that the Government is recommending here

5     through imprisonment to be followed by the four years of

6     supervised release.

7            First of all, these were serious violations.  They

8     were violations that basically fall into two categories,

9     either the defendant's persistent use of names other than his

10    own true legal name or dishonesty with the Probation Office.

11    And obviously both of these things are important to the

12    ability of the Government and the Probation Office to

13    supervise the defendant.

14            Paramount is that he is honest with them.  So when

15    asked questions about names he has used, employment that he's

16    had, things of that nature -- it's essential that people on

17    supervised release are truthful with Probation to allow them

18    to do their jobs.  And this defendant was not truthful as he

19    admitted when he admitted violation number five.

20            And the alias issue was also a serious issue here

21    as well.  And it's a serious issue because of the history and

22    characteristics of this particular defendant.  As the Court

23    will remember back in 2009, 2010, in the underlying case,

24    this is a defendant who participated in a massive fraudulent

25    scheme involving the use of a whole host of fraudulent

UNITED STATES DISTRICT COURT

1    identities.

2              Well over 640 -- 641 credit and debit cards in

3    names other than his own were found in his possession that he

4    used to open no less than 60 different bank accounts to

5    defraud the victim banks in this case of approximately

6    $800,000.

7              In this particular case, as the Court now knows, he

8    changed his name from Nakoula Basseley Nakoula to Mark

9    Basseley Youssef back in troubling.  Despite that fact, even

10   including the litigation before this Court, he was using a

11   different name, his old name, Nakoula Basseley Nakoula.  And

12   he has persisted in using that name throughout the term of

13   his supervised release even though he knows he knows as

14   well -- well knows that that is not his true legal name.

15             And perhaps most troubling he has carried

16   identification in these two different names during the period

17   of his supervised release.  He has a passport in the name of

18   Mark Basseley Youssef.  He has a driver's license in the name

19   of Nakoula -- Nakoula Basseley Youssef.

20             And as this Court should appreciate, as a result of

21   his criminal past including the use of aliases and multiple

22   forms of identification other than his true legal name, this

23   is not a defendant that we want out there using a name other

24   than his true name.  This is not a defendant the Court should

25   want out in the streets using multiple forms of

UNITED STATES DISTRICT COURT

 1    identification and having multiple forms of identification in

 2    names other than his own.

 3         And then of course there's the use of the name Sam

 4    Bacile, which relates to Allegation Number Five to which the

 5    defendant admitted, which is an entirely new identity that he

 6    put forward to other people for fraudulent purposes as I'll

 7    explain in a minute.

 8         So because of that, these are serious allegations.

 9    Because of his history and characteristics particularly

10    serious as it relates to this defendant.

11         Second, as the Probation Office noted in its

12    lengthy letter to the Court, this is a defendant who has

13    engaged in a long running pattern of deception really dating

14    back to when he first appeared in front of this Court and

15    misrepresented what his true name is all the way through up

16    to his arrest back in September in this case.

17         So his dishonesty goes back years.  It's a

18    defendant with a criminal history which includes not only the

19    fraudulent conduct that resulted in victimization of the

20    banks to the tune of almost $800,000 but also a prior

21    conviction related to methamphetamine manufacturing, even

22    selling nonconforming gas.

