**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CINDY LEE GARCIA,<br>  *Plaintiff-Appellant*,<br><br>v.<br><br>GOOGLE, INC., a Delaware Corporation; et al.,<br>  *Defendants-Appellees*,<br><br>and<br><br>NAKOULA BASSELEY NAKOULA, an individual, AKA Sam Bacile; et al.,<br>  *Defendants*. | No. 12-57302<br><br>D.C. No.<br>2:12-cv-08315-MWF-VBK<br><br>AMENDED ORDER |

Filed May 18, 2015

Before: Sidney R. Thomas, Chief Judge

Order by Chief Judge Thomas;
Dissent by Judge Reinhardt

| 2 | GARCIA V. GOOGLE |
|---|---|

## SUMMARY[*]

**Copyright / Preliminary Injunction**

Chief Judge Thomas issued an amended order denying rehearing en banc of the three-judge panel's order directing Google and YouTube to remove immediately all or part of the film *Innocence of Muslims* from their platforms and to prevent further uploads.

Dissenting from the initial denial of emergency rehearing en banc of the three-judge panel's order, Judge Reinhardt wrote that this was a case in which the court not only tolerated the infringement of fundamental First Amendment rights but also was the architect of that infringement. He wrote that although he agreed with the en banc court's majority opinion, immediate en banc consideration would have been the only way of preventing the irreparable damage to free speech rights caused by the three-judge panel's order in the period before the case could be taken en banc under the court's regular procedure.

## ORDER

As noted in the order filed March 14, 2014, a judge of this Court made a *sua sponte* request for a vote on whether to rehear *en banc* the panel's order of February 28, 2014 denying an emergency stay of the panel's prior orders, as amended, directing Google and YouTube to remove

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

immediately all or part of a film entitled "Innocence of Muslims" from their platforms worldwide and to prevent further uploads.

Pursuant to General Order 5.5(b), a vote of the non-recused active judges was conducted as to whether to rehear the panel order *en banc*. A majority of the non-recused active judges did not vote in favor of rehearing *en banc*. Therefore, an order was issued on March 14, 2014, pursuant to General Order 5.5(c), returning control of the case to the panel.

Separately from the *en banc* call as to the panel's stay order, a judge of this Court made a request for a vote on whether to rehear *en banc* the panel's amended opinion. A majority of the non-recused active judges voted in favor of rehearing the case *en banc*, and an order was issued on November 12, 2014 ordering that the case be reheard *en banc*. Oral argument was held before the *en banc* panel on December 15, 2014. The *en banc* panel has issued its decision, which is filed concomitantly with this order.

This amended order denying rehearing *en banc* as to the panel order of February 28, 2014 denying an emergency stay of the panel's prior orders is filed for the purpose of allowing publication of a dissent from the denial of rehearing *en banc* as to the panel order.

Therefore, the order of March 14, 2014 denying rehearing *en banc* as to the panel order of February 28, 2014 is reinstated and filed for publication. This amended order does not affect the subsequent *en banc* proceedings in this case.

4            GARCIA V. GOOGLE

REINHARDT, dissenting from initial denial of emergency rehearing en banc (although agreeing with opinion of the en banc court):

    This is a case in which our court not only tolerated the infringement of fundamental First Amendment rights but was the architect of that infringement. First we issued an order that prohibited the public from seeing a highly controversial film that pertained to an ongoing global news story of immense public interest. Then we ordered that the public could see it only if edited to exclude a particular scene, thereby conditioning freedom of expression on a judicially sanctioned change in the message expressed. We did this primarily because persons or groups offended by the film's message made a threat—in the form of a fatwa—against everyone connected with the film. By suppressing protected speech in response to such a threat, we imposed a prior restraint on speech in violation of the First Amendment and undermined the free exchange of ideas that is central to our democracy and that separates us from those who condone violence in response to offensive speech.

    Although I agree with the en banc opinion that is being issued in the normal course well over a year after the unconstitutional order, I dissent from this court's earlier refusal to go en banc immediately on an emergency basis. Only by doing so could we have prevented the irreparable damage to free speech rights in the lengthy intervening period until we could take the case en banc under our regular procedure. The unconscionable result is that our court allowed an infringement of First Amendment rights to remain in effect for fifteen months before we finally issued our opinion dissolving the unconstitutional injunction issued by a divided three-judge panel.