23         So his own businesses he has not operated on the up

24    and up.  He's been dishonest with this Court.  He's been

25    dishonest with the Probation Office.  He's been dishonest

UNITED STATES DISTRICT COURT

13

```
 1    with the officials in California who issued him that driver's

 2    license that's not in his true name.  He's been dishonest

 3    with the people that he has done business with including the

 4    people who appeared in the film that I'll talk about in a

 5    second.

 6              A third reason why a period of incarceration of

 7    12 months is appropriate is because he was given a break

 8    before by this Court and appropriately so at the time,

 9    probably fully with the expectation of this Court that we

10    wouldn't be seeing him back here so quickly.

11              The United States Sentencing Guidelines provide in

12    section 7B1.4, application note three, that when an original

13    sentence was a result of a downward departure, as it was in

14    this case, that is something the Court should consider in

15    revocation conduct and perhaps grant an upward departure.

16              When -- because you got the break before did not

17    take advantage of that break and find yourself so soon in

18    front of the Court again as a result of engaging in violation

19    conduct in the legal conduct, that is something the Court

20    should take into account when sentencing him now.

21              As the Court will probably recall, he received a

22    21-month sentence when he was looking at a guideline range at

23    that time obviously purely advisory a 41 to 51 months.

24              THE COURT:  Right.  And I believe it was a 5K1.1

25    motion --
```

UNITED STATES DISTRICT COURT

1        MR. DUGDALE:  There was.

2        THE COURT:  -- that triggered the downward

3   departure by this Court, but nonetheless you are correct.

4        MR. DUGDALE:  That is correct.  And the application

5   note that I cite specifically talks about getting a downward

6   departure as a reward for substantial assistance.

7        And how, if you come back after something like

8   that, because you've engaged in violation conduct, that

9   should be taken into account and is an aggravating factor,

10   and the Government is citing it as so in this case.

11        And the last point as to why this was a serious

12   offense worthy of the punishment that frankly I thought the

13   parties had agreed to before a minute ago, is the fact that

14   his deception actually caused real harm to people.

15        I'm not going to say much about the movie.  He's

16   not here because of the content of this movie --

17        THE COURT:  Agreed.

18        MR. DUGDALE:  -- but the way that he went about

19   making this movie is the problem because he did defraud

20   people.  He portrayed to people that he was Sam Bill, not

21   Nakoula Basseley Nakoula, not even that person, not even Mark

22   Youssef -- not Basseley Youssef, but this other identity.

23        So the people who got involved with this -- the

24   actors and actresses who answered the casting call that he

25   made -- they had no idea that he was a recently released

1   federal felon with a history as extensive as I mentioned

2   before who had defrauded banks out of close to $800,000.

3          And had these people known that, had they been

4   given this true name and known his background, they might

5   have had some second thoughts before they joined in on that

6   project.  But they didn't have that opportunity because the

7   defendant defrauded them by betraying something as

8   fundamental as his identity to them.

9          And second, as far as how he went about making the

10   movie -- and this is mentioned in the Probation Officer's

11   lengthy letter -- is then he committed a second deception

12   with these people.  After they had filmed their scenes, he

13   went back and dubbed in language which made the film the film

14   that people have considered offensive.

15          And this is not a choice that these actors or

16   actresses had to made.  It's the choices he made for them.

17   So if the defendant wanted to be a lightning rod for

18   controversy or attach himself to a project like this, as

19   amateurish as it was, and as offensive as people might view

20   it, that was his choice.

21          But he made this choice for other people who were

22   not on board with that decision and had no idea he was doing

23   so.  And that's a substantial fraud.  And as a result, these

24   people have come forward to the Probation Office and reported

25   that they have experienced death threats, they're afraid for

UNITED STATES DISTRICT COURT

1    their lives, they feel like they're careers have been

2    ruined -- all as a result of what this man did to defraud

3    them.  So again it fits within the pattern of deceit that the

4    Probation Office has -- has cited to the Court.

5           As you know, the Probation Office actually in its

6    letter remitted two years.  I will tell that you we've had

7    discussions with the Probation Office.  They are on board

8    with the one-year recommendation in light of the defendant's

9    acceptance of responsibility in this case, which should of

10   course be considered as a mitigator by this Court.

11          But all in all as a result of the factors that I've

12   laid out here, your Honor, the United States does submit that

13   a one-year period of incarceration is an appropriate sentence

14   in light of the seriousness of the offenses and the damage

15   that he has done to other people as a result of this

16   longstanding pattern of fraudulent behavior that this

17   defendant has engaged in.

18          So unless the Court has any additional questions, I

19   will submit, your Honor.  Thank you.