## I.

Mark Basseley Youssef (a.k.a. Nakoula Basseley Nakoula or Sam Bacile) wrote and directed *Innocence of Muslims*, a 13-minute-and-51-second film in which the plaintiff Cindy Lee Garcia appears for five seconds. Although Garcia believed she was acting in an uncontroversial movie called *Desert Warrior*, Youssef dubbed over her lines and ultimately created *Innocence of Muslims*, a film in which Mohammed is portrayed as an evil figure—a murderer and child molester. After an Egyptian cleric issued a fatwa against everyone involved in creating the film, Garcia unsuccessfully sought a preliminary injunction requiring Google to remove the film from all of its platforms. By a 2–1 vote, a panel of this court reversed the district court's denial of an injunction and ordered Google to remove all copies of *Innocence of Muslims* from YouTube.com and any other platforms within its control, and to take all reasonable steps to prevent further uploads of *Innocence of Muslims* to those platforms.[1]

When the panel denied Google's motion for a stay of the panel's order,[2] a judge of this court immediately made an

---

[1] In an unprecedented action, the panel also ordered Google not to disclose the existence of the order or its contents until the panel filed its opinion a week later, a provision that exacerbated the First Amendment violation as well as exceeded the panel's authority.

[2] When it declined to stay its order for the second time, on February 28, 2014, the panel simultaneously modified the gag order to allow Google to show a censored version of *Innocence of Muslims* with the plaintiff's appearances edited out of the film. This dissent applies equally to the initial order and the order as modified. As the majority points out, the modification had little practical effect: "the end result was the same: the entire film remained removed from YouTube." Majority Op. at 29.

emergency sua sponte en banc call. The basis of the call was that the panel's order constituted a prior restraint on speech in violation of the First Amendment, and that free speech rights should not be denied pending the lengthy process of invoking en banc proceedings regarding the merits of the panel opinion in the normal course. *See* General Orders 5.4–5.6. Although I agree with the en banc opinion affirming the district court's denial of an injunction, that action comes too late to avoid the irreparable injury to First Amendment rights. I respectfully dissent from our refusal to *immediately* rehear en banc on an emergency basis the denial of a stay of the panel's order.[3] By leaving in place the panel's unprecedented gag order for well over a year, we surrendered to the threats of religious extremists who were offended by the film. For a United States court to do so was anathema to the principles underlying the First Amendment. It is remarkable that this late in our history we have still not learned that the First Amendment prohibits us from banning free speech in order to appease terrorists, religious or otherwise, even in response to their threats of violence.

## II.

By refusing to immediately rehear this case en banc, we condoned censorship of political speech of the highest First Amendment magnitude. Although amateurish, offensive, and banned in many undemocratic countries, *Innocence of Muslims* is a film of enormous political, social, and religious

---

[3] This dissent from the initial denial of rehearing en banc is being filed concurrently with the en banc opinion, consistent with the rule that all claims of error in the proceedings are ordinarily addressed "in a single appeal following final judgment on the merits." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981).

GARCIA V. GOOGLE 7

interest. Its release sparked so much outrage in the Muslim world that a fatwa issued against everyone involved in the film, the Afghan government asked Google to remove it, and Google blocked the video in Libya and Egypt in response to protests. *See* Claire Cain Miller, *As Violence Spreads in Arab World, Google Blocks Access to Inflammatory Video*, N.Y. Times (Sept. 13, 2012); *Police Probe Threats, Fatwa against 'Innocence of Muslims' Actors*, L.A. Times (Sept. 21, 2012). It is considered by many, including some congressional leaders, to be a cause of the riots in Benghazi that led to the death of the United States Ambassador to Libya. *See* David K. Kirkpatrick, *A Deadly Mix in Benghazi*, N.Y. Times (Dec. 28, 2013). Its role in the Benghazi attack has been the subject of congressional hearings, and high-ranking governmental officials have testified about its impact on foreign relations. *See* Aaron Couch, *Clinton Asked About 'Innocence of Muslims' During Benghazi Hearing*, The Hollywood Reporter (Jan. 23, 2013). President Obama even discussed the film in an address to the United Nations, explaining to those gathered: "I know there are some who ask why we don't just ban such a video. And the answer is enshrined in our laws: Our Constitution protects the right to practice free speech."[4] Clearly, *Innocence of Muslims* is part and parcel of international political events and discourse. As such, it "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

---

[4] President Barack Obama, Remarks by the President to the UN General Assembly (Sept. 25, 2012), *available at* http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-un-general-assembly.

The censorship of *Innocence of Muslims* by our court violated the public's First Amendment right to view a film of immense significance and public interest. "The right of citizens to inquire, to hear, to speak, and to use information . . . is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). "[T]he Constitution protects the right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), and that protection "is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). Widespread and uncensored access to *Innocence of Muslims* was critical so that the public could view the film, make its own judgment about its role and significance, and debate the appropriate response of a pluralist society to threats of revenge against controversial or offensive speech—whether those threats are made by a foreign government, foreign or domestic terrorists, or religious fundamentalists of any stripe.