20          THE COURT:  All right.  Anything further?

21          MR. SEIDEN:  Thank you, your Honor.

22          I'm not sure why the Government had to go into a

23   lengthy recitation of what we had already discussed

24   previously.  We have an agreement.  We worked very hard

25   towards a disposition in this matter.  We've reached it.  My

UNITED STATES DISTRICT COURT

1    client's made his admissions to the Court.

2           And as far as the movie goes, which I'm not sure

3    why that was brought up, but like any movies, people who are

4    involved in the making of the movies have the right to change

5    dialogue, change titles, change everything.  These actors and

6    actresses whom nobody ever knew before signed releases.  I

7    don't know why that's any part of any discussion today.

8           But my client has admitted that.  We have agreed on

9    the disposition of the one-year confinement.  We're just

10    asking the Court to consider home detention.  He has not been

11    able to see any members of his family for the last five weeks

12    but for glances in court proceedings.  He's had a very

13    difficult time getting his son and daughter in to see him at

14    the detention center.  That will be corrected in the future.

15           And we're asking this Court to give him some

16    consideration.  He has avoided a lengthy hearing probably by

17    allowing me to engage in discussions with the Government to

18    resolve this matter which we've done in a timely fashion I

19    believe.  And we ask the Court to consider the home detention

20    that we're requesting.

21           Thank you.

22           THE COURT:  Well, I am strongly of the opinion that

23    the one year in custody is appropriate for the reasons

24    indicated by the Government.  The -- as far as I'm concerned,

25    Mr. Youssef has struck a deal far more favorable than he

1    might have otherwise suffered had he proceeded to try this

2    case.  I appreciate his acceptance of responsibility, but I

3    am also mindful of the fact that he has engaged in continuing

4    deception.

5             I might even add to the laundry list of Mr. Dugdale

6    that, as I recall, we placed Mr. Youssef under oath; and for

7    purposes of his guilty plea he presented himself as

8    Mr. Nakoula, which obviously was incorrect and a fraud on

9    this Court.

10            That's not why we're here either today.  We're here

11   because of his continuing conduct in this regard and the fact

12   that he has not dealt honestly with Probation.

13            So I do think that one year in custody is

14   appropriate followed by four years of supervised release, and

15   that is what my sentence is going to be.

16            MR. SEIDEN:  Your Honor, I appreciate that.  Could

17   I just -- I neglected to mention one thing.

18            In the 2009 Presentence Report given to this Court,

19   the very first name under aliases was the name Mark Basseley

20   Youssef, and Probation never did anything further to confirm

21   at that time that that was in fact his legal name under the

22   name change that occurred in 2002.

23            And I wish they had.  I wish his counsel at that

24   time had done that.  We wouldn't be here today.

25            THE COURT:  Well, you were not counsel at that

UNITED STATES DISTRICT COURT

19

```
 1    time, but obviously all of us were led to believe that he had

 2    a different name than his true name.

 3              MR. SEIDEN:  Well, that's true.  I'm just saying

 4    they must have known because they put it in the Presentence

 5    Report.

 6              THE COURT:  I understand your point.

 7              MR. SEIDEN:  Thank you.  And with that I submit.

 8    Thank you very much.

 9              THE COURT:  And so that is going to be my sentence

10    in this case.  I'm going to revoke supervised release and

11    sentence Mr. Youssef to 12 months in custody followed by four

12    years of supervised release.

13              Mr. Youssef shall make the proffer that was

14    discussed by Mr. Dugdale and to which Mr. Seiden agreed.  And

15    I believe you asked for a recommendation that Mr. Youssef be

16    placed at a Southern California facility.  And to the extent

17    possible, I will make that recommendation.

18              MR. SEIDEN:  Thank you very much, your Honor.

19              MR. DUGDALE:  Thank you, your Honor.

20              Just one quick thing.  There were some additional

21    conditions of supervised release that the Probation Office

22    had requested in its letter.

23              THE COURT:  Yes.

24              MR. DUGDALE:  Rather than put the Court on the spot

25    with this, perhaps we will just submit a proposed order along
```

20

 1     those lines.  And Mr. Seiden, if he has issues with those,

 2     can object to those.  But I'll deal with it however the Court

 3     would like.