The panel primarily justified its censorship of *Innocence of Muslims* based on threats to Garcia's safety from persons offended by the film,[5] but "[i]t is firmly settled that under our

---

[5] The panel also asserted that Garcia was likely to succeed in her copyright claim, but the theory under which she claimed to own the portion of the film in which she appeared as an actress was entirely without legal precedent and bordered on the frivolous. Indeed, as the majority explains, even *valid* copyrights are not "categorically immune from challenges under the First Amendment," *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003) (internal quotation marks and citation omitted). *See also Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988) *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207 (1990) (denying permanent injunction

GARCIA V. GOOGLE 9

Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969). As lawful political speech, the public's access to *Innocence of Muslims* could not constitutionally be restricted based on others' reaction to the speaker's message. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).[6] That is, protected speech cannot "be punished or banned, simply because it might offend a hostile mob," *id.* at 134–35, and "constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Cox v. State of La.*, 379 U.S. 536, 551 (1965) (internal quotation marks omitted). If allegations of grave and irreparable danger to national security were insufficient to allow suppression of the Pentagon Papers, *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam), then threats to persons involved in making *Innocence of Muslims* could not justify the suppression of speech of great national import in this case either.

"[A] function of free speech under our system of government is to invite dispute." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Controversial or offensive ideas "may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of

---

against copyright infringement because "an injunction could cause public injury by denying the public the opportunity to view a classic film . . . .").

[6] *Innocence of Muslims* did not involve incitement to imminent unlawful action and neither was it "within that small class of 'fighting words'" that may be prohibited. *See Texas v. Johnson*, 491 U.S. 397, 409–10 (1989); *see also Cohen v. California*, 403 U.S. 15, 20 (1971).

openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508–09 (1969). By censoring *Innocence of Muslims* and limiting the public's access to the film, we allowed fear of those opposed to the film's message to trump our commitment to a robust First Amendment. In that circumstance, it was contrary to the fundamental obligation of our judiciary and a violation of this court's constitutional duty for us to fail to go en banc in response to the emergency call.

It is of no comfort that the panel shortly amended its original gag order to allow Google to show versions of the film with Garcia's five-second appearance deleted. "*Any* system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (emphasis added). A prior restraint is no less offensive to the First Amendment simply because it enjoins only a certain quantity of words or a small portion of a film. To the contrary, "it is wholly inconsistent with the philosophy of the First Amendment" for a court to pick and choose which speech and how much of it may be permitted as opposed to being enjoined. *See Stanley v. Georgia*, 394 U.S. 557, 566 (1969). Indeed, it exacerbates the First Amendment injury for a court to condition the right to speak on a change in the message being expressed. *See also supra* note 2.

Nor does the fact that the suppression of speech ended with the en banc opinion lessen the violence done to the First Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). For over a year we violated the First Amendment by censoring a film that had become part of a global news story of utmost importance. "[E]very restraint issued in this case, whatever its form, has violated the First Amendment—and not less so because that restraint was justified as necessary to afford the courts an opportunity to examine the claim more thoroughly." *New York Times Co.*, 403 U.S. at 727 (Brennan, J., concurring). Restoring First Amendment freedoms after a lengthy period of unconstitutional judicial censorship does not cure the problem. Those freedoms should never have been denied, and the exercise of freedom that was lost pending en banc proceedings cannot be recovered.

In the fifteen months since the court refused to rehear the case on an emergency basis, there have been numerous developments regarding threats by religious extremists who reject pluralist values—the rise of the Islamic State of Iraq and Syria (ISIS), the murderous attack on Charlie Hebdo, the barbarous beheadings of innocent civilians, the kidnappings of young girls and their enslavement because of their religious membership, the bitter warfare between Shiites and Sunnis and among their terrorist allies, the emergence of groups such as Boko Haram, the failures of nascent democracies to take hold in the wake of the Arab Spring, and the spread of increasingly virulent anti-Semitism throughout Europe, if not the world. Setting aside the fact that *Innocence of Muslims* is an offensive film of poor quality, it was part of the ongoing debate pertaining to such events and its voice was silenced while the continuing debate was at a peak. Although the inability to view this particular film may have been no great loss, the suppression of speech was, as a matter of principle, intolerable under the First Amendment: a court ordered a political video removed from the public sphere

because of threats of violence, thereby changing the content and context of ongoing global discourse. The constitutional violation is not cured by restoring access to the video well over a year later, long after the time when it was most relevant to the debate and of greatest interest to the public.

### III.

"The vitality of civil and political institutions in our society depends on free discussion. . . . The right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello*, 337 U.S. at 4. *Innocence of Muslims* may indeed be offensive, but we do not accept political terrorism or even judicial censorship as the answer. By ordering the removal of the filmmaker's version of *Innocence of Muslims* for well over a year, we inappropriately cast aside the very tradition of robust dialogue that separates us from those who would wish harm upon persons whose speech they find offensive. It is no answer to these basic concepts that the gag order was eventually vacated.

For the foregoing reasons, I respectfully dissent from our decision not to immediately rehear this case en banc on an emergency basis.