 4              THE COURT:  Well, I'll do either way.  I'm sure I

 5     have the letter here, and I'm sure I can deal with it now if

 6     we want to wrap it up now.  But if you would prefer to deal

 7     with it and discuss it with one another, I'm happy to let you

 8     do that.

 9              MR. DUGDALE:  I think that might be best just to

10     make sure that we have it all correct.

11              THE COURT:  That sounds fine.

12              MR. DUGDALE:  So we will submit that to the Court,

13     your Honor.

14              And the only other housekeeping matter is to -- the

15     Government will move to dismiss the remaining allegations

16     which are Allegations Four, Six, Seven, and Eight in the

17     interest of justice.

18              THE COURT:  All right.  That motion will be

19     granted.

20              And I think we should probably, in light of

21     Mr. Youssef's earlier comments, return to him the submission

22     that arrived yesterday.

23              MR. SEIDEN:  Very good, your Honor.

24              THE COURT:  Anything further, Counsel?

25              MR. SEIDEN:  Thank you for accommodating us and

                  UNITED STATES DISTRICT COURT

21

1   allowing us to be heard today.  Thank you.  Your Honor, we

2   appreciate it.

3            MR. DUGDALE:  Yes, thank you, your Honor.

4            THE COURT:  Thank you.

5            THE CLERK:  This Court is adjourned.

6            (Whereupon, at 1:53 p.m. , the proceeding

7            concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                    CERTIFICATE OF REPORTER

 2

 3    COUNTY OF LOS ANGELES )
                           ) ss.
 4    STATE OF CALIFORNIA  )

 5

 6    I, LEANDRA AMBER, OFFICIAL FEDERAL COURT REPORTER, REGISTERED

 7    PROFESSIONAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT

 8    COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY

 9    CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES

10    CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

11    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

12    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS

13    IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

14    CONFERENCE OF THE UNITED STATES.

15

16

17    DATE:  _____

18

19

20    _____/s/_____

21    LEANDRA AMBER, CSR 12070, RPR

22    FEDERAL OFFICIAL COURT REPORTER

23

24

25
```

UNITED STATES DISTRICT COURT

**EXHIBIT G**



**Capture Date: 07/22/2011 Sequence #: 5760731057**

MINA S. IMIEL     **703**
12608 PARK ST
CERRITOS, CA 90703-1142    16-66/1220
1051

7-19-11 _Date_

Pay to the
Order of   AbANob NAKouA    $ 14000

Fourteen Thousand Dollars

**Bank of America**
Cerritos Financial
18641 S Gridley Rd
Cerritos CA
562.865.1448

Customer Since
2005

For

⑈2000551⑈0703⑈ 1051⑈⑈⑈⑈ ⑈000140000⑈

BANK OF AMERICA, NA LAC
167 81 P03
07/22/11

5760731057

for Deposit

No Electronic Endorsements Found
No Payee Endorsements Found



**Capture Date: 07/27/2011 Sequence #: 5760154124**

MINA S. IMIEL
12608 PARK ST
CERRITOS, CA 90703

373

18-60/1220
1061

Date 7-18-11

Pay to the
Order of  A 6 A No 6   No Ko s 1 A                   $ 7000

Seven  thousal  Dollars                              Dollars

**Bank of America**

Cerritos Financial
18641 S Gridley Rd
Cerritos CA
562.865.1448

Customer Since
2005

For _____

⑆ ⑈ ⑆ ⑈ ⑆ ⑈          ⑈ 0000 700000 ⑈

BANK OF AMERICA NA LAC

5760154124

4590-165
122000661

No Electronic Endorsements Found
No Payee Endorsements Found

Aug 05 11 10.35a    Rene Veluzat Blue Cloud R                661 254 1962        p.2

# RENE VELUZAT

*Blue Cloud Movie Ranch*
*P. O. Box 220219*
*Newhall, California 91322*

### Film Contract
*Between*
### RENE VELUZAT
*and*
### MEDIA FOR CHRIST

_____

For Rene Veluzat Movie Ranch Property Blue Cloud Movie Ranch

Prep Dates:   -0-

Film Dates:   AUGUST 21, 2011                     TOTAL $ 3,000.00

**MEDIA FOR CHRIST** shall be responsible for any damages caused by the production company to the RENE VELUZAT MOVIE RANCH property, sets or props during prep, filming, or strike of the following sets: **Baghdad Square.**

The Production company is obligated to repair any damages of the sets set forth above caused by the Production company upon completion of filming. While repair work is being done, wrap days will be charged. This includes damage to grass, ruts, etc, caused by heavy equipment that will be used for the production. All clean up must be completed before the days end.

All such set modifications must be approved by Rene Veluzat with a written memo. All sets must be returned to their original conditions, except reasonable wear and tear, including painting before the company finishes the wrap days.

Rene Veluzat is not liable nor accepts any responsibility for injury to anyone on the premises during prep, filming, wrap or scouting, except as a result of any claims arising from the gross negligence or intentional acts of Rene Veluzat. Media For Christ agrees to hold Rene Veluzat harmless from any and all third party suits, claims, loss or liabilities resulting from Media For Christ's use of said property.

Rene Veluzat is not liable nor accepts responsibility for stolen, lost or damage to items belonging to the production company or any other company or individual providing goods and other materials to the production company or visitors to the set or its employees.

Rene Veluzat is not responsible to provide access to ranch before, after or during poor weather conditions.

Certificate of Insurance is to be issued to Rene Veluzat as an additional insured and loss payee before the Production Company enters the location.

Aug.05.2011  11:33 AM Media For Christ          6263595222          PAGE.  3/  4

Overtime begins on a prep day or wrap day after -0- hours. The charge for overtime is $ n/a per hour. A wrap day will be charged as long as equipment is left on the ranch or repairs or clean up are still needed.

Overtime on a film day begins twelve (12) hours from call time to wrap time. The charge for overtime is $150.00 per hour.

Water truck and driver are required on the Ranch at all times with the Production Company, if County Fire Department requires a Water Truck and Driver.

Call time shall be confirmed to Rene Veluzat prior to the commencement of prep, film and/or strike.

No tree or shrub trimming is allowed unless approved by Rene Veluzat.

Speed limit is 15 miles per hour on the Ranch. Please see that this limit is posted in all call sheets, etc. to the crew.

Removal of all trash/rubbish is the responsibility of the Production Company.

Production company may use available parking.

No smoking is allowed in or around any set. Smoking is permitted only in an area to be designated by the fire safety advisor on the set.

Rene Veluzat does not supply security for your protection. Security must be supplied by the Production Company. All guards must be licensed.

All equipment must be removed from the Ranch on your Filming and/or Wrap day. Any production equipment left after the paid for Wrap Day, will incur additional wrap day charges.

**INSURANCE CERTIFICATE, SIGNED CONTRACT, FULL PAYMENT MUST BE RECEIVED BEFORE ENTERING THE PROPERTY. A COPY OF FILMING PERMIT IS TO BE GIVEN TO RENE VELUZAT.**

**AMOUNT DUE PRIOR TO PRODUCTION COMPANY ENTERING THE RANCH**

**$ 3,000.00**
**MAKE CHECK PAYABLE TO RENE VELUZAT**
**includes water  truck & driver/Site Rep**

SIGNED: _____
Rene Veluzat, Ranch Owner

SIGNED _____
Title: Line Producer

Date: August 4, 2011

Date: 8/5/11

# *RENE VELUZAT*

### *Blue Cloud Movie Ranch*
### *P. O. Box 220219*
### *Newhall, California 91322*

### *Film Contract*
### *Between*
### *RENE VELUZAT*
### *and*
### *MEDIA FOR CHRIST*

---

For Rene Veluzat Movie Ranch Property **Blue Cloud Movie Ranch**

**Prep Dates:**    -0-

**Film Dates:**    **AUGUST 21, 2011**                                    **TOTAL $ 3,000.00**

**MEDIA FOR CHRIST** shall be responsible for any damages caused by the production company to the RENE VELUZAT MOVIE RANCH property, sets or props during prep, filming, or strike of the following sets: **Baghdad Square.**

The Production company is obligated to repair any damages of the sets set forth above caused by the Production company upon completion of filming. While repair work is being done, wrap days will be charged. This includes damage to grass, ruts, etc, caused by heavy equipment that will be used for the production. All clean up must be completed before the days end.

All such set modifications must be approved by Rene Veluzat with a written memo. All sets must be returned to their original conditions, except reasonable wear and tear, including painting before the company finishes the wrap days.

Rene Veluzat is not liable nor accepts any responsibility for injury to anyone on the premises during prep, filming, wrap or scouting, except as a result of any claims arising from the gross negligence or intentional acts of Rene Veluzat. **Media For Christ** agrees to hold Rene Veluzat harmless from any and all third party suits, claims, loss or liabilities resulting from **Media For Christ's** use of said property.

Rene Veluzat is not liable nor accepts responsibility for stolen, lost or damage to items belonging to the production company or any other company or individual providing goods and other materials to the production or visitors to the set or its employees.

Rene Veluzat is not responsible to provide access to ranch before, after or during poor weather conditions.

Certificate of insurance is to be issued to Rene Veluzat as an additional insured and loss payee before the Production Company enters the location.

Overtime begins on a prep day or wrap day after -0- hours. The charge for overtime is $ n/a per hour. A wrap day will be charged as long as equipment is left on the ranch or repairs or clean up are still needed.

Overtime on a film day begins **twelve (12)** hours from call time to wrap time. The charge for overtime is **$150.00** per hour.

Water truck and driver are required on the Ranch at all times with the Production Company, if County Fire Department requires a Water Truck and Driver.

Call time shall be confirmed to Rene Veluzat prior to the commencement of prep, film and/or strike.

No tree or shrub trimming is allowed unless approved by Rene Veluzat.

Speed limit is 15 miles per hour on the Ranch. Please see that this limit is posted in all call sheets, etc. to the crew.

Removal of all trash/rubbish is the responsibility of the Production Company.

Production company may use available parking.

No smoking is allowed in or around any set. Smoking is permitted only in an area to be designated by the fire safety advisor on the set.

Rene Veluzat does not supply security for your protection. Security must be supplied by the Production Company. All guards must be licensed.

All equipment must be removed from the Ranch on your Filming and/or Wrap day. Any production equipment left after the paid for Wrap Day, will incur additional wrap day charges.

**INSURANCE CERTIFICATE, SIGNED CONTRACT, FULL PAYMENT MUST BE RECEIVED BEFORE ENTERING THE PROPERTY. A COPY OF FILMING PERMIT IS TO BE GIVEN TO RENE VELUZAT.**

**AMOUNT DUE PRIOR TO PRODUCTION COMPANY ENTERING THE RANCH**

**$ 3,000.00**
**MAKE CHECK PAYABLE TO RENE VELUZAT**
**Includes water truck & driver/Site Rep**

SIGNED: _____     SIGNED _____
**Rene Veluzat, Ranch Owner**

                                      Title _____

**Date: August 4, 2011**             Date: _____

**ABANOB B NAKOULA**
312 ELLWOOD BEACH DR
GOLETA, CA 93117

1036

15-66/1220
2175

8-21-11

Reveveluzat        $ 3,000

Three thousand

**Bank of America**
Artesia & Norwalk
12221 Artesia Blvd
Cerritos CA
562.865.1448

Customer Since
2